UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------X
This Document Relates to:                          :
                                                   :
RICHARD A. GEORGE,                                 :
                                                   :
                              Plaintiff,           :
                                                   :
              v.                                   :
                                                   :
A.W. CHESTERTON COMPANY, et al.,                   :
                                                   :
                              Defendants.          :
----------------------------------------------------------X
```

**Civil Action No.: 1:14-cv-04511-VEC**

Index No.: 115544-04
(Supreme Court, New York County)

---

### PLAINTIFF'S MEMORANDUM OF LAW
### IN SUPPORT OF MOTION TO REMAND TO STATE COURT

---

**WEITZ & LUXENBERG, P.C.**
*Attorneys for Plaintiff*
700 Broadway
New York, New York 10003
(212) 558-5500

By: //ss// *Carmen St. George*
Carmen St. George, Esq. (CS-1114)
CSTGeorge@WeitzLux.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

I.      INTRODUCTION ..................................................................1

II.     CRANE'S REMOVAL IS UNTIMELY ...............................................2

III.    CRANE'S GOVERNMENT-CONTRACTOR DEFENSE IS NOT
        COLORABLE ....................................................................3

IV.     CONCLUSION ...................................................................26

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988)............................5, 7, 13, 19, 20, 21

*Colorado v. Symes*, 286 U.S. 510 (1932) ...................................................................................4

*Cuomo v. Air & Liquid Sys. Corp.*,
No. 13 Civ. 273, 2013 WL 5913379 (S.D.N.Y. Nov. 1, 2013)...................................................11

*Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653 (E.D. Tex. 1999)...................19

*GAF Corporation v. United States*,
No. 287-83-C, 19 Cl. Ct. 490 (Cl. Ct. Feb. 12, 1990) ...............................................................18

*Granier v. Northrup Grumman Ship Sys.*,
No. 06-3738, 2008 U.S. Dist. LEXIS 103245 ...........................................................................5

*Gray v. General Dynamics Corp.* No. H-75-327 (D. Conn. May 21, 1979) ..............................8

*Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187 (D. Mass. 2008)..................*passim*

*Hill v. Delta Intern. Machinery Corp.*, 386 F. Supp. 2d 427 (S.D.N.Y. 2005) ..........................4

*Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009)................................9, 20

*In re Asbestos Litig.: Seitz v. Adel Wiggins Group*,
No. 08-351-SLR (D. Del. Sept. 30, 2009).………………………………………………...20

*In re Fifth Judicial District Asbestos Litigation: Pokorney*,
Index No. 2006-3087 (Sup. Ct., Onondaga County, Dec. 4, 2008)....................................10, 20

*In re Joint Eastern & Southern Districts Asbestos Litigation – Grispo et al.*,
897 F.2d 626 (2d Cir. 1990) ....................................................................................................13

*In re Joint Eastern & Southern Districts Asbestos Litigation – Grispo et al.*,
No. CV-88-4577 (S.D.N.Y. June 27, 1989) ............................................................................20

*In re Joint Eastern & Southern Dist. Asbestos Litig.*,
715 F. Supp. 1167 (E.D & S.D.N.Y. 1988)...............................................................................5

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*,
488 F.3d 112 (2d Cir. 2007) ....................................................................................................4

*In re New York City Asbestos Litigation: Dummitt v. A.W. Chesterton*,
Index No. 1090196/2010 (Sup. Ct., N.Y. County, Aug. 21, 2012)............................................25

*In re New York City Asbestos Litig. – Ronsini v. Garlock, Inc.*,
256 A.D.2d 250 (1st Dep't 1998)..................................................................................................5

*Kings Choice Neckwear, Inc. v. DHL Airways, Inc.*,
No. 02 Civ. 9580, 2003 WL 22283814 (S.D.N.Y. Oct. 2, 2003).................................................4

*Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014)....................................................................13

*Lindenmayer v Allied Packing & Supply, Inc.*,
No. C09-05800, 2010 WL 234906 (N.D. Cal. Jan. 14, 2010).......................................................9

*Luce v A.W. Chesterton Co., Inc.*,
No. C-10-2111, 2010 WL 2991671 (N.D. Cal. July 29, 2010)......................................................9

*Mann v. H.K. Porter Co.*, No. 83-477-N (E.D. Va. Nov. 12, 1985) ...........................................23

*Martropico Compania Naviera S. A. v. Pertamina*,
428 F. Supp. 1035 (S.D.N.Y. 1977).............................................................................................3

*Miranda v. Abex Corp.*,
No. 08 Civ 5509, 2008 WL 4778886 (S.D.N.Y. Oct. 31, 2008)........................................ 11, 20

*Prewett v. Goulds Pumps (IPG)*,
No. C09–0838, 2009 WL 2959877 (W.D. Wash. Sept. 9, 2009)..................................................9

*Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012) ................................................................13

*Smith v. Anchor Packing C .*, No. 08 Civ. 7219 (S.D.N.Y. Nov. 12, 2008) ..............................10

*Somlyo v. J. Lu–Rob Enters., Inc.*, 932 F.2d 1043 (2d Cir. 1991) .............................................4

*Stephens v. A.W. Chesterton, Inc.*, No. 09-633-GPM (S.D. Ill. Oct. 22, 2009) ........................20

*Sublett v. Air & Liquid Systems Corp.*,
No. 11-433, 2011 U.S. Dist. LEXIS 70908 (S.D. Ill. June 30, 2011) ........................................25

*Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28 (2002)............................................................3

*Westmiller v. IMO Indus.*,
No. 05-945RSM, 2005 U.S. Dist. LEXIS 29371 (W.D. Wa. Oct. 20, 2005)............................19

**Statutes**

28 U.S.C. § 1446 .................................................................................................1, 2, 3

28 U.S.C. § 1447(c) ...................................................................................................1

## I.    **INTRODUCTION**

Plaintiff submits this memorandum in support of his Motion to Remand this action to the Supreme Court of the State of New York, New York County, pursuant to 28 U.S.C. § 1447(c), based on Defendant Crane Co.'s ("Crane") untimely removal, and for lack of subject matter jurisdiction. This action should be remanded because (1) Crane's removal was untimely under 28 U.S.C. § 1446(b), and (2) this Court does not have subject matter jurisdiction over this action since Crane has failed to proffer a colorable federal defense.

As to timeliness, Crane claims that its motion is timely because it filed the Notice of Removal within 30 days of receiving Plaintiff's discovery responses.[1]  However, Plaintiff filed their initial interrogatory responses in this action on November 3, 2004.[2]  The 2004 interrogatory responses contained information concerning Plaintiff's exposure to asbestos during his service in the Navy.[3] Nevertheless, Crane did not file its Notice of Removal until June 23, 2014.  Needless to say, Crane's notice is grossly untimely, as it was filed far past the 30 day time limitation contained in 28 U.S.C. § 1446(b)(3),[4] and this alone is an adequate basis upon which to grant Plaintiff's Motion to Remand.

Furthermore, Crane's proffered federal defense is insufficient to establish subject matter jurisdiction in this Court.  Crane, in support of its removal, has provided no evidence it ever warned in a non-Navy context during the time period Plaintiff alleges exposure to Crane products.  There is no evidence, and it is simply not the case, that the Navy prohibited Crane, or any of its contractors, from warning about ultrahazardous products.  Rather, all of the relevant specifications establish that contractors retained full discretion to do so. The evidence similarly establishes that Crane could have

---

[1] Crane's Notice of Removal at ¶ 4.
