**FILE COPY**

VOLUME I
(May 21, 1979)

NGM 2901

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

------------------------------------------x

IN RE: GENERAL DYNAMICS ASBESTOS CASES :    CML No. 1

------------------------------------------x

SAMMIE L. GRAY, et al.,                          :

              Plaintiffs,      :

            -versus-                   :      Civil Action

GENERAL DYNAMICS CORPORATION, et al.,  :      No. H-75-327

            Defendants.     :

------------------------------------------x

HENRIETTA C. BROWN, et al.,                 :

              Plaintiffs,      :

            -versus-                   :      Civil Action

UNITED STATES OF AMERICA, et al.,         :      No. H-76-434

            Defendants.     :

------------------------------------------x

        Deposition of HE▬▬▬▬▬▬▬, taken

pursuant to the Federal Rules of Civil Proce-

dure, at the offices of the United States

Department of Justice, Todd Building, 550 11th

SANDERS, GALE & RUSSELL
Certified Shorthand Reporters

PRODUCED
JM - 83

MT-PWHD-015902

2

Street, Washington, D. C., before Roy F. Brown,

a Registered Professional Reporter and Notary

Public within and for the State of Connecticut,

on Monday, May 21, 1979, commencing at 10:03

o'clock in the forenoon.

oOo

A p p e a r a n c e s :

    KREINDLER & KREINDLER, ESQS.
        Attorneys for the Plaintiffs
        99 Park Avenue
        New York, New York 10016

    BY:   STANLEY J. LEVY, ESQ.,
                       of Counsel


    McNAMARA & HOWD, ESQS.
        Attorneys for the Defendant General Dynamics
          Corporation
        102 Oak Street
        Hartford, Connecticut 06106

    BY:   HADLEIGH H. HOWD, ESQ.,
                       of Counsel

               -and-

    FOLEY, HOAG & ELIOT, ESQS.
        10 Post Office Square
        Boston, Massachusetts 02109

    BY:   PETER B. ELLIS, ESQ.,
                   of Counsel

PRODUCED
JM - 83

MT-PWHD-015903

H E N R Y   G E O R G E   M U R A D ,   called as a
witness, having been first duly sworn by the Notary
Public (Roy F. Brown), was examined and testified as
follows:

MR. SCHWARTZ:   The usual stipulations,
just so there is no misunderstanding, unless
someone objects:  Roy is competent to swear in
the witness and to take the testimony, and that
all objections as to the notice are waived and
all objections except as to form are reserved
until time of trial.

Off the record.

(Discussion off the record)

DIRECT EXAMINATION

BY MR. JELLEY:

Q     Why don't you give us your full name and address,
Mr. Murad.

A     Henry George Murad, 9822 Bridle Ridge Court,
Vienna, Virginia.

Q     By whom are you employed, Mr. Murad?

A     By the United States Air Force.

Q     What position do you hold with the United States

PRODUCED
JM - 83

MT-PWHD-015908

8

Air Force?

A    I'm a general engineer.

Q    How long have you been employed by the Air Force?

A    About three months.

Q    By whom were you employed prior to your employment by the Air Force?

A    By the Navy.

Q    How long were you employed by the Navy?

A    Almost fourteen years.

Q    Does that mean that you began in about 1965 with the Navy?

A.   That's right, May of '65.

Q    What is your educational background, Mr. Murad?

A    Well, I have a Master's Degree in Inorganic Chemistry.

Q    From?

A    The University of Maryland, in 1957.

Q    And your Bachelor's Degree?

A    That was in chemistry, from Utica College of Syracuse University.

Q    Were you in the service at all?

A    Six months, yes, in the Army.

So that during this period from November '66 to September '69, did you have anything to do with asbestos at all?

A    Very little in that period of time.

Q    To the extent that you did have something to do with asbestos, what connection did you have something to do with it in?

A    Only in that there are some filters in water treatment -- certain water treatment systems that are composed, partially, at least, of asbestos.

Q    This is water treatment systems for --

A    Propulsion plants.

Q    -- cooling and things?

A    Right.

Q    Not drinking water?

A    No.

Q    Where did you go after you left the Naval Ship Engineering Center in the chemistry and toxicology section in September of 1969?

A    Well, I continued to work for the Ship Engineering Center, and I worked for another unit.

Q    What was that unit?

PRODUCED
JM - 83

MT-PWHD-015921

A     That was called the coatings unit.

Q     How long were you with the coatings unit of the Naval Ship Engineering Center?

A     Another three years, approximately, from '69 -- September '69 to October '72.

Q     Was the coatings unit another section or unit that was concerned with preparation of specifications and standards of one sort or another?

A     Yes.

Q     Did you have a title or position in the coatings unit?

A     Materials engineer.

Q     I suppose that the coatings unit had a boss of some sort?   Did it?

A     Yes.

