

**FRANKLIN D. HOLDREN, et al., Plaintiffs, v. BUFFALO PUMPS, INC., et al., Defendants.**

Civil Action No. 08cv10570-NG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

*614 F. Supp. 2d 129; 2009 U.S. Dist. LEXIS 38253*

**May 4, 2009, Decided**

**COUNSEL:** [**1] For Franklin D Holdren, Plaintiff: Brian P. Barrow, LEAD ATTORNEY, PRO HAC VICE, Simon, Eddins & Greenstone, LLP, Long Beach, CA.

For Janice A Holdren, Plaintiff: Marianne E. Brown, LEAD ATTORNEY, Governo Law Firm LLC, Boston, MA.

For Buffalo Pumps, Inc., Defendant: Marianne E. Brown, LEAD ATTORNEY, Governo Law Firm LLC, Boston, MA.

For Franklin D Holdren, Plaintiff: Edward P. Coady, LEAD ATTORNEY, Coady & Associates, Boston, MA.

For Janice A Holdren, Plaintiff: Mark O. Denehy, LEAD ATTORNEY, Adler Pollock & Sheehan PC, Providence, RI.

For Foster Wheeler Energy Corporation, Defendant: Mark O. Denehy, LEAD ATTORNEY, Adler Pollock & Sheehan PC, Providence, RI.

For Buffalo Pumps, Inc., Cross Defendant: Heather S. Dixon, LEAD ATTORNEY, PRO HAC VICE, Morgan, Lewis & Bockius LLP, Philadelphia, PA.

For Buffalo Pumps, Inc., Defendant: Erika J. Doherty, Cooley Manion Jones LLP, Boston, MA.

For General Electric Company McCarter & English, Cross Claimant, Cross Defendant, Defendant: Erika J. Doherty, Cooley Manion Jones LLP, Boston, MA.

For Franklin D Holdren, Plaintiff: Christopher P. Duffy, LEAD ATTORNEY, Coady Law Firm, Boston, MA.

For Janice A Holdren, Plaintiff: David W. Fanikos, LEAD ATTORNEY, Coady [**2] Law Firm, Boston, MA.

For Franklin D Holdren, Plaintiff: David W. Fanikos, LEAD ATTORNEY, Coady Law Firm, Boston, MA.

For Janice A Holdren, Plaintiff: Jonathan A. George, LEAD ATTORNEY, Simon, Eddins & Greenstone, LLP, Richmond, VA.

For Franklin D Holdren, Plaintiff: Jonathan A. George, LEAD ATTORNEY, Simon, Eddins & Greenstone, LLP, Richmond, VA.

For Janice A Holdren, Plaintiff: David M. Governo,

LEAD ATTORNEY, Governo Law Firm LLC, Boston, MA.

For Buffalo Pumps, Inc., Defendant: David M. Governo, LEAD ATTORNEY, Governo Law Firm LLC, Boston, MA.

For Buffalo Pumps, Inc., Cross Defendant: Brady L. Green, LEAD ATTORNEY, PRO HAC VICE, Morgan, Lewis & Bockius LLP, Philadelphia, PA.

For Buffalo Pumps, Inc., Defendant: Christopher A.D. Hunt, McCarter & English, LLP, Boston, MA.

For General Electric Company McCarter & English, Defendant, Cross Claimant, Cross Defendant: Christopher A.D. Hunt, McCarter & English, LLP, Boston, MA.

For Viad Corporation, Defendant: Lynda R. Jensen, LEAD ATTORNEY, Hermes, Netburn, O'Connor & Spearing, Boston, MA.

For General Electric Company McCarter & English, Cross Claimant, Cross Defendant, Defendant: Timothy Kapshandy, LEAD ATTORNEY, PRO HAC VICE, Sidley Austin LLP, [**3] Chicago, IL.

For Foster Wheeler Energy Corporation, Defendant: April M. Luna, LEAD ATTORNEY, Adler, Pollock & Sheehan PC, Boston, MA.

For A.W. Chesterton Company, Defendant: Daniel P. McCarthy, Cooley, Manion, & Jones, LLP, Boston, MA.

For Buffalo Pumps, Inc., Defendant: Bryna Rosen Misiura, LEAD ATTORNEY, Governo Law Firm LLC, Boston, MA.

For Viad Corporation, Defendant: Peter C. Netburn, LEAD ATTORNEY, Hermes, Netburn, O'Connor & Spearing, Boston, MA.

For Foster Wheeler Energy Corporation, Defendant: Katharine S. Perry, LEAD ATTORNEY, Adler, Pollock & Sheehan PC, Boston, MA.

For Elliott Turbo Machinery Company, Cross Claimant, Cross Defendant, Defendant: Michael D. Simons, LEAD ATTORNEY, Governo Law Firm LLC, Boston, MA.

For Buffalo Pumps, Inc., Defendant: Michael D. Simons, LEAD ATTORNEY, Governo Law Firm LLC, Boston, MA.

**JUDGES:** NANCY GERTNER, United States District Judge.

**OPINION BY:** NANCY GERTNER

**OPINION**

[*135]  *MEMORANDUM AND ORDER RE: MOTION TO REMAND*

## I. INTRODUCTION

The plaintiffs in this product-liability lawsuit have brought claims against a number of manufacturers for their failure to warn of the dangers of asbestos associated with their products. Defendants include both commercial manufacturers, who produced goods for [**4] the general market, and a smaller subset of companies who contracted with the United States Navy ("the Navy") to supply pumps, oil heaters, and other equipment. *See, e.g.*, Notice of Removal P 5 (document # 1). This Memorandum Re: Motion to Remand concerns the second set of defendants who produced machinery for Navy ships from 1957 to 1979. Although the failure-to-warn claims against both sets of defendants are all but identical, the latter group has sought the protections of a federal forum. If they failed to warn about asbestos hazards in violation of Massachusetts law, they claim it was because they were acting at the behest of the Navy. On this basis, these manufacturers argue that they are entitled to the "federal contractor defense" and, consequently, to removal under the federal officer removal statute. *28 U.S.C. § 1442(a)(1)*; *see* Notice of Removal.

In reply, the plaintiffs have filed a Motion to Remand the case to state court (document # 10). However the motion is resolved, this Court is

merely a temporary way station for the underlying litigation: If remand is granted, this action will return to the Massachusetts courts to be heard expeditiously alongside the plaintiffs' claims [**5] against the other manufacturers. [1] If denied, the case will join thousands of other asbestos cases waiting to be resolved by the Multidistrict Litigation Panel in Philadelphia. [2]

> 1   At present, the state court trial is set for May 6, 2009. *See Holdren v. Alfa Laval, Inc.*, Massachusetts Superior Court, Middlesex Co., Civil Action No. 08-0718; Letter from David Fanikos (document # 54).
> 2   Recently, the MDL Panel stated that its docket included 59,000 pending cases encompassing some 3.5 million asbestos-related claims. *See In re: Asbestos Products Liability Litigation*, MDL Docket No. 875, 254 F.R.D. 266 (E.D. Pa. Dec. 18, 2008).