[2] *See generally* Plaintiff's November 3, 2004 Responses to Defendants' Fourth Amended Standard Set of Interrogatories and Request for Production of Documents ("November 2004 responses") (**Exhibit 1**).
[3] *Id.* at 10.
[4] *See* Section II, *infra*.

warned end product users in the Navy about the hazards of the asbestos-containing products, and that the Navy not only permitted but required warnings when needed.  Nor is there an iota of evidence indicating that the Navy would have interfered in the slightest with a contractor's issuance of safety warnings.  Indeed, Crane's chief item of evidence, the affidavit from Admiral David Sargent, contains averments that are utterly and impermissibly speculative, demonstrably false, and contradicted by the documentation and factual background he ignores, including the very military specifications discussed below.  In short, Crane's assertions in support of its removal under the federal officer statute are speculative, unreliable, and wholly insufficient to confer federal subject matter jurisdiction.

## II.    CRANE'S REMOVAL IS UNTIMELY

28 U.S.C. § 1446 governs removal of civil actions. Subsection (b)(1) provide as follows:

> The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

Subsection (b)(3) provides, in pertinent part, as follows:

> If the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.

Crane contends that its Notice of Removal was timely filed on June 23, 2014 because that date was "within 30 days of receiving Plaintiff's Discovery Responses" on May 21, 2014.[5]  Crane is, simply put, wrong.  Crane conveniently ignores the fact that Plaintiff first filed interrogatory responses in this action on or around November 3, 2004—nearly *10 years* prior to Crane's filing of its Notice of Removal.[6]  As Crane is well aware, Plaintiff sought inclusion in the New York City Asbestos

---

[5] Crane's Notice of Removal at ¶¶ 3, 4.
[6] *See* Exhibit 1.

Litigation ("NYCAL") May 2005 *In Extremis* cluster, and thus filed the November 2004 interrogatory responses with the Court and served the same responses on all Defendants, including Crane.[7]

Plaintiff's November 2004 interrogatory responses contain precisely the same information that Crane cites in the May 2014 responses: that "Plaintiff was exposed to a variety of different asbestos-containing products during his service as a machinist's mate in the United States Navy" from 1942 to 1946, i3ncluding while serving aboard the USS Richland and while stationed at the Brooklyn Naval Shipyard.[8]  Crane has thus been aware of Plaintiff's Naval exposure history for nearly 10 years, yet has only now decided to remove this action to federal court.

The November 2004 interrogatory responses constitute the "other paper from which it may first be ascertained that the case is one which is or has become removable" under § 1446(b)(3). Crane's removal thus falls far outside the time limitation prescribed by § 1446(b)(3), as Crane indisputably filed its Notice of Removal far more than 30 days after receiving the 2004 interrogatory responses—indeed, Crane waited approximately *3519 days* from receipt of the responses to file this Notice.  Crane's untimeliness has burdened both this Court and the New York County Court, as Crane participated in this action for almost a decade in state court and now consumes federal court resources with its meritless and shockingly tardy removal.  Crane's failure to seek timely removal alone warrants remand pursuant to § 1446(b)(3).[9]

## III.    CRANE'S GOVERNMENT-CONTRACTOR DEFENSE IS NOT COLORABLE.

This Court should first note that Plaintiff's Complaint explicitly disclaims any design defect claims in relation to government sites; plaintiff's failure to warn claims are the only basis upon which

---

[7] Plaintiff's May 2005 *In Extremis* Application Letter (**Exhibit 2**) at 1, Service Rider at 2. *See also* Exhibit 1, Service Rider at 2.

[8] *Id.* at 3; Exhibit 1 at no. 17A and Chart A; *see also* Crane's Notice of Removal, Exhibit 2 at nos. 25, 27, and Chart A. (containing the same information regarding Navy exposure as the 2004 responses).

[9] *See Syngenta Crop Prot., Inc. v. Henson,* 537 U.S. 28, 32 (2002) ("[S]tatutory procedures for removal are to be strictly construed."); *Martropico Compania Naviera S. A. v. Pertamina,* 428 F. Supp. 1035, 1038 (S.D.N.Y. 1977) (holding that § 1446's the 30-day time limitation must be strictly construed).

Crane's federal officer removal could be premised.[10]  Also, it is critical to note that, in support of its removal, Crane provided no evidence that it ever warned in a non-Navy context during the time period Plaintiff alleges exposure to Crane products.  Crane merely contended that all of the equipment it supplied to the Navy "was built in accordance with the Navy specifications," proffering Sargent's affidavit[11] for the principal conjecture that "the Navy issued Military Specifications (MILSPECs) [which] required the use of asbestos or asbestos components" and unless Crane "products were first determined to be in conformity with all applicable Navy specifications, they could not be installed aboard Navy ships."[12]  Crane contended that "[t]he Navy's specifications governed not only the design and construction of Crane['s] products, but also the form and content of any labeling, product literature, or warnings supplied with the products."[13]  Crane also submitted Samuel Forman's affidavit stating that the Navy's state of the art knowledge about asbestos hazards was equal to or superior to that of Crane.[14]

"In determining whether jurisdiction is proper, [courts] look only to the jurisdictional facts alleged in the Notices of Removal."[15]  The party seeking removal bears the burden of proving removability, and federal courts "must 'resolv[e] any doubts *against* removability.'"[16]  "If the removing party cannot demonstrate federal jurisdiction by 'competent proof,' the removal was in error and the district court must remand the case to the court in which it was filed."[17]  As the precondition to asserting the government-contractor defense to Plaintiff's failure to warn claim, Crane must show

---

[10] Plaintiff's Complaint (Crane's Notice of Removal, Exhibit 2) explicitly incorporates by reference Weitz & Luxenberg P.C.'s Standard Asbestos Complaint for Personal Injury No. 7 ("Standard Complaint") (**Exhibit 3**).
[11] Crane's Notice of Removal, Exhibit 4.
[12] Crane's Notice of Removal at ¶9.
[13] *Id.* at ¶11.
[14] *Id.* at ¶11, and Exhibit 5.
[15] *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) (citation omitted).
[16] *Id.* (quoting *Somlyo v. J. Lu–Rob Enters., Inc.*, 932 F.2d 1043, 1045-46 (2d Cir. 1991)) (emphasis added); *see State of Colorado v. Symes*, 286 U.S. 510, 518-19 (1932).
[17] *Hill v. Delta Intern. Machinery Corp.*, 386 F. Supp. 2d 427, 429 (S.D.N.Y. 2005) (citing *Kings Choice Neckwear, Inc. v. DHL Airways, Inc.*, No. 02 Civ. 9580, 2003 WL 22283814, at *2 (S.D.N.Y. Oct. 2, 2003)).