Q     What was his title?

A     His title was supervisory engineer, I believe.

Q     Who was that during the time that you were with the coatings unit?

A     It was Mr. Ed Morganstearn.

Q     Did you report directly to Mr. Morganstearn, or was there some intermed'ate level between you and Mr.

PRODUCED
JM - 83

MT-PWHD-015922

get involved with the extremely high temperatures in the
fire rooms, some of which went up to a hundred forty, a
hundred fifty degrees, Fahrenheit.   It was almost -- it was
very hot from time to time.

Q   All of these subjects that we have been talking
about, that were under your cognizance when you were with the
coatings division -- did they all involve the need to either
revise existing standards and specifications or create new
ones, things of that sort?

A   They didn't all involve that, no.   They included
that as appropriate, yes.

Q   What I am trying to find out, Mr. Murad, is this:

Were you in charge of trying to develop materials
to solve problems, or were you merely, in a sense, making
decisions on standards and specifications and doing the
paperwork?

A   Well, a little of both.   Really, the way you
phrase the question, it is impossible to answer.

Q   I take it, maybe, then, from what you have just
said to me, that, if a problem arose, such as the one with
the jet blast deflectors that you were telling us about, you
had concern in one way or another to find a material that

PRODUCED
JM - 83

MT-PWHD-015939

would involve a problem; is that correct?

    A     That's true.

    Q     How did you go about finding materials to solve problems?

    A     That specific case, we tasked Puget Sound Naval Shipyard to survey the field and determine whether there was any kind of existing material that would satisfy the requirements that we set for it.  We set them for it based on information we received from carrier-type desk and the Naval Ship Engineering Center, interface  with the aircraft carrier type desk, as it was called at that time, and we worked with NAVAIR, Naval Air Engineering Center, or Naval Air Systems Command.  We also, by the way, worked with Naval Air Engineering Center, but that's another part of it.

    We then tested those materials that were -- or we saw to it that those materials that were selected were tested on a small scale, a pilot scale, and a full scale. We worked with a variety of different people at different places to do it.  I don't know if you want to take the time here to break it down.

    That's how we worked that particular one.

    Q     Is that, in general, the way you solved problems

PRODUCED
JM - 83

MT-PWHD-015940

40

of materials?

A   That's one way to do it.

Q   Tell me another way.

A   Another way is to get information from industry and work with them to -- and with the existing engineering and testing organizations -- to come up with materials;   for example, the American Society For Testing  &  Materials.

A good deal of it has to do with the funds that are available to do the job.   In the case of the jet blast deflector, we were allocated funds;   we were funded by people at Naval Ship Systems Command.   In the case of some others, we were not given funds, so we tried the best we could, depending on -- obviously, if you have money to pay people to do a job, the job gets done better --

Q   Faster --

A   -- than if you have to do it with no funds.

MR. NOWINSKI:   Would this be a good time to take a break?

MR. JELLEY:   Sure.

MR. NOWINSKI:   About five minutes.

(A recess was taken from 11:09 a.m. until 11:19 a.m.)



MT-PWHD-015941

44

Q       Was the problem the same?

        MR. JELLEY:    That is withdrawn.    That is
not a good question.

Q       At the time that we are talking about, from the
fall of 1969 to the fall of '72, when you were with the
coatings division, you, of course, had a number of military
standards that called for asbestos for various insulation
purposes; isn't that true?

A       The only -- as I recall, there was just the one
standard.

Q       Maybe I am using my language incorrectly.    Is it
military specifications?    Is that the terminology?

A       There are specs and there are standards.

Q       What is the difference?

A       Specification identifies a particular material.
A standard gives procedures on how you use that material,
how the material is applied.

Q       Specifications are these things with MIL spec
numbers, and so on; is that correct?

A       They have MIL spec numbers, yes.

Q       All right, let me ask a different question, then.

        At the time that you were with the coatings

PRODUCED
JM - 83

MT-PWHD-015946

45

division, from the fall of 1969 to the fall of '72, you had a number of different military specifications for insulation used aboard ships that called for asbestos.   Is that correct?

MR. NOWINSKI:  Excuse me, Counsel.   What do you mean, "called for asbestos"?

MR. JELLEY:   That required the use of asbestos.

A     Here again, the specification identifies the characteristics.   We used mainly performance specifications, called for the performance of a -- the performance characteristics of the material.   That's what the specification does; it describes the performance that the material -- of that material.

Q     So that the specifications, or most of the specifications that you were dealing with for insulation on ships, were performance specifications that required material that did particular things but didn't necessarily call for asbestos.   Is that correct?

A     Didn't necessarily -- yes, that's right.

Q     Why, when you were trying to reduce the amount of asbestos aboard ships, didn't you just revise the military specifications for insulation so as to provide that asbestos

PRODUCED
JM - 83

MT-PWHD-015947