In a multitude of suits like this one, courts across the country have split on [*136] whether failure-to-warn cases against these private government contractors justify removal to federal court. *See Harris v. Rapid American Corp.*, 532 F. Supp.2d 1001, 1004 (N.D. Ill. 2007) (collecting cases on both sides). Some courts have found similar evidentiary materials submitted by the same defendants sufficient; others have disagreed. [3] Precisely because district courts have differed in their application of the removal statute, it is not enough to recite general standards followed by [**6] specific facts, as many decisions have done. Rather, the Court must consider the underlying purposes of the federal officer removal statute, with its long history, and the context in which the defendants now seek removal.

> 3   *Compare O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51 (D. Mass. 2008) (Stearns, J.); *Machnik v. Buffalo Pumps, Inc.*, 506 F. Supp. 2d 99 (D. Conn. 2007); *Nesbiet v. General Electric Co.*, 399 F. Supp. 2d 205, 2005 WL 697966 (S.D.N.Y. 2005); *Harris v. Rapid American Corp.*, 532 F. Supp. 2d 1001, *with Westmiller v. Imo Industries, Inc.*, 2005 U.S. Dist. LEXIS 29371, 2005 WL 2850334 (W.D. Wash. 2005); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187 (D. Mass. 2008); *Miranda v. Abex Corp.*, 2008 U.S. Dist. LEXIS 91497, 2008 WL 4778886 (S.D.N.Y. 2008).

Looking to these purposes, it is clear that private government contractors -- particularly those in failure-to-warn cases -- are several degrees distant from the paradigmatic federal officer protected by 28 U.S.C. § 1442(a)(1). Federal customs officials and tariff collectors, beset by state civil suits and criminal prosecutions in the early eighteenth century, were the original recipients of these protections. *See Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 S. Ct. 2301, 2304-07, 168 L. Ed. 2d 42 (2007). [**7] Since then, this right to a federal forum has been afforded to federal prohibition agents, federal judges, and federal immigration officers, among others. *See Colorado v. Symes*, 286 U.S. 510, 52 S. Ct. 635, 76 L. Ed. 1253 (1932); *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999); *Arizona v. Manypenny*, 451 U.S. 232, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981). Here, the removal statute has served to insulate national policy from state interference, to shield federal officers and their agents from the potential bias of state courts, and to promote consistent application of official immunity doctrines.

Private military contractors sued in state court for design defects have also been brought within the ambit of the federal officer removal statute, but only under certain circumstances. *See Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 939 (E.D.N.Y. 1992) (suggesting that private actors seeking to invoke the federal officer removal statute "bear a special burden"). After all, these contractors, sued by plaintiffs from the same state, hardly face the kind of state-court bias with which the federal officer removal statute was originally concerned. What they do face, however, is state tort liability stemming from the execution of federal duties -- much like [**8] the federal tariff officer who acted at the behest of the national government. *See In re Eastern and Southern Dist. New York Asbestos Litigation*, 897 F.2d 626, 630 (2d Cir. 1990). Thus, a contractor may assert the "federal contractor defense" only insofar as it has acted as the federal

government's agent by complying with "reasonably precise" design specifications. *See Boyle v. United Technologies Corp., 487 U.S. 500, 507-08, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988)*. And, like the federal officer, it may remove the action only if the federal government was the source of the specific act for which the contractor now faces suit. *See Mesa v. California, 489 U.S. 121, 131-32, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)*.

[*137] By virtue of their limited federal role, the private contractors in this failure-to-warn case are different from the prototypical federal officer but, just as critically, they also stand apart from military contractors sued for design defects. When the military commissions a product, its design specifications reflect a trade-off between safety and performance that trumps conflicting state law. Warnings, by themselves, do not necessarily jeopardize that basic policy judgment. Rather, the decision not to warn about a particular hazard involves [**9] a separate discretionary judgment and requires separate proof. *See Tate v. Boeing Helicopters, 55 F.3d 1150, 1156 (6th Cir. 1994)*. In order for a contractor to avoid liability, the decision not to warn must be the government's, not the contractor's, and it must reflect a federal interest incompatible with the important health and safety requirements of state law. While the Court recognizes the significant national interests on which the removal statute is premised, comity and federalism require a careful determination of whether there is a meaningful conflict between state law and federal policy. *See Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003 (7th Cir. 1996)*. If there is not - if both federal policy and state law can be satisfied at the same time -- removal may well be inappropriate.

The removing defendants have together submitted volumes of evidence seeking to show that the Navy would not have permitted them to warn about the dangers of asbestos, if they had tried. But the Court's decision rests ultimately on what is missing from the record. The defendants have submitted no evidence that the Navy expressly prohibited asbestos warnings by manufacturers; no evidence that they ever [**10] attempted to warn about asbestos on products destined for the Navy; no evidence that the Navy ever rejected any other manufacturer's proposed asbestos warning; and no evidence that defendants warned of asbestos on other, non-military equipment they produced during the same period, by contrast to the equipment they supplied to the Navy. Finally, they offer no persuasive evidence of an overall Navy-wide policy that would have conflicted with manufacturer asbestos warnings.

All told, the manufacturers do not claim that the Navy ever offered them any guidance on asbestos warnings, nor that they themselves ever contemplated warning about the dangers of asbestos. Their defense, instead, rests entirely on an untested hypothetical: *If* they had made such a proposal, the Navy *would have* refused that recommendation. This account rings of post-hoc justification.

Under the circumstances, the Court finds that defendants have not shown the type of genuine and "significant conflict" between federal policy and state law that would support the federal contractor defense. *See Boyle, 487 U.S. at 511-12*. Nor have they shown any causal relationship between the Navy's directives and their failure to warn about [**11] asbestos. *See Mesa v. California, 489 U.S. 121, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989); Hilbert v. McDonnell Douglas Corp., 529 F. Supp. 2d 187 (D. Mass. 2008)*. Both are required to justify removal jurisdiction here. Given the purposes of the federal officer removal statute and the federal contractor defense, removal in this case is not warranted. The plaintiffs' Motion to Remand (document # 10) is **GRANTED**.

## II. BACKGROUND

This is an asbestos personal injury action. Plaintiff Franklin Holdren ("Mr. Holdren") worked as a boiler technician onboard various Navy ships, and in Navy [*138] shipyards, from 1957 to 1979.[4] *See* Compl. P 9, Ex. 1 to Notice of Removal (document # 1-2). Thereafter, he inspected and maintained residential and commercial boilers at power plants, paper mills, and other industrial sites. Pl. Disclosures at 4-5, Ex. 2 to Notice of Removal (document # 1-3). Mr. Holdren's exposure to asbestos during the course of his employment

allegedly caused him to develop malignant mesothelioma. *See* Compl. P 11.