that the Navy's specifications made it impossible for Crane to comply with those specifications and State law warning requirements.[18]  As the Supreme Court explained in the landmark decision *Boyle v. United Technologies Corp.*, the "displacement of ordinary tort liability" represented by the government-contractor defense "occur[s] only where... a significant conflict exists between an identifiable federal policy or interest and the [operation] of state law . . . ." Under *Boyle*, the defense is only applicable where "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."[19]

Sargent's affidavit does not give rise to a colorable defense regarding Plaintiff's failure to warn claims, and simply hinges on insupportable speculation that should not, absent some real substance lacking therein, sanction the removal of this case from Plaintiff's chosen forum.  His core assertions underlying his report, and hence any government-contractor defense Crane or any other defendant may proffer, are problematic both on their face and factually.  On their face, Sargent's assertions end up saying nothing that is relevant or supportive of a government-contractor defense, for even if it is true that a contractor could have warned end users about the ultrahazardous nature of its

---

[18] *See In re Joint Eastern & Southern Dist. Asbestos Litig.*, 715 F. Supp. 1167, 1169 (E.D & S.D.N.Y. 1988) (In *Boyle*, "compliance with both federal and state mandates at once was impossible because each dictated a contrary helicopter design.  By contrast, in this case, because the federal specifications were silent on the matter of warnings, defendant could have provided adequate warnings to Plaintiff and complied with the federal specifications"); *Hilbert v. McDonnell Douglas Corp., supra*, 529 F. Supp. 2d 187, 199-200, 202 (D. Mass. 2008) (rejecting defendants' "claim that the military specifications, though not explicitly forbidding warnings about asbestos, were so precise that the defendants could not simultaneously warn about asbestos and conform to the specifications," and concluding that "there is simply no basis upon which the Court can conclude that a conflict existed between the federal contracts and the defendants' state-law duty to warn"); *Granier v. Northrup Grumman Ship Sys.*, No. 06-3738, 2008 U.S. Dist. LEXIS 103245, at *9-10 (E.D. La. Dec. 12, 2008) ("[T]he specifications under the contract specified technical parameters, and only had more general references to safety regulations.  The federal government provided no direction on warnings when using asbestos, and further did not prevent Avondale from taking its own safety precautions above the minimum standards incorporated in the federal contracts.  Thus, the Court finds that Avondale has failed to establish a causal connection between the Navy's direction pursuant to the design contracts and plaintiff's failure to warn claims."); *In re New York City Asbestos Litig. – Ronsini v. Garlock, Inc.*, 256 A.D.2d 250, 251 (1st Dep't 1998) ("In the absence of any evidence of a conflict between State warning requirements and any Federal prescription of label information or proscription of a warning, there was no basis for [defendant's] requested government[-]contractor defense charge").

[19] 487 U.S. 500, 507, 512 (1988).

products upon "prior discussion and express approval by the Navy,"[20] then this qualification means nothing other than that the contractor could have warned, and there is not one iota of evidence, nor is it true, that defendants ever attempted to do so.  Any additional, gratuitous statements on the part of Sargent to the effect that *if* a contractor had attempted to warn, the Navy would have prohibited such warning,[21] are pure speculation insufficient to support a government-contractor defense.

Indeed, to proffer this insupportable conjecture, Sargent advances a confusing and misleading argument.  Specifically, after speculating that "the Navy would not have permitted . . . asbestos-related warnings," he states the basis for this conjecture as follows:

> 64.     In this regard, it is useful to consider the Bureau of Ships Technical Manual.  This manual, prepared by the Navy and updated periodically, was intended to provide guidance and information to Navy personnel on various matters . . . .
> 65.     A review of examples of [various chapters] reveals that . . . the Navy nowhere included any cautionary language regarding – or even any mention of – any potential hazards related to asbestos . . . .
> 66.     The absence of asbestos-related cautionary language in the Navy's own manuals for equipment or for asbestos-containing materials is *consistent with* the notion that the Navy did not accept and did not permit, asbestos-related warnings in technical manuals relating to individual pieces of machinery or equipment, and is fully *consistent with* my experience that such warnings were not neither sought [*sic*] nor welcome from manufacturers of such items.[22]

Sargent's speculation about what facts are "consistent with" the Navy's specifications are totally devoid of any probative value with respect to whether the Navy would have permitted warnings.  The lack of any statement whatsoever about warnings in the Bureau of Ships Technical Manual simply does not support the argument that Sargent tries to spin out of that fact – that somehow the Navy would not have permitted such warnings.  At best, the lack of any information regarding the health hazards of asbestos in the Manual is relevant *solely* to the third prong of the *Boyle* test, discussed below, by which defendant must establish, among other things, that the Navy had greater

---

[20] Crane Notice of Removal, Exhibit 4 at ¶ 58
[21] *Id.* at ¶ 63.
[22] *Id.* at ¶¶ 63-66 (emphases added).

knowledge than the contractor about the specific hazards of exposure to asbestos.  The Manual, if relevant at all, evidences the Navy's lack of "greater" or even equivalent knowledge, and thereby cuts strongly against the propriety of any government-contractor defense.

Indeed, Sargent's own affidavit acknowledges that the Navy "often created lengthy memoranda detailing word-by-word line edits to the content of technical manuals submitted for approval, *including the wording of instructional material and warnings.*"[23]  This admission – misleading and confusing in the context of his other claims – is flatly inconsistent with Sargent's position that contractors could not have proffered warnings, and appears to concede that, quite the contrary, contractors did indeed supply product warnings (albeit not when it came to the supplies of asbestos-containing products).

While Sargent further claims that "manufacturers of components were not consulted by the Navy with respect to insulation of their equipment,"[24] which also underlies his entire perspective, the facts refute this misstatement. For example, in 1946 the Navy issued the Naval Machinery manual which deals with valves, packing, insulation and other products and components relevant to these cases.[25]  That manual explicitly states: "While the major work of revision of this text has been accomplished by the officers attached to the Department of Marine Engineering, valuable assistance was rendered by the manufacturers named herewith," which, inter alia, "supplied descriptive matter," "furnished illustrations," and "offered suggestions which made possible the completion of the book."[26]  Those contributing manufacturers, whose input the Navy therefore obviously both "sought" and "welcome[d]," contrary to Sargent's analysis, included Defendant Crane, Foster-Wheeler Corp., Blackmer Co., Babcock & Wilcox Co., Johns-Manville, Worthington Pump & Machinery Corp., and

---

[23] *Id.* at ¶ 60 (emphasis added).
[24] *Id.* at ¶ 44.
[25] **Exhibit 4** at 24.
[26] *Id.* at vi.

numerous others.[27]

The Declaration of Joseph H. Chilcote, with exhibits, is also attached.  Mr. Chilcote was a project engineer with the Department of the Navy, Bureau of Ships, from 1942 through 1964.  He attested that the Navy did not, and could not practicably develop its own specifications for thermal insulation materials.  Rather, the Bureau of Ships "invariably consulted with industry to determine product availability from preexisting commercial sources," and regularly met with industry representatives, from whom the specifications were derived and taken.[28]

Mr. Chilcote attested that in procuring insulation or other asbestos-containing products, the Navy relied wholly upon the manufacturers' "specific and comprehensive knowledge," and adapted its needs and specifications "to products and materials already commercially available," as revealed by the manufacturers.[29]  Accordingly, it was the contractors' discretion, not the Navy's, which predetermined the asbestos content of any such products supplied to the Navy during the relevant time periods.

Also, Henry George Murad, a general engineer in the military, was deposed in *Gray v. General Dynamics Corp.*[30]  Murad served in the U.S. Navy from 1965 to 1979, and beginning in 1969 served in the Naval Ship Engineering Center where he was in charge of specifications and standards for asbestos products.  He attested that a principal method by which the Navy arrived at its specifications was "to get information from industry and work with them to – and with the existing

---

[27] *Id.* at vi.