> 4   Mr. Holdren worked onboard Navy ships including the USS Ault, USS Sierra, USS Norfolk, and USS Pawcatuck, as well as at the Fore River Shipyard in Quincy, Massachusetts. *See* Pl. Disclosures at 5.

The plaintiffs filed [**12] suit in Massachusetts state court, charging that the defendants were responsible for Mr. Holdren's asbestos-related disease. They seek relief on theories of negligence, breach of warranty, and gross negligence, as well as loss of consortium. [5] The plaintiffs claim that the removing defendants breached their duties to Mr. Holdren in failing to warn him about asbestos and its health hazards; they do not allege defective design against these defendants. *Id.* at PP 17, 26 (disclaiming defective-design theories against manufacturers of equipment installed on Navy vessels). All of the plaintiffs' claims are based on state law. *See id.*

> 5   The plaintiffs also assert two counts exclusively against Metropolitan Life Insurance Company -- conspiracy and undertaking of a special duty. Because these counts are not related to the federal contractor defense or removal, the Court does not address them here.

Five defendants seek removal in this case: Buffalo Pumps, Inc.; Foster Wheeler Energy Corp.; Viad Corp.; General Electric Co. ("GE"); and Elliott Turbo Machinery Co. Each claims that it was a manufacturer and supplier of equipment used or procured by the United States Navy during the period of Mr. Holdren's [**13] employment aboard Navy ships. Each further argues that, as a government contractor, it had no authority to add asbestos warnings to the products or accompanying manuals that it supplied to the Navy. *See, e.g.*, GE Opp. Mem. at 18-21 (document # 37); Foster Wheeler Opp. Mem. at 5, 11 (document # 25). As a result, the defendants seek to remove the claims against them to federal court under 28 U.S.C. § 1442(a)(1).

In support of removal, the defendants have submitted thousands of pages of materials. Importantly, no defendant attempts to show that it actually sought to warn about asbestos or that it even considered warning about asbestos. Rather, all claim that -- if they had tried -- the Navy would have rejected any such warning, whether it was affixed to the products themselves or included in the technical manuals that accompanied the equipment. Because of this common approach, the Court evaluates the evidence cumulatively, giving each manufacturer the benefit of the defendants' combined submissions.

These submissions include affidavits from individuals familiar with the defendants' manufacturing processes, [6] the Navy's procurement practices, [7] and the [*139] Navy's knowledge of asbestos risks [**14] during the relevant period. [8] They also include numerous military specifications ("MILSPECS") illustrating the requirements that the Navy imposed on parts and equipment it commissioned. *See, e.g.*, MIL-P-17639 (document # 21-32); MIL-P-17840 (document # 21-33); MIL-T-17600A, Ex. C to Betts Aff. (document # 42); MIL-M-15071D (document # 24-9).

> 6   *See* Aff. of Martin Kraft, current production manager for Buffalo Pumps (document # 21-31); Aff. of J. Thomas Schroppe, retired President of Foster Wheeler Boiler Corp. (document # 25-6); Aff. of Thomas Keenan, product engineer for Elliott Turbo Machinery (document # 41-2); Aff. of David Hobson, GE manager of Navy customer service (document # 42).
> 7   *See* Aff. of David Sergeant, retired Rear Admiral of the United States Navy (document # 21-4); Aff. of Roger Horne, retired Rear Admiral of the United States Navy (document # 21-35); Aff. of Ben Lehman, retired Rear Admiral of the United States Navy (document # 5-6, 41-3); Aff. of Charles Cushing, naval architect and marine engineer (document # 5-5).
> 8   *See* Aff. of Samuel Forman, Navy doctor for occupational medicine beginning in 1977 (document # 21-38); Aff. of Lawrence Betts, Navy industrial hygiene officer [**15] beginning in 1972 (document # 42).

Significantly, the vast majority of these documents do not pertain to warnings at all. *See Hilbert, 529 F. Supp. 2d at 199 n.14*. To be sure, they demonstrate that the products themselves were meticulously designed and tested by the Navy as part of its ship-building program -- but not that the same attention or detail was ever applied to the possibility of including asbestos warnings. Against this backdrop, three things are clear: (1) The Navy held final authority over the design of these products and, where it chose to exercise that authority, any associated warnings; (2) manufacturers themselves drafted the technical manuals and warnings that accompanied their products, subject to Navy review and revision; and (3) the Navy was aware of the risks of asbestos and, in other contexts, took some steps to issue precautions about handling the substance. What they do not show is whether anyone -- either the manufacturers or the Navy itself -- ever contemplated applying asbestos warnings to these products. Indeed, it is not clear that the Navy ever exercised its final authority in any fashion that either expressly barred or broadly preempted the inclusion [**16] of asbestos warnings with this equipment.

Given their importance, these materials are analyzed in greater detail below. The central question is whether they establish that the manufacturers were acting at the direction of the Navy when they failed to provide asbestos warnings, or colorably show that such warnings would have conflicted with "reasonably precise specifications" approved by the Navy. *Boyle, 487 U.S. at 512*.

### III. ANALYSIS

**A. Removal Standard**

The law relating to the federal contractor defense and the federal officer removal statute, *28 U.S.C. § 1442(a)(1)*, is outlined in this Court's opinion in *Hilbert v. McDonnell Douglas Corp., 529 F.Supp.2d 187, 191-92, 196-99 (D. Mass. 2008)*, another asbestos case which presented all but identical issues. The Court's view of those principles is little changed, however the applicable standards are reviewed here for clarity and easy reference.

The Supreme Court's decision in *Mesa v. California, 489 U.S. 121, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)*, established three criteria for removal pursuant to *28 U.S.C. § 1442(a)(1)*. [9] First, the defendant seeking removal must demonstrate a colorable [*140] federal defense. Second, the defendant must be a federal officer or "acting under" a federal [**17] officer. Third, the defendant must show that there is a "causal connection" between the acts taken under color of office and the conduct for which the plaintiff has sued. *Mesa, 489 U.S. at 131-32* (quoting *Maryland v. Soper (No. 1), 270 U.S. 9, 33, 46 S. Ct. 185, 70 L. Ed. 449 (1926)*); *see In re Methyl Tertiary Butyl Ether ("MBTE") Products Liability Litigation, 488 F.3d 112, 124 (2d Cir. 2007)*. The burden is on the removing defendants to satisfy each of these elements. *See Rossello-Gonzalez v. Calderon-Serra, 398 F.3d 1, 11 (1st Cir. 2004)*.

> 9 *Section 1442* provides, in relevant part:
>
> > (a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
> >
> > > (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such act . . . .