[28] Joseph H. Chilcote Declaration, July 9, 1981 (**Exhibit 5**) at ¶ 3.  Plaintiff's Motion to Remand touches upon design-related matters for the sole purpose of showing that even when it came to the use of asbestos, the government's decisions derived from industry practices.  As discussed (*supra*, at 3-4), Plaintiff's Complaint disclaims design defect claims in relation to government sites.  But all the more strongly, the Navy did not interfere with, and certainly did not and would not have prevented, any warnings that its industry contractors might have deemed important.
[29] *Id.* at ¶ 3.
[30] No. H-75-327 (D. Conn. May 21, 1979) (Deposition excerpts) (**Exhibit 6**).

engineering and testing organizations – to come up with materials."[31]

Here, Crane fails to make even a prima facie showing that the Navy precluded it from issuing warnings, or that it ever tried to warn, either in a government or commercial setting. Crane's arguments are analogous to those asserted by defendants in *Hilbert v. McDonnell Douglas Corp.*, where defendants contended "that the military, through its contracts, exercised its discretion in such a way as to prevent them from warning [plaintiff] about the dangers of asbestos."[32] Specifically, defendants "claim[ed] that the military specifications, *though not explicitly forbidding warnings about asbestos,* were so precise that the defendants could not simultaneously warn about asbestos and conform to the specifications."[33] In support, defendants submitted an affidavit from a retired Air Force Colonel who stated that the Air Force "would not have approved any warnings" and that if defendants had made any suggestions to that effect, "those suggestions would have been futile."[34] The District Court flatly rejected defendants' argument on the ground that the Colonel's statements "amount to speculation," concluding that, on this claim, "there is simply no basis upon which the Court can conclude that a conflict existed between the federal contracts and the defendants' state-law duty to warn."[35]

A host of Courts have followed suit.[36] For example, in *Holdren v Buffalo Pumps, Inc.*,[37] the

---

[31] *Id.* at 38, 40.
[32] *Hilbert*, 527 F. Supp. 2d at 199.
[33] *Id.* at 199-200.
[34] *Id.* at 200.
[35] *Id.*
[36] In *Lindenmayer v Allied Packing & Supply, Inc.*, No. C09-05800, 2010 WL 234906 (N.D. Cal. Jan. 14, 2010) the Court held that defendant's "evidence fails to raise a colorable defense on the failure-to-warn theory":

> In the absence of any effort to warn about asbestos, [defendant] cannot rely on the hypothetical assertion that such an effort would have been futile. [Defendant] offers no evidence suggesting that its failure to warn should be attributed to the Navy, and identifies no conflicts between its duties under state law and its compliance with Navy specifications. The federal government cannot have exercised its discretion to preclude [defendant] from issuing asbestos warnings if the provision of asbestos warnings was never contemplated or proposed in the first place. [Defendant]'s defense to the failure-to-warn claims is therefore not "colorable" and not, by itself, a sufficient basis for removal.

*See also Luce v A.W. Chesterton Co., Inc.*, No. C-10-2111, 2010 WL 2991671 (N.D. Cal. July 29, 2010); *Prewett v. Goulds*

court similarly held as follows:

> All told, the manufacturers do not claim that the Navy ever offered them any guidance on asbestos warnings, nor that they themselves ever contemplated warning about the dangers of asbestos. Their defense, instead, rests entirely on an untested hypothetical: If they had made such a proposal, the Navy would have refused that recommendation. This account rings of post-hoc justification.

Typically, when defendants assert a right to the government-contractor defense as an excuse for their failure to warn, they omit the pertinent military specifications which actually address the warnings issue.  As the Honorable James W. McCarthy concluded in *In re Fifth Judicial District Asbestos Litigation: Pokorney*, the record "is utterly bereft of any evidence that Foster Wheeler was, by Federal specification, prohibited from placing a warning on its boilers or in the manuals accompanying the product," and thus "there was no basis for Foster-Wheeler's requested government[-]contractor defense charge."[38]

In all events, the full record of specifications has been analyzed by Captain Arnold P. Moore, who has helped design six major classes of naval warships and been instrumental in the modernization of three additional classes.[39]  For example, in *Smith v. Anchor Packing Co.*,[40] plaintiffs' motion to remand was granted because the sworn Declaration from Captain Moore conclusively established that the Navy afforded the contractors the discretion, and indeed encouraged and "required" them, to warn about hazards.[41]

Among other things, Captain Moore explained, as illustrative, the Navy's expectation that its contractors *would* take the initiative to issue adequate warnings – that defendant Foster Wheeler

---

*Pumps (IPG)*, No. C09–0838, 2009 WL 2959877, at *7 (W.D. Wash. Sept. 9, 2009) (remanding where defendant "provided no evidence that it ever attempted to warn, or that the Navy prohibited warnings," and relied solely on "hypothetical" theory that Navy "would have not allowed" defendant to place a warning on product if defendant had proposed a warning, defendant's "government contractor defense [was] not 'colorable'").

[37] 614 F. Supp. 2d 129, 137 (D. Mass. 2009).

[38] Index No. 2006-3087 (Sup. Ct., Onondaga County, Dec. 4, 2008) (**Exhibit 7**) at 8-11.

[39] Captain Arnold P. Moore, Curriculum Vitae (**Exhibit 8**).

[40] No. 08 Civ. 7219 (S.D.N.Y. Nov. 12, 2008).

[41] **Exhibit 9 at ¶ 11.**

submitted drawings subsequently approved ("rubber stamped") by the Navy, which drawings "specifically require[] a boiler component to be equipped with a warning plate. Clearly this drawing illustrates that the U.S. Navy did not prohibit manufacturers from providing warning plates when manufacturers deemed them necessary."[42]

To the same effect is the language and schematics in the Instruction Book supplied by the De Laval Steam Turbine Company in relation to its supply to the Navy of equipment for DD445 Class United States Destroyers.[43]   The schematic includes, as Item m 58, space on a gear and turbine assembly for an "Instruction Plate," and the "Operation and Care" section of the booklet advises readers to "[r]ead the entire instruction manual carefully."[44]   In granting plaintiffs' motion to remand for lack of federal jurisdiction, Judge Gerard E. Lynch noted that "[t]he federal defense asserted [on the basis of allegations precisely like those of Crane's expert Forman] was in any event, for the reasons advanced by plaintiffs, somewhat dubious."[45]

Judge Shira Scheindlin first issued a directly relevant ruling in *Miranda v. Abex Corp.*, holding that "[a] review of the evidence submitted by GE shows that it has failed to assert a colorable federal defense [because] GE can assert a federal defense only if the Air Force 'dictated' the content of warnings to it."[46]   As in the present case, defendant's assertions "suggest[ed] that the government was silent as to whether or not [defendant was] permitted to warn."[47]

Judge Scheindlin recently reiterated this holding in *Cuomo v. Air & Liquid Sys. Corp.*, where Crane also removed a state court action based upon the government-contractor defense.  Plaintiffs

---

[42] *Id.* at ¶ 22.  The warning requirement written by Foster Wheeler, and submitted to the Navy, appears on the second page of the drawing Captain Moore references (**Exhibit 10**), in the center of the drawing, as follows: "Note: 1 drawn valve . . . To be equipped with a warning plate inscribed thus: 'use only when all oil burners are secured.'
[43] **Exhibit 11**.
[44] *Id.*
[45] **Exhibit 12**.