By *Mesa's* terms, the asserted federal defense must only be "colorable" to justify removal. *489 U.S. at 132-34*. Yet removal of a federal officer's case has never been automatic. [**18] As a constitutional matter, a defendant must aver something more than his status as a federal officer in order to bring his case into a federal forum. It is only the assertion of a colorable federal defense that justifies the federal court's limited Article III jurisdiction in these cases. *See Mesa, 489 U.S. at 136-38* (denying removal of state criminal cases against postal service employees because the charged officers had not asserted a colorable federal defense). Without this requirement, § 1442(a) would "expand[] the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Id. at 136* (quoting *Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 491, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983)*). Because it alone confers Article III jurisdiction, the "colorable" standard requires that a federal court carefully weigh the plausibility of the proffered defense. *See Adams v. Reliance Standard Life Ins. Co., 225 F.3d 1179, 1182 (10th Cir. 2000)* ("In light of the limited subject matter jurisdiction granted to the federal courts by Congress, we have a duty to satisfy ourselves that jurisdiction is appropriate."). [10]

> 10   *See also Marathon Oil Co. v. Ruhrgas, A.G., 115 F.3d 315, 318 & n.7 (5th Cir. 1997)* [**19] (noting "the overwhelming body of precedent commanding all federal courts to scrutinize assiduously subject matter jurisdiction at each stage of litigation, trial and appellate, and to dismiss cases not properly before us"), *vacated on other grounds, 129 F.3d 746 (5th Cir. 1997)*. *Cf. 28 U.S.C. § 1447(c)* ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *Fed.R.Civ.P. 12(h)(3)* ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Nonetheless, it is typical in these cases to quote the Supreme Court's admonition that *Section 1442(a)* should not be subject to a "narrow, grudging interpretation." *Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981)*; *Jefferson County, Ala. v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)* (quoting *Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)*). There is no doubt, as the Supreme Court reasoned, that federal officer removal protects "exercise[s] of legitimate federal authority" -- but this is hardly the end of the story in the case of private government contractors. *Manypenny, 451 U.S. at 242*. Indeed, a crucial jurisdictional question [**20] in such cases is whether the contractor's actions were undertaken at the direction of the federal government at all. [11] By their very nature, [*141] private actors face a kind of preliminary showing typically unknown to bona fide federal officers. *See Ryan v. Dow Chemical Co., 781 F.Supp. 934, 939 (E.D.N.Y. 1992)*. Yet this showing, where a contractor must colorably establish that it acted at the federal government's behest, is essential to the Court's Article III jurisdiction.

> 11   As set out more fully below, where a manufacturer seeks removal based on the federal contractor defense, whether the federal government actually directed the act at issue is doubly important. It pertains to two separate prongs of the *Mesa* standard for removal: both the question of causation and the colorability of the asserted federal defense.

In this respect, government contractors are degrees different from both the federal officers who originally inspired the removal statute and the cases in which the Supreme Court later coined its cautionary language. The earliest version of the federal officer removal statute was promulgated by Congress in response to a barrage of state-court suits by New England ship-owners, who [**21] opposed federal customs officials' efforts to enforce a trade embargo with England during the War of 1812. *See* Customs Act of 1815, ch. 31, § 8, 3 Stat. 198. The statute's scope was later expanded when South Carolina sought to nullify federal tariff laws in the 1830s by authorizing the prosecution of the federal agents who collected those tariffs. *See* Force Act of March 2, 1833, ch. 57, 4 Stat. 632-33; *Gay v. Ruff,*

292 U.S. 25, 32, 54 S. Ct. 608, 78 L. Ed. 1099 (1934) (discussing history and origins of the federal officer removal statute); *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 S. Ct. 2301, 2304-07, 168 L. Ed. 2d 42 (2007) (same). In the years since, the statute has been applied to protect a wide variety of federal officers, as well as those "acting under" them, from suit in state court. *See Colorado v. Symes*, 286 U.S. 510, 517, 52 S. Ct. 635, 76 L. Ed. 1253 (1932) (considering state prosecution of federal prohibition agent); *Willingham v. Morgan*, 395 U.S. 402, 407, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969) (considering prisoner's suit against the warden and chief medical officer of a federal prison); *Arizona v. Manypenny*, 451 U.S. 232, 242, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981) (considering state prosecution of federal immigration officer); *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999) (considering effects of local occupational [**22] tax on federal judges).

It is these cases -- where the federal character of the disputed act is hardly in doubt -- that have prompted the Supreme Court to caution against an unduly narrow view of federal officer removal. *See id. at 431*. Indeed, it is not up to a court, at a preliminary stage, to conclusively determine the validity of a plausible but contested federal defense. *See id*. Yet the court must still satisfy itself that the defense has enough substance to trigger the right to a federal forum. Relaxing this standard too far, particularly in the context of a private contractor, could well err in the opposite direction -- by providing a federal forum to a party whose acts were outside its federal directives. A colorable federal defense, as *Mesa* itself makes plain, is not a requirement that may be reduced to the point of vanishing altogether. *See 489 U.S. at 132-34*.

The removal standard's remaining two elements -- the defendant's status as a federal officer or agent and the required causal nexus -- are arguably subject to a somewhat higher showing. These factors are akin to jurisdictional facts set by Congress, as opposed to the colorable federal legal defense that provides the constitutional [**23] basis for a federal court's removal jurisdiction. *See Amoche v. Guarantee Trust Life Ins. Co.*, 556 F.3d 41, 50 (1st Cir. 2009) (applying "reasonable probability" standard to jurisdictional facts, such as amount in controversy, "where little or no evidence has yet been produced" at the pleadings stage); *United Food & Comm. Workers Union, Local 919, AFL-CIO v. Centermark Prop. Meriden Sq., Inc.*, [*142] 30 F.3d 298, 305 (2d Cir. 1994) (holding that the party asserting jurisdiction must support challenged jurisdictional facts "with competent proof and justify its allegations by a preponderance of the evidence").

Between these two requirements, the causation standard is likely to be the more difficult threshold. In practical terms, the federal government must be the source of the specific act for which the contractor now faces suit. A federal contractor must show that those acts or omissions were dictated by the federal government -- i.e., that it acted *as* the federal government. *See In re Eastern and Southern Dist. New York Asbestos Litigation*, 897 F.2d 626, 630 (2d Cir. 1990). If the contractor acted of its own accord, while the government simply remained silent, removal cannot be sustained.

Obviously, [**24] the Court's decision assumes, in the absence of First Circuit authority to the contrary, that government contractors are entitled to seek removal under the statute, as other courts have held. *See Hilbert, 529 F. Supp. 2d at 191-92* (collecting cases); *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 S. Ct. 2301, 2307, 168 L. Ed. 2d 42 (2007) (suggesting, in dicta, that government contractors may invoke federal officer removal). Likewise, the Court assumes that the federal contractor defense described in *Boyle*, 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442, supplies a substantive defense for purposes of the removal statute. This conclusion is not self-evident. *See Hilbert, 529 F. Supp. 2d at 192*; *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 944-45 (E.D.N.Y. 1992). But as in *Hilbert*, the Court need not resolve this question because it finds, in any case, that the defendants do not satisfy the criteria for removal set out in *Mesa, 489 U.S. 121, 109 S. Ct. 959, 103 L. Ed. 2d 99*.