[46] No. 08 Civ. 5509, 2008 WL 4778886, *3 (S.D.N.Y. Oct. 31, 2008) (**Exhibit 13**).
[47] *Id.*

moved to remand and Crane opposed, submitting, as it does here, an affidavit from Sargent.  Judge Scheindlin granted Plaintiffs' motion and concluded that "Crane has not presented a colorable federal contractor defense for the purpose of federal officer removal."[48]

Importantly, Plaintiff submits relevant portions of the very military specifications which pertain to the preparation and contents of instructions intended to accompany equipment supplied to the Navy.  These flatly belie any claims Crane could make that there was any significant conflict in the state-versus-federal duties of a defendant equipment manufacturer.

The Navy's "Interim Military Specification: Book, Instruction, Preparation, Contents and Approval"–MIL-B-15071A(Ships), effective October 20, 1952, is precisely the specification – alluded to, but never proffered, by Defendant – regarding written material to be delivered with equipment supplied to the Navy.[49]  The section addressing "General Data" which equipment suppliers should include within the instruction book or manual they supply with their equipment prescribes that this portion of the contractor's manual "shall contain data such as the following:  a "[s]afety notice (where high voltages or special hazards are involved)."[50]

Further, subsections within this 1952 specification advise that equipment manuals "shall contain methods of installation, alignment, precautions, mounting instructions, recommendations regarding shielding, grounding or bonding."[51]  Clearly, this provision concerning information to be provided with respect to installation of the equipment leaves it to the contractor to provide complete and correct "precautions" and safety guidance.

The specification similarly requires "simple, brief and effective instructions, including normal

---

[48] No. 13 Civ. 273, 2013 WL 5913379 (S.D.N.Y. Nov. 1, 2013).
[49] **Exhibit 14.**
[50] *Id.* at § 3.5.1.1(a).  The specification annexes a sample "warning" which concerns "voltages over 300 volts," but the specification's prescription, once again, is that data "such as" any such warning shall be included, and no example is provided with regard to "special hazards" other than high voltages, leaving this to the contractor's discretion.
[51] *Id.* at § 3.5.1.3.

routines and precautions to be observed in starting, operating, and shutting-down the equipment" and "instructions for disassembly and replacement of worn or damaged parts."[52]   Another provision prescribes that "[i]nstructions shall be included stressing the importance of properly maintaining any safety devices, interlocks, provided to prevent damage to equipment or injury to personnel."[53]   This provision of the actual specification addressing "safety devices" is utterly inconsistent with any claim that the Navy would have prohibited asbestos-related safety warnings.   For by this provision of the very sort of specification alluded to, but tellingly omitted from, Defendant Crane proffers, the Navy *invited and required* that contractors inform equipment users of the need to maintain safety measures that could prevent injury to personnel.

Because the specification was largely otherwise silent, the contractor retained discretion to provide the content of any such safety notice, precautions, and instructions, depending upon the nature of, or special hazards associated with, the particular product being supplied.   In all events, the specification evinced a concern that the contractor adequately provide instructions and precautions with regard both to equipment maintenance and personal safety.   More to the point, there is absolutely nothing whatsoever about this document which supports the view that any defendant was prevented or in any way impaired by Navy regulations from issuing warnings regarding the hazards of asbestos, as defendant would have this Court conclude.[54]

To state a tautology, the contractor whose manual or instruction book accompanying its

---

[52] *Id.* at §§ 3.5.1.5 and 3.5.1.6.

[53] *Id.* at § 3.4.1.8.1(f).

[54] Crane misleadingly relies on *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014). Crane's Notice of Removal at ¶6. However, the 9th Circuit's interpretation of *Boyle* is necessarily at odds with the 2nd Circuit's, and thus.   The 2d Circuit has held that, under *Boyle*'s significant conflict standard, "[t]he contractor must show that whatever warnings accompanied a product resulted from a determination of a government official . . . and thus that the Government itself 'dictated' the content of the warnings meant to accompany the product." *In re Joint E. & S. Dist. New York Asbestos Litig. – Grispo et al.*, 897 F.2d 626, 630 (2d Cir. 1990). By contrast, the 7th Circuit in *Ruppel* "expressly rejected this [the 2d Circuit] standard," 701 F.3d 1176, 1185 n2 (7th Cir. 2012), and *Leite* explicitly agrees with *Ruppel*, *see* 749 F.3d at 1124. Crane's reliance on *Leite* is thus meritless, as *Leite* is inapplicable here.

product complied with the above-referenced specification would necessarily have been deemed to have been in substantial compliance with the specification; and the specification would allow for a finding of substantial compliance in the event the contractor chose to comply with state law by warning about the hazards of its product's asbestos-containing components. Absent evidence – and not merely insupportable speculation – establishing that the Navy would have precluded defendant contractors from warning, or at the least engaged in a "continuous back and forth" the outcome of which was the Navy-endorsed failure to warn, there is no genuine, colorable issue concerning the government contractor defense. Further, the "Military Specification: Technical Manuals for Mechanical and Electrical Equipment"–MIL-T-15071B(Ships), effective August 16, 1954, patterns the 1952 specification; the two appear to be equivalent in all relevant respects.[55]

Plaintiff also proffers relevant portions of the "Military Specification: Manual, Technical, For Mechanical and Electrical Equipment (Less Electronics)"–MIL-M-15071C(Ships), effective September 10, 1957.[56] By this time, the specification governing written materials to be disseminated with products evinced even more concern that equipment suppliers provide safety instructions and precautions where, and to the extent, necessary.

For instance, the 1957 section on "operating instructions" prescribed, in part, that "[i]nformation shall include routine and emergency procedures, and safety precautions."[57] The section on "installation," expanding on earlier versions of the specification noted above, requires that the contractor provide information concerning "methods of installation, including packing or unpacking, handling, preparation of foundation, alignment, precautions, mounting instructions, bolting

---

[55] **Exhibit 15.**
[56] **Exhibit 16.**
[57] Exhibit 13 at § 3.3.1.2.5.

diagrams, recommendations regarding shielding, safety guards, grounding or bonding."[58]

Contrary to the impression Crane seeks to convey, no limitation or restriction is placed on the sort of precautions that should accompany the product pertaining to any hazard that might arise during the installation process.  As prescribed in previous versions, the 1957 specification required that there be "[i]nstructions stressing the importance of properly maintaining any safety devices or interlocks provided to prevent damage to equipment or injury to personnel."[59]

All of that being said, the 1957 specification went significantly beyond its predecessors in certain critically relevant respects. The paragraph governing the "Scope" of the specification states as follows: "This specification covers *the minimum requirements* for preparing and revising technical manuals for electrical and mechanical equipment(s)."[60] By this language, the 1957 specification *clearly* affords the contractor leeway and discretion to provide greater protection and more detailed health and safety precautions to equipment users than might otherwise be suggested in the specification. Toward this end, Section 3.3.3.2, labeled "Emphasis," prescribes in general terms that:

> When necessary, emphatics such as "NOTE", "CAUTION", and
> "WARNING" shall be used as adjuncts to the text.  These, however, shall be used as
> sparingly as is consistent with the real need.  The appropriate adjunct to the text shall
> be selected in accordance with the following definition:
> (a) "NOTE" – An operating procedure, condition, etc., which it is essential to
> highlight.