**B. Assertion of a Colorable Federal Defense**

**1. Legal Standard**

The removing defendants assert only one federal defense: the federal contractor defense recognized by the Supreme Court in *Boyle*, 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442. While *Boyle* involved allegations of defective design -- in that case, related to a Marine helicopter's [**25] emergency escape system -- courts, including this one, have adapted its elements to failure-to-warn claims. In particular, when state law would otherwise impose liability for a failure to warn, that law can be displaced when the contractor can show that: (1) the government issued reasonably precise specifications governing warnings; (2) the contractor provided the warnings required by the government; and (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government. *See Hilbert*, 529 F. Supp. 2d at 198 (citing *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003 (7th Cir. 1996); *Boyle*, 487 U.S. at 512).

This Court's previous decision also made clear, as did *Boyle*, that the crux of the federal contractor defense is a "significant conflict" between a federal interest and the defendant's state-law duties. *Id. at 511*. This requirement was at the heart of the Supreme Court's extension of the Federal Tort Claims Act's (FTCA) discretionary function exception to cases in which the military's procurement needs cannot be reconciled with state law. *See id.*; 28 U.S.C. § 1346(b); 28 U.S.C. § 2680(a). Ultimately, the elements [**26] described above must demonstrate such a conflict. "If there is no conflict, if both federal policy and state law can be satisfied at the same time, the contractor may not assert the defense." *Hilbert*, 529 F. Supp. 2d at 198. The measure of "reasonably [*143] precise" is not simply the sheer number of specifications; it is whether those requirements plausibly imply such a conflict between the omitted warning and a deliberate federal policy-choice or judgment.

Importantly, compared to the design-defect claims in *Boyle*, the type of conflict required by the defense may be considerably more difficult to show in a failure-to-warn case. "[D]esign defect and failure to warn claims differ practically as well as theoretically." *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156 (6th Cir. 1994). In the design-defect case, the government is entitled to receive the product it commissioned. The design specifications themselves reflect a federal interest; where it is aware of potential risks in the design, the government has necessarily balanced safety and performance. *See Boyle*, 487 U.S. at 511 (discretionary function lies in "the balancing of many technical, military, and even social considerations"). In these [**27] cases, the manufacturer could not remedy the design defect without compromising those relative priorities -- that is, without giving the government a product different from what it expressly ordered.

Failure-to-warn claims do not raise the same type of obvious conflict. *See Oliver*, 96 F.3d at 1003-04; *Tate*, 55 F.3d at 1156.[12] Generally speaking, a manufacturer could give the government precisely the product it ordered while complying with its state-law duties to warn. Such a warning does not, by itself, require a departure from the government's design specifications and the judgments they reflect. For this reason, proof that would support the defense as to a defective-design claim is not sufficient to defeat liability for a failure to warn. *Id.* Merely because the government has issued reasonably precise design specifications does not mean that it also exercised the requisite discretion with respect to warnings. These are separate showings.

> 12   Cf. *Wyeth v. Levine*, 555 U.S.    , 129 S. Ct. 1187, 1198, 173 L. Ed. 2d 51 (2009) (examining drug manufacturer's preemption defense to failure-to-warn claim). "[A]bsent clear evidence that the FDA would not have approved a change to [the drug's] [**28] label, we will not conclude that it was impossible for Wyeth to comply with both state and federal regulations." 129 S. Ct. at 1198.

Thus, a manufacturer asserting the federal contractor defense must show that the federal government issued reasonably precise specifications covering warnings -- specifications that reflect a considered judgment about the warnings at issue. Short of this, the manufacturer must show either back-and-forth negotiations over the warning or

"some extrinsic evidence that the government exercised independent judgment" in such a way as to preclude the warning. [13] *Hilbert*, 529 F. Supp. 2d at 199 (discussing "direct control," "negotiation," and "extrinsic evidence" theories).

> 13   For instance, a broad policy statement or regulation expressing the decision not to warn about a particular hazard would be one such type of extrinsic evidence.

Government silence about a particular warning does not easily fit into any of these categories and does little to substantiate the alleged exercise of government discretion. The keystone is proof that the government exercised its discretion in connection with the warnings in some meaningful way. *See Lewis v. Babcock Indus., Inc.*, 985 F.2d 83, 87 (2d Cir. 1993) [**29] (rejecting the defense where the government merely "rubber stamped" the manufacturer's design); *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1481 [*144] (5th Cir. 1989) (stating that "imprecise or general guidelines" would be insufficient). While the government need not dictate the exact content of the warnings, it must have at least spoken broadly on the subject such that an actual conflict is apparent. Only this showing adds up to the type of incompatibility contemplated by the federal contractor defense. As the Supreme Court has stated, "a conflict there must be." *Boyle*, 487 U.S. at 508.

At its root, the defense may protect government discretion, *see Tate*, 55 F.3d at 1154, 1157, but it only does so where that discretion has actually been exercised. It does not shield defendants where the government might have exercised its discretion and final authority but did not. Indeed, the purpose of both the federal officer removal statute and the federal contractor defense is to protect the execution of federal policies from state interference. If the government cannot be said to have made a decision -- if it is simply silent -- there is no federal policy or interest to protect. By default, any state-law [**30] duties thus remain intact.

### 2. Application to the Evidence

The removing defendants submit a variety of materials to show that the Navy either specifically prohibited them from warning about asbestos or had concluded, as a broad matter of policy, that such precautions were unnecessary and undesirable. The Court has carefully scrutinized the voluminous materials submitted by the parties. *See Hilbert*, 529 F.Supp.2d at 199 n.14. While the number of pages has multiplied, the evidence is ultimately no more persuasive.

#### a. Evidence of Direct Control

Large portions of the evidence relate to the Navy's control over the design of the parts and ships themselves, rather than the accompanying labels, manuals, and warnings. *See, e.g.*, Buffalo Pumps Opp. Mem. (document # 21); Sergeant Aff. PP 48-54 (only four pages out of thirty addressing warnings, as opposed to ship design and Navy organization). Because the case does not include design-defect claims, much of this evidence is beside the point; compliance with the Navy's exacting design specifications would not have automatically foreclosed the defendants' ability to warn about the hazards associated with the required components. "Simply because the government [**31] exercises discretion in approving a design does not mean that the government considered the appropriate warnings that ought to accompany the product." *Tate*, 55 F.3d at 1156. The possibility that defendants could have satisfied both the federal design specifications and their state-law duty to warn is precisely what makes these cases different from *Boyle*, 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442. As stated, the removing defendants must make out a genuine conflict between Navy policy and the omitted warnings.