> (b) "CAUTION" – Operating procedures, practices, etc., when if not strictly observed,
> will result in damage or destruction of equipment.
> (c) *"WARNING" – Operating procedures, practices, etc., which will result in*
> *personal injury or loss of life if not correctly followed.*[61]

Clearly, by virtue of Section 3.3.3.2, the specification left it up to the contractor to rely upon its expertise and knowledge of the hazards of its products, to determine what the "real need" was with

---

[58] *Id.* at § 3.3.1.2.6.
[59] *Id.* at § 3.3.1.2.7.1(e).
[60] *Id.* at § 1.1 (emphasis added).
[61] *Id.* at § 3.3.3.2 (emphasis added).

regard to any particular equipment, and, whenever appropriate and necessary, to direct a "WARNING" to product users, advising them to employ safe operating procedures and practices to be set forth by the contractor to prevent personal injury or loss of life.

The "Military Specification: Manuals, Equipment and Systems"–MIL-M-15071E(Ships), effective April 15, 1962, contains a section addressing written information the contractor should provide dealing with installation specified that "precautions" related to "unpacking and handling" should be provided as necessary, and provides that instructions should be given dealing with any further "safety precautions" and "ventilation" needs associated with the equipment.[62]

Section 3.3.4 of this specification similarly prescribes that "[o]perating instructions shall include . . . safety precautions."[63]  Significantly, within the section of the specification governing overall equipment maintenance issues, the Repair subsection requires that "[i]nformation on the use of special tools and test equipment supplied with the equipment, *as well as any cautions or warnings which must be observed to protect personnel* and equipment, shall also be covered."[64]

Under such circumstances, and the instant record, Crane's claim that specifications would have conflicted with state law warnings requirements is speculative and, indeed, false, and cannot support the government-contractor defense.  For, as shown, the military specifications governing the manuals and instructions to accompany equipment supplied to the Navy establish exactly the opposite proposition from that advanced by defendant – namely, that the Navy "imposed" on its contractors a requirement precluding them from providing safety warnings in compliance with New York state law during Plaintiff's Navy exposure period in the 1942-46 timeframe.

---

[62] **Exhibit 17** at § 3.3.3.
[63] *Id.* at § 3.3.4.
[64] *Id.* at § 3.5.3.2 (emphasis added).

The Navy's September 24, 1956 Uniform Labeling Program directive is also annexed.[65] Sargent's Report ignored this core document. Other individuals, playing a similar role on behalf of Crane in other cases (*i.e.*, Dr. Forman), have selectively read it in a skewed manner to draw the purported conclusions that the Navy maintained autonomy over hazard recognition, and, as Sargent suggests, rejected participation from manufacturers with respect to alerting employees to potential asbestos hazards. First, the issue is not whether the Navy "required" the manufacturer to undertake any labeling for purposes of warning product users. Rather, the issue is whether Crane has or can establish that the Navy would have prohibited any such warnings, requiring product suppliers to violate duties to warn under state law. Sargent may omit mention of the Uniform Labeling Program because it includes the following relevant language:

> This Instruction is *not* intended to govern:
>
> a. The type of labels to be affixed by the manufacturer. (These are governed by State and Federal Laws and regulations depending on the nature of the material and whether the shipment is interstate or intrastate. In addition, most manufacturers of chemicals abide by the "Warning Labels Guide" published by the Manufacturing Chemists' Association.)[66]

This document directly contradicts Sargent's attempted interpretation throughout his Report of Navy policies, and his underlying speculation that the Navy "would not have permitted" warnings and effectuated some sort of blockade against industry involvement in health and safety precautions.[67] And the document directly establishes that the manufacturer was at all times free to, and required to, comply with state warnings obligations.

Also fatal to Crane's position is the Navy's October 1969 Consolidated Hazardous Item List ("CHIL") publication, where the Navy states that Navy-specified labels "supplement labels/markings .

---

[65] **Exhibit 18.**
[66] *Id.* at "page 3 of 46" (emphasis in original).
[67] Crane's Notice of Removal, Exhibit 4 at ¶¶ 63, 67.

. . applied by the MCA (Manufacturers Chemist Association), NFPA (National Fire Protective Association), and/or manufacturer.[68] These supplemental labels <u>shall not</u> cover, or cause to deface or remove any other hazardous labels/markings affixed to the containers in accordance with the preceding regulations."[69] This document shows that the Navy invited and expected the product seller's participation in supplying warnings pursuant to state law, in direct contradiction to Sargent's assertions. Critically, the CHIL lists asbestos as a hazardous item.[70]

Significantly, in *GAF Corporation v. United States*, the asbestos-related contribution action brought by asbestos defendant GAF Corporation against the United States under the Federal Tort Claims Act, GAF repeatedly asked the United States to admit that government specifications "[a]t no time prior to 1964 . . . permit[ted] the placement by [GAF] of a label or marking concerning the hazards known to [the United States] regarding exposure to asbestos dust;" the United States denied that its specifications dealing with labeling "prescribed the exclusive manner of marking containers."[71]

In his own very recent deposition testimony, Dr. Forman, whose Report and Declaration Crane submitted in support of its Notice of Removal, flatly admitted "that if a warning on an asbestos product or on a container, any sort of warning about the hazards of asbestos was consistent with the Navy's understanding of the hazard and how it wished to control the hazard, then it would allow the warning."[72] Yet, Dr. Forman admitted that he could not cite to a single example "where, in fact, a company proposed a warning for asbestos that [he] believed was inconsistent with the Navy's

---

[68] **Exhibit 19.**
[69] *Id.* at viii.
[70] *Id.* at B–3. By its December, 1977 version, the CHIL provided that "[w]hen material is received from contractors with labels or symbols already applied, the information on the container takes precedence over the information in the CHIL." **Exhibit 20** at 6.
[71] *GAF Corporation v United States*, No. 287-83-C, 19 Cl. Ct. 490 (Cl. Ct. Feb. 12, 1990) (United States' Responses (**Exhibit 21**) at 123-24, 126-39).
[72] Samuel Forman Deposition, Sep. 17, 2012 (**Exhibit 22**) at 57-58.

understanding of the hazard or how to control it, and the Navy's actions precluded" the warning, and explained that any opinion that the Navy would do so is merely "hypothetical" and speculative.[73]

Numerous decisions assessing the existence of federal jurisdiction in the removal context have determined that affidavits, like that of Sargent, do not suffice to demonstrate even a "colorable" claim that the Navy would have interfered with the contractors' duty to issue asbestos-related warnings with their products.[74]  In contrast, Captain Moore attests that the Navy did not dictate warnings and safety requirements, did not prevent manufacturers from warning, but rather "relied heavily upon its manufacturers and vendors to identify hazards associated with their products," and "to provide warnings" about those hazards.[75]  Clearly, Crane, and for that matter every defendant in this case, certainly could have complied both with its contractual requirements and with state law warnings requirements.  As stated in *Faulk v. Owens-Corning Fiberglass Corp.*,[76] involving defendant GE and others, "the federal government provided no direction or control on warnings when using asbestos; moreover, the federal government did not prevent Defendants from taking their own safety precautions heeding state-law standards . . . ."