None of the procurement contracts, military specifications, or technical manual revisions addressed to these defendants discuss asbestos warnings whatsoever. Nor is there evidence that the Navy had a fixed set of approved warnings for these products, simply dictating for manufacturers the content or subject-matter of the warnings that did appear. *See* MIL-M-15071D, effective June 6, 1961 (document # 24-9) (permitting manufacturers to utilize technical manuals "prepared in accordance with [their] commercial practice," discussed *infra*). Finally, none of these materials reflect a single effort by manufacturers to warn about asbestos -- even at

the proposal or draft stage -- that was then rebuffed by the Navy. Altogether, [**32] there is little evidence that the Navy exercised "direct control" to prohibit asbestos warnings.

[*145] Instead, the defendants take a more hypothetical approach to control. They argue that if they had tried to warn about asbestos, the Navy would have rejected this effort. In support of this broad proposition, they submit the affidavits of David Sergeant, Jr., Roger Horne, and Ben Lehman, all retired Rear Admirals of the United States Navy who served during the relevant period. Sergeant Aff. (document # 21-4); Horne Aff. (document # 21-35); Lehman Aff. (document # 5-6). Each describes the importance of asbestos to the Navy's ship-building program, the Navy's design of these vessels, the Navy's requisition and procurement processes, and the Navy's careful oversight of production itself to ensure compliance with its specifications. Based on this survey, each expressed the opinion that "the Navy would not have permitted Buffalo Pumps or other equipment suppliers to place asbestos-related warnings on packaging or containers for pumps or related parts or items supplied during the 1940s, 1950s, or 1960s." Sergeant Aff. PP 51, 54; *see also* Horne Aff. PP 15-16; Lehman Aff. P 10.

But the documentary [**33] evidence on which the affiants rely does not bear out their conclusion. The military specifications they point to are vague about the content of manufacturer warnings: None of them specify which hazards manufacturers should warn about and which they should not. *See, e.g.*, MIL-P-17639 (document # 21-32) (governing the design of pumps, without addressing warnings); MIL-P-17840 (document # 21-33) (same). For instance, the technical manuals that accompanied these products appear to have been governed primarily by one military specification -- MILSPEC 15071D and its successors. MIL-M-15071D, effective June 6, 1961 (document # 24-9); MIL-M-15071H, effective July 17, 1978 (document # 38-5). This MILSPEC set out the requirements for technical manuals across the board, rather than one or several specific products. It required that every manufacturer itself prepare and submit a technical manual governing the use and repair of its product to the Navy. MIL-M-15071D § 3.1.2. Although the removing defendants argue that the content of these manuals was dictated exclusively by the Navy, rather than the general marketplace, the very first section of MILSPEC 15071D states: "The intent is to accept the [**34] manufacturer's commercial type of manual or one prepared in accordance with his commercial practice whenever it is roughly equivalent to the detail requirements included herein." *Id*. § 1.1; *see also id*. § 3.1.3 ("A class A or B manual may be the manufacturer's commercial manual, or one prepared in accordance with his commercial practice.").

With respect to warnings, the manual specifications are notably bare, providing only:

> Notes, cautions and warnings -- Notes, cautions and warnings should be used to emphasise important and critical instructions. The use should be as sparing as is consistent with real need.
>
> (a) "NOTE" -- An operating procedure, condition, etc., which it is essential to highlight.
>
> (b) "CAUTION" -- Operating procedures, practices, etc., when if not strictly observed, will result in damage or destruction of equipment.
>
> (c) "WARNING" -- Operating procedures, practices, etc., which will result in personal injury or loss of life if not correctly followed.

*Id*. § 3.3.6; *see also id*. § 3.1.9 ("Operating instructions -- Information shall include routine and

emergency procedures, safety precautions . . . ."). Beyond these provisions, the manual specifications offer little guidance [**35] on the subject of warnings. [*146] While the requirements express an overall interest in parsimony, they discourage only superfluous or trivial precautions. Certainly, they do not exclude asbestos warnings on their face.

### b. Evidence of Negotiation

Instead, the specifications left the work of drafting technical manuals -- including any warnings therein -- to the manufacturers themselves, subject to Navy review and approval. Here, the Navy officers and other affiants place an enormous emphasis on the Navy's ultimate control over the products and any accompanying warnings. "The Navy retained the 'final say' over the design of any piece of equipment." Horne Aff. P 15; *see also* Lehman Aff. PP 3, 5-8 ("The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment."); Hobson Aff. PP 4, 8; Keenan Aff. PP 12-22 (document # 41-2). They also point to the Navy's role in reviewing, editing, and approving the technical manuals as evidence of this control. *See* Sergeant Aff. P 51 ("Navy personnel . . . participated intimately in the preparation and [**36] review of these instruction books and technical manuals."). But the fact that the Navy possessed final authority over the design and labeling of these products does not, without more, demonstrate that it exercised that authority with respect to asbestos warnings. No evidence shows that the Navy even considered such a possibility; no draft proposed such a warning. Seeking to elide this gap, defendants characterize the Navy's revision of the technical manuals as "exacting" and "lengthy," suggesting that the Navy all but wrote these manuals itself. *Id.* That is not the case. As noted, MILSPEC 15071D explicitly encourages manufacturers to submit their commercial manuals -- which would have been subject to state law -- where suitable. *See* MIL-M-15071D §§ 1.1, 3.1.3. Moreover, most of the naval revisions offered as exhibits, while certainly detailed, are no more than one or two pages in length and do not address warnings, asbestos or otherwise, at all. *See* Technical Manual Revisions, Ex. L to Sergeant Aff. (document # 21-30) and Ex. C to Kraft Aff. (document # 21-34).

Two revisions do illustrate the Navy's attention to safety issues generally, but these notes reveal no discernible position [**37] on asbestos warnings -- the subject of the claims in this case. Technical Manual Revision, June 8, 1959, Ex. L to Sergeant Aff. at 2 (requiring manufacturer to add caution about transporting pump units); Technical Manual Revision, July 28, 1966, Ex. C to Kraft Aff. at 6 (requiring manufacturer to add the warning "Never use water on electrical fires. Use CO2."). Such evidence does not amount to the type of "back-and-forth" discussion about asbestos risks that would colorably support a negotiation version of the federal contractor defense. *See Hilbert, 529 F. Supp. 2d at 199*. Simply because the Navy ultimately approved all labels and manuals does not imply that it rejected a warning that the manufacturers never offered for its consideration. Rather, the record is simply silent.