> At a minimum, courts have restricted the applicability of the government contractor defense in failure to warn cases to situations in which the government's approval or prohibition of certain warnings has precluded a contractor from complying with state-law duties to warn . . . .  In the specific context of asbestos cases, the *Boyle* standard means that, even if a federal contract mandates the use of asbestos in a certain product, yet provides no requirements as to the warnings to be furnished regarding exposure to asbestos, a contractor could comply with everything "promised the Government" while at the same time following the "state-prescribed duty of care" both to warn regarding asbestos exposure and to create procedures to avoid potentially

---

[73] *Id.* at 59-60,

[74] *See Hilbert, supra*; *Westmiller v. IMO Indus.*, No. 05-945RSM, 2005 U.S. Dist. LEXIS 29371, *8 (W.D. Wa. Oct. 20, 2005) (**Exhibit 23**) (Admiral Ben J. Lehman's affidavit statements, similar to those of Sargent, lacked "sufficient specificity to establish a colorable [federal government contractor] defense," and his statements "too vague to constitute a showing of 'reasonably precise specifications' that were imposed during the relevant time period").

[75] Exhibit 8 at ¶¶ 11-12.

[76] 48 F. Supp. 2d 653, 663 (E.D. Tex. 1999)

fatal exposure to asbestos dust.[77]

As noted in *Pokorney*, Justice McCarthy concluded that "there was no basis" for the government contractor defense" because the record "is utterly bereft of any evidence" that federal specifications prohibited the contractor from placing warnings on asbestos-containing products or in manuals accompanying the products.[78]

In *Holdren v. Buffalo Pumps, Inc.*,[79] defendants proffered affidavits from Sargent, among others, and the court explained as follows:

> [Defendants] together submitted volumes of evidence seeking to show that the Navy would not have permitted them to warn about the dangers of asbestos, if they had tried. But the Court's decision rests ultimately on what is missing from the record. The defendants have submitted no evidence that the Navy expressly prohibited asbestos warnings by manufacturers; no evidence that they ever attempted to warn about asbestos destined for the Navy; no evidence that the Navy ever rejected any other manufacturer's proposed asbestos warning; and no evidence that defendants warned of asbestos on other, non-military equipment they produced during the same period, by contrast to the equipment they supplied to the Navy. Finally, they offer no persuasive evidence of an overall Navy-wide policy that would have conflicted with manufacturer asbestos warnings.[80]

Crane's grounds for removal must also certainly fail with respect to the third prong of the *Boyle* test, which requires defendant to show that the Navy had greater knowledge than the contractor about the specific hazards of asbestos exposure. Defendants' expert in various cases, Lawrence Stilwell Betts, a retired United States Navy Captain, has admitted that, during the time periods when

---

[77] *Weese v. Union Carbide Corp.*, No. 07-581-GPM, 2007 U.S. Dist. LEXIS 73970, *27-29 (S.D. Ill. Oct. 3, 2007) (**Exhibit 24**).

[78] Exhibit 5; *see also In re Asbestos Litig.: Seitz v. Adel Wiggins Group*, No. 08-351-SLR (D. Del. Sept. 30, 2009) (**Exhibit 25**) at 6 ("The court finds there is no evidence of record that the U.S. Navy prohibited [manufacturers] from, or otherwise directed defendants related to, issuing warnings"); *Stephens v. A.W. Chesterton, Inc.*, No. 09-633-GPM (S.D. Ill. Oct. 22, 2009) (**Exhibit 26**) at 7 (ruling that, despite submission of affidavits by Lehman and others, defendant "has not put forward sufficient evidence even to raise an inference of a colorable federal defense").

[79] 614 F. Supp. 2d 129 (D. Mass. 2009) (**Exhibit 27**).

[80] *Holdren*, 614 F. Supp. 2d at 137. In *Miranda*, Judge Scheindlin approvingly cites *Hilbert*, in ruling that "GE's asserted federal defense fails," similarly observing that "GE fails to 'rebut the obvious inference: that [it] never tried to warn about asbestos at all.'" *See also In re Joint Eastern and Southern Districts Asbestos Litigation – Grispo et al.*, No. CV-88-4577 (S.D.N.Y. June 27, 1989) (Hon. Charles P. Sifton) (**Exhibit 28**) (the history of government specifications do not provide "a sufficient basis for a rational inference that the government affirmatively prohibited warnings from being given")

the most significant asbestos exposures occurred, the Navy was unaware of the special hazard posed by asbestos.[81]    Sargent has testified that he personally was unaware of the dangers of asbestos exposure until the mid- to late 1970s.[82]    Dr. Forman testified the Navy relied on the erroneous Fleischer-Drinker Report, issued in 1946, which indicated that asbestos thermal insulation posed no threat to shipyard workers.[83]    Furthermore, in the very affidavit Crane submitted with its removal, Dr. Forman admits and even emphasizes that the Navy did not consider Crane's products to pose any health hazard.[84]    Forman thus inadvertently shows that Crane's removal fails to satisfy the third *Boyle* prong, as the Navy could not possibly have had knowledge equivalent or greater to Crane's regarding the hazards of its products.

Additionally, Admiral Roger B. Horne testified that, prior to 1968, the Navy did not recognize the significance of the problem posed by asbestos exposure or that it could lead to the development of cancer.[85]    Admiral Lehman, also by defendants' own representations standing for the cutting edge of Navy knowledge and awareness, testified that he did not personally become aware of the hazards of asbestos until the late 1970s.[86]

James Delaney, a retired Navy Commander and machinist, testified that the Navy never provided training regarding asbestos, but did provide training about other workplace health hazards, which suggests that (1) if the Navy knew about asbestos-related health hazards, it was not responsible for warning about them and left this task to the contractors/manufacturers, and/or (2) the Navy did not know about asbestos-related health hazards.[87]

Alvin Vincent Anceravage was formerly served as the Head of the Packaging and Container

---

[81] Betts Affidavit, Dec. 18, 2009 (**Exhibit 29**) ¶ 7.
[82] David Sargent Deposition, May 25, 2004 (**Exhibit 30**) at 96-97.
[83] Samuel Forman Deposition, Jan. 7, 2008 (**Exhibit 31**) at 42; Fleischer-Drinker Report (**Exhibit 32**).
[84] Crane's Notice of Removal, Exhibit 5 at ¶¶77-79.
[85] Roger B. Horne Deposition, Jan. 9, 2004 at 40-41 (**Exhibit 32**).
[86] Ben Lehman Deposition, Oct. 26, 1999 (**Exhibit 34**) at 66.
[87] James Delaney Deposition, Feb. 22, 2011 (**Exhibit 35**) at 75-78.

Section of the Naval Sea Systems Command Materials and Engineering Division, and as such, was directly involved in the "packaging and labeling" of products supplied by government contractors.[88] Anceravage has testified as follows:

> When we get a request requesting packaging requirements we find out who are the possible suppliers. We call the suppliers up and we ask them, first, what is their normal retail, commercial, or wholesale procedures on packaging of this item . . . and then we develop those requirements based on what industry normally uses to furnish the general public.[89]

Again, Anceravage's testimony refutes the claim that the Navy did not invite, welcome, or permit contractor involvement, input and decision-making with respect to the warnings issue. Even more to the point, Anceravage's deposition included the following colloquy:

> Q. Are there any packaging requirements that state what can or cannot be on the package?
> A. Would you clarify that question?
> Q. Are there any regulations that state what can be on a package that is sent to the government?
> A. As to marking and labeling?
> Q. Right.
> A. The minimum requirements are established by MIL Standards 129.
> Q. Okay, do these standards indicate the only things that can be on a package?