### c. Extrinsic Evidence

In the absence of this evidence, the defendants appeal to the Navy's general knowledge of

asbestos risks and its safety efforts in other contexts. Samuel Forman, a Navy doctor in occupational medicine, points to the Navy's extensive experience with asbestos beginning in the 1920s and its adoption of certain precautions over the following decades. Forman [*147] Aff. (document # 21-38); *see also* Betts [**38] Aff. (document # 25-7) (offering similar history of occupational safety); Lehman Aff. PP 9, 11. Documentary materials highlight the Navy's knowledge of the dangers of asbestos and available methods of avoiding injury or illness due to working with asbestos, including wetting the materials before cutting to reduce dust, instructing workers to wear masks and providing proper ventilation at work sites. *See, e.g.*, Bureau of Ships Manual, Thermal Insulation (document # 21-7); Minimum Requirements for Safety and Industrial Health, 1943 (document # 21-68); Letter re: Asbestos Hazards, Dec. 6, 1968 (document # 21-60); NAVSHIPS

Instruction 5100.26, effective Feb. 9, 1971 (document # 21-61). Based on these submissions, the Court has no doubt that the Navy knew a good deal about asbestos; this is not a case where the defendants withheld information about the risks of their products.

Yet even at this range, no evidence shows that asbestos warnings, by their nature, would have conflicted with any documented Navy policy. In fact, the defendants may prove too much: They present evidence that the Navy, in other contexts, recognized the hazards of asbestos and offered occupational safety instructions [**39] to those who worked with it. *See* Buffalo Pumps Opp. Mem. at 14-15 (document # 21); Forman Aff. PP 32, 34-41. Under these circumstances, it is entirely plausible that the Navy would have accepted manufacturer warnings consistent with its own "robust safety and health program." [14] *Id.* at P 44. As the defendants admit, it is simply not true that the Navy had no interest in the hazards of asbestos. *Id.* Nothing in the naval history of asbestos shows that the Navy was intent on limiting the asbestos precautions it had adopted exclusively to those places where these warnings appeared.

> 14   Contrary to Dr. Forman's suggestion, it would not be "unreasonable to assume" that the Navy might have accepted a warning that matched its own policies for the handling of asbestos-related equipment. Forman Aff. P 44.

Likewise, Dr. Forman's conclusion that the Navy "reject[ed] the participation from manufacturers in the Navy's efforts to alert Navy personnel to potential asbestos" is unfounded. Forman Aff. P 30 (document # 21-38). His review of naval materials showed no instance "in which the Navy, at any time during the 1930s through the 1960s, instructed or permitted a supplier of pumps to a vessel or facility [**40] to affix or provide any asbestos-related warning with its equipment." *Id.* at P 29. But, equally, he points to no instance where the Navy had occasion to consider a manufacturer's proposed asbestos warning or where it preemptively forbade such a warning. To say, then, that the Navy conclusively "rejected" manufacturers' participation in its asbestos safety practices is a mischaracterization. *Id.* at PP 20-21, 27-28 (showing only that the Navy rejected outside federal inspections of its shipyards by the U.S. Labor Department's Bureau of Labor Standards in 1941, and that it later chose to continue using asbestos). Once again, the defendants seek to transform the Navy's silence into a substantive policy judgment.

The manufacturers' theory is in many ways extraordinary. By its terms, they would be shielded anytime the government knew as much about a hazard as they knew themselves. Indeed, this theory takes government silence on a particular warning and turns it into an affirmative expression of government policy and evidence of a specific discretionary judgment. The implicit assumption is that if the government knows about a hazard, the [*148] precautions it has adopted are an exact calibration [**41] of its estimation of the risks, permitting no more and no less. This is too much to conclude from the scant guidance on asbestos that the Navy communicated to these manufacturers. In most instances, silence on a subject indicates that an issue has not been raised or decided. *Cf. Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 561, 169 L. Ed. 2d 481 (2007) ("Drawing meaning from silence is particularly inappropriate here, because Congress knows how to direct sentencing practices in express terms."); *James v. United States*, 366 U.S. 213, 220, 81 S. Ct. 1052, 6 L. Ed. 2d 246, 1961-2 C.B. 9 (1961) (warning against reading too much into legislative silence). Yet here the removing defendants ask the Court to draw exactly the opposite conclusion from the Navy's silence -- that it had considered and then rejected asbestos warnings on these products. On the record presented, the Court finds this theory insufficient to raise a colorable federal contractor defense. Silence is not the stuff of "reasonably precise" specifications.

### d. Evidence of Conflict

Finally, the defendants' efforts fail also when the Court steps back to consider the keystone of the federal contractor defense: Some genuine conflict between federal interests and the state-law duties at issue. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988). [**42] Above all, they have not adequately shown

what underlying Navy policy or priority would have prevented them from warning about asbestos altogether, as they claim. For the substantive source of this conflict, the defendants suggest that the Navy had an interest in enforcing "uniformity" across its safety protocols and also a concern that "apathy and resulting disregard of hazard[s]" would be the product of too many safety warnings. *See* Sergeant Aff. P 53; Lehman Aff. PP 10, 12; Horne Aff. P 16.

The manufacturers offer no documentary proof of these imperatives and this Court can find none. While a military concern for standardization and consistency is rational and compelling, defendants admit that the Navy had adopted safety practices for asbestos exposure and handling during the relevant period. *See, e.g.*, Forman Aff. PP 37-38, 41. Thus, uniformity could not have been a bar to manufacturer warnings where, as defendants also admit, the Navy carefully reviewed all accompanying written materials. Lehman Aff. PP 3, 5-8. This interest implies only that manufacturer warnings could have been made consistent with the precautions the Navy issued elsewhere -- not that they would have been prohibited [**43] altogether. *Id*. at P 12d. As for fear of apathy, the Court simply has no evidence that this was a controlling federal interest, apart from a single unsourced statement in Admiral Horne's affidavit. Horne Aff. P 16.

The default rule, as *Boyle* made clear, is that state law duties persist when the federal government requisitions a product from a private contractor, absent instructions to the contrary. This principle does not change when it is the military that has procured the equipment. *See Boyle, 487 U.S. at 507-08* (requiring reasonably precise specifications in order to displace state law, even where the United States Marine Corps was the procuring party). It is difficult for the Court to credit any overwhelming threat to military efficiency posed by holding manufacturers to their state-law duty to warn -- applicable in the broader marketplace -- until the government has expressed a policy against such warnings. *See id. at 510* (declining to adopt increased procurement costs as rationale for [*149] insulating all government contracts from liability).

Absent an identifiable federal interest at stake, communicated in the form of reasonably precise specifications, the Court cannot conclude that [**44] defendants have met even the generous threshold offered by the federal officer removal statute.