> A. No. . . . The contractor can put anything on a package.
> Q. Oh, he can?
> A. Definitely; they are minimum. . . . I have never seen any objection to a manufacturer using his commercial package so long as his commercial package met the requirement of the packaging requirements of that commodity . . . .
> Q. Do these requirements ever prohibit anything from being on a package?
> A. Not that I know of.[90]

Further, Adam Martin, a military packaging specialist and Action Officer for Military Standard 129, has testified that nothing in Military Standard 129 would have prohibited manufacturers from placing warnings on their products.[91]

---

[88] Alvin Vincent Anceravage Deposition, Aug., 15, 1979 (**Exhibit 36**) at 7, 50.
[89] *Id.* at 50.
[90] *Id.* at 118-119.
[91] Adam Martin Deposition, Jan. 28, 1983 (**Exhibit 37**).

Similarly, in *Mann v. H.K. Porter Co.*,[92] Lieutenant Kenneth Nelson testified regarding his work on behalf of the Maritime Commission and the United States Navy. Lieutenant Nelson affirmed that it was his belief that it was "feasible to put a warning label on the boxes" of "the asbestos products that the asbestos insulators were using."[93] Critically, he further testified that, regarding asbestos-containing products supplied to the Navy by government contractors, "asbestos manufacturers . . . could have . . . put a warning on the cartons of their asbestos products that the product could possibly be dangerous."[94]

Also, the exemplary Bureau of Ships, Navy Department's March 1, 1941 "General Specifications for Machinery," specifies that "[i]nstruction books will be furnished by contractors and sub-contractors for main propelling machinery, boilers, air compressors," pumps and so forth, and that "[t]hese instruction books will contain all necessary pertinent information to insure efficient and economical use of the equipment," including "[s]afety precautions."[95]

Similarly, on or about September 24, 1956, the Secretary of the Navy issued an exemplary iteration of the Navy's instructions regarding the labeling of "hazardous industrial chemicals and materials", prescribing that it was the manufacturer who affixed "[t]he type of labels . . . governed by State and Federal laws and regulations depending on the nature of the material," and noting that "most major manufacturers of chemicals abide by the "Warning Labels Guide" published by the Manufacturing Chemists' Association."[96]

Plaintiff urges this Court to consider Sargent's recent deposition testimony given in connection with *In re New York City Asbestos Litigation*.[97] Sargent admitted that he was "unaware of

---

[92] No. 83-477-N (E.D. Va. Nov. 12, 1985); Kenneth Nelson Deposition, Nov. 12, 1985 (**Exhibit 38**) at 253.
[93] *Id.* at 269.
[94] *Id.*
[95] **Exhibit 39** at 14-15.
[96] **Exhibit 40**.
[97] Sup. Ct., NY County, Sept. 18, 2012 (**Exhibit 41**).

any Navy specification, from the 1920s through the early- to mid-1970s, that required a specific

warning regarding asbestos."[98]   Nor was he aware of any "Navy order or direction or memo or

suggestion" during that period that required any sort of specific asbestos-related warning. Sargent was

also not aware, "from the 1920s to the early- to mid-1970s . . . of any Navy specifications, orders,

directions or new document that specifically prohibited a warning regarding asbestos."[99]

> Q:  You are unaware of any Navy specification, from the 1920s through the early to
> mid 1970s, that required a specific warning regarding asbestos?
> A:  Now, when you say specification, are we speaking of a Navy spec, a military spec,
> technical specification as used in a procurement contract?
> Q:  Yes, sir.
> A:  I am not aware of any such specification in that time period.
> Q:  Are you aware of any Navy order or direction or memo or suggestion, from the
> 1920s through the   early 19 -- strike that -- through the early to mid 1970s, that
> required a specific warning regarding asbestos?
> MR. INSCO: Objection to form, overbroad.
> A:  Isn't that the same question?
> Q:  Well, the first one was focused more on specifications, specifically.
> A:  I see.
> Q:  Now I'm broadening it to any order memo direction anything that may be –
> A:  No, sir, I'm not aware of any document, be it technical spec or policy memo or
> anything else, that required a specific asbestos warning or spiel in that timeframe.[100]

Conversely, Sargent is not aware of any Navy specifications, orders, direction or documents

that either prohibited a warning regarding asbestos or that even addressed the issue:

> Q:  Okay. During the same timeframe, from the 1920s to the early to mid 1970s, are
> you aware of any Navy specifications, orders, directions or new document that
> specifically prohibited a warning regarding asbestos?
> A:  As you worded the question, specifically prohibited, no, sir, I'm not aware of a
> document that had prohibited -- prohibitive language in it.
> ***
> Q:  Whether you are --are you aware, from the timeframe 1920 to the early to mid
> 1970s, whether you're aware of any US Navy specs, orders, directions, documents that
> spoke to the issue of the content of any asbestos warnings?
> MR. INSCO: Objection, form, overbroad.
> A:  Certainly none that I can think of, I don't believe that I've seen anything like that,

---

[98] *Id.* at 39.
[99] *Id.* at 39-41.
[100] *Id.* at 39-41.

24

and certainly not anything that had to do with shipboard environment.[101]

Finally, this Court should note that New York State Supreme Court Justice Joan A. Madden recently explained that under New York law:

> Crane has not established it [is] entitled to this defense as it fail[s] to establish that the Navy prescribed or proscribed any specific warnings with respect to valves . . . . This conclusion is supported by the evidence that under certain circumstances the Navy not only permitted, but required, cautions and warnings as to other types of equipment. Thus, Crane has failed to establish that the Navy exercised its discretion as to warnings or that there was a conflict with state warning requirements.[102]

## IV.   CONCLUSION

Accordingly, for the reasons discussed *supra*, and in light of Defendant Crane's untimely removal and failure to demonstrate any colorable basis for federal subject matter jurisdiction, Plaintiff respectfully requests that his Motion to Remand this action to the Supreme Court of New York, New York County, where it originated, be granted in its entirety.  Plaintiff also seeks such further and other relief as this Court may deem just and proper.

Dated:  July 9, 2014

Respectfully submitted,
**WEITZ & LUXENBERG, P.C.**
*Attorneys for Plaintiff*
700 Broadway
New York, New York 10003
Tel: (212) 558-5500

By: //ss// *Carmen St. George*
Carmen St. Georg, Esq. (CS-1114)
CSTGeorge@WeitzLux.com

CC: All Counsel via ECF.

---

[101] *Id.* at 40-41.

[102] *In re New York City Asbestos Litigation: Dummitt v. A.W. Chesterton*, Index No. 1090196/2010 (Sup. Ct., N.Y. County, Aug. 21, 2012) (**Exhibit 42**).  Likewise, in *Sublett v. Air & Liquid Systems Corp.*, No. 11-433, 2011 U.S. Dist. LEXIS 70908, at *6-7 (S.D. Ill. June 30, 2011) (**Exhibit 43**), the court held as follows:

> In support of its claim of federal officer jurisdiction GE has submitted to the Court an affidavit given by Ben J. Lehman, a retired USN rear admiral . . . claims in that capacity to have had personal involvement with the supervision and oversight of ship construction as well as ship alterations and equipment overhauls. . . .  In the past the Court has attached little significance to such evidentiary material, unaccompanied as it is by exemplar contracts between the USN and its contractors or pertinent regulations promulgated by the USN or another responsible agency.

25