### C. "Acting Under" a Federal Officer

To be entitled to removal, a defendant must also show that it was a federal officer or "acting under" a federal officer. *Watson v. Philip Morris Cos., Inc., 551 U.S. 142, 127 S. Ct. 2301, 2307, 168 L. Ed. 2d 42 (2007)*. This requirement concerns the identity of those permitted to seek removal under Section 1442(a)(1); it broadly confines removal jurisdiction under this section to federal officers and their agents. For the purposes here, the Court finds that the manufacturers have satisfied this element. They have shown that they produced the equipment at issue pursuant to specific procurement requests from the Navy and under the close supervision of its employees. *See, e.g.*, Keenan Aff. PP 12-22. These facts are sufficient to establish that the defendants were "acting under" a federal officer, as the statute requires. *See Watson, 127 S. Ct. at 2308* (suggesting that "[g]overnment contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the government is an unusually close one involving detailed regulation, monitoring, [**45] or supervision"); *Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 486 (1st Cir. 1989)* (permitting removal by private telephone company that facilitated wire-tapping at the direction of federal agents).

### D. Causal Connection

The final requirement for federal officer removal is related, but far more specific: A removing defendant must show that the specific acts or omissions complained of were committed pursuant to a federal duty. That is, it must show a causal connection between its federal mandate and the very actions it now seeks to defend in federal court. The defendant seeking removal "must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty." [15] *Mesa v. California, 489 U.S. 121, 131-32, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)* (quoting

*Maryland v. Soper (No. 1), 270 U.S. 9, 33, 46 S. Ct. 185, 70 L. Ed. 449 (1926))*. In the case of a government contractor, this question is closely related to evidence supporting a colorable federal defense; in both instances, a defendant must show that it acted at the federal government's command. *See Hilbert, 529 F. Supp. 2d at 203*. But, as a jurisdictional fact, causation is judged by a somewhat stricter "reasonable probability" [**46] standard. *Amoche v. Guarantee Trust Life Ins. Co., 556 F.3d 41, 50 (1st Cir. 2009)*. Moreover, a federal contractor who acts as a governmental agent in one limited capacity will arguably have less leeway in this analysis than a federal officer who executes federal policies generally. [16] Nonetheless, proof of reasonably precise [*150] specifications would generally establish the requisite causal connection.

> 15   A federal contractor who acts as a governmental agent in one limited capacity will arguably have less leeway in this analysis than a federal officer who executes federal policies generally. *See Ryan v. Dow Chemical Co., 781 F. Supp. 934, 939 (E.D.N.Y. 1992)*.
>
> 16   A supplier of equipment may have still more difficulty compared to other types of private agents directly enlisted in government activities. Compare this case to *Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 486 (1st Cir. 1989)*, in which a phone company was sued under state law for assisting federal agents conduct a wiretapping operation.

Here, however, that causal nexus is lacking. As the Court noted at the outset, the removing defendants have offered no evidence that the Navy's position on asbestos warnings had any [**47] real bearing on their own. So far as the record shows, no Navy contractor ever sought to warn about asbestos during the relevant period; nor do the defendants claim that they considered proposing an asbestos warning to the Navy. [17] *Cf. Wyeth v. Levine, 555 U.S.    , 129 S. Ct. 1187, 1198, 173 L. Ed. 2d 51 (2009)* (noting that the defendant did not argue "that it attempted to give the kind of warning required by [state law] but was prohibited from doing so by the FDA"). Likewise, as discussed above, the Court cannot identify any specific naval regulation or broad policy statement that would have preempted an effort to warn about asbestos. Finally, the defendants might show that they included asbestos warnings with products sold in the general marketplace, but omitted those warnings on equipment supplied to the Navy. This evidence would support the inference that the Navy was responsible for any failure to warn -- but there is none. *See MIL-M-15071D §§ 1.1, 3.1.3* (permitting manufacturers to submit commercial manuals for Navy approval and review).

> 17   Mr. Lehman testified at his deposition that he could not recall any instance in which a vendor asked to put a warning on any piece of equipment. [**48] Nor could he specifically recall any contractors or vendors bringing possible asbestos health hazards to the Navy's attention. *See* Lehman Dep. at 62-63 (document # 11-4). Likewise, Mr. Schroppe conceded that he knew of no document in which the Navy forbade contractors from warning about asbestos. *See* Schroppe Dep. at 1337 (document # 11-2).

Instead, the proof the defendants offer is all but speculation: They tell the Court that if they had sought to warn, the Navy would have rejected such a proposal. This hypothetical, even if true, does not amount to causation. [18] If the manufacturers never contemplated warning about asbestos here and did not do so on their other products, it is difficult to see how the Navy "caused" them to omit such precautions. As a general matter, this element will not be hard to satisfy. It simply prevents removing defendants from imputing their own unrelated judgments to the government after the fact. Here, however, that appears to be precisely the manufacturers' rationale. As a result, the Court finds that the defendants have also failed to show a sufficient causal connection to support removal.

> 18   *Cf. Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 876 (1st Cir. 2008)* [**49] (quoting *Price Waterhouse v. Hopkins, 490 U.S. 228, 240, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)*) (examining but-for causation by assuming that the alleged cause was present and asking whether "even if that

factor had been absent, the event nevertheless would have transpired in the same way"). The Court cannot say that the manufacturers would have provided asbestos warnings even in the absence of the broad Navy prohibition they allege -- i.e., they have not shown that anything "would have been different." *Id*.

**E. Disclaimer**

In addition to their substantive objections to removal, plaintiffs have sought to plead around the federal contractor defense by disclaiming any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave, which expressly excludes U.S. Navy vessels. Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States government. [*151] Compl. P 4. Because the Court finds no basis for removal, as discussed above, it need not resolve whether such a disclaimer defeats the defendants' right to seek a federal [**50] forum under *28 U.S.C. § 1442(a)(1)*. The Court notes, however, that several other courts to consider the issue have found precisely such a disclaimer ineffective. *See, e.g., O'Connell v. Foster Wheeler Energy Corp., 544 F. Supp. 2d 51, 54 n.6 (D. Mass. 2008)*; *Machnik v. Buffalo Pumps, Inc., 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007)*.

**IV. CONCLUSION**

The defendants have shown that they were subject to many military specifications in relation to the products at issue, but quantity is no substitute for precision in the *Boyle* analysis. They have offered no Navy regulations or specifications that apply to asbestos warnings in particular and few, if any, that relate to their ability to include safety warnings more generally. In fact, the specifications governing the creation of technical manuals appear to open the door to warnings developed for products sold commercially. This evidence does not meet the requirement of "reasonably precise specifications" in the failure-to-warn context - specifications which must show a significant conflict between federal interests and state-law duties. Nor does it demonstrate that the Navy itself "caused" the defendants to omit the disputed warnings, as the [**51] federal officer removal statute requires.

For the reasons stated, this Court lacks subject-matter jurisdiction over the pending action. The plaintiffs' Motion to Remand (document # 10) is **GRANTED**.

**SO ORDERED**.

**Date: May 4, 2009**

/s/ **Nancy Gertner**

**NANCY GERTNER, U.S.D.C.**