257449

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DIVISION OF VIRGINIA
NORFOLK AND NEWPORT NEWS DIVISION

In re:  Asbestos Cases                    No. C/P 77-1
                                          E.D. Virginia


Alexandria, Va.

January 28, 1983

Deposition of:

## ADAM MARTIN,

a witness, called for examination by counsel for plaintiffs

in Virginia, pursuant to Notice and agreement of the parties

as to time and date, beginning at approximately 9:00 o'clock

a.m., at the Department of Justice, The Todd Building, 550

11th Street, Northwest, Washington, D.C., Room 1238, before

Joanne Normandin, a Notary Public in and for the District of

Columbia, when were present on behalf of the respective

parties:

Cox & Normandin
VERBATIM STENOTYPE REPORTERS
9409 Coral Lane • Alexandria Virginia 22309
(703) 360-2184

1  H. K. Porter and Southern Textile out of Virginia.
2      MR. LOKER: I'm Ford Loker. I represent Keene
3  Corporation, and I'm from Baltimore attending on behalf
4  of the counsel in Washington State.
5      MR. LONERGAN: I'm J. B. Lonergan. I'm from
6  Virginia Beach, Virginia also representing Keene Corporation.
7      MR. MILLS: I'm Robert L. Mills from Norfolk,
8  and I represent Pittsburgh Corning out of Norfolk, Virginia.
9      MR. HUDGINS: I'm Steve Hudgins from Newport News,
10 and I represent Raymark Industries.
11     MS. BAUMER: I'm Catherine Baumer from Washington,
12 D.C., Eagle-Picher Industries.
13     MR. HAGERTY: Tom Hagerty from Washington, D.C.
14 I represent Owens-Corning in the Washington State litigation.
15     MR. BONNER: Keith Bonner from Washington, D.C.
16 I represent Fibreboard.
17 WHEREUPON
18                 ADAM MARTIN
19 a witness, called for examination by counsel for the
20 plaintiffs, having been previously duly sworn, was examined
21 and testified as follows:
22
23

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. LAWLOR:

Q   Mr. Martin, would you state your full name, please?

A   Adam Martin.

Q   And your address, sir?

A   Wilkes-Barre, Pennsylvania.

Q   And what is your business address?

A   Tobyhanna Army Depot. The Packaging Center at Tobyhanna Army Depot.

Q   Do you have a business phone?

MR. GORLAND: Yes, but I don't think the phone number is material and necessary.

MR. LAWLOR: All right. Can he be reached through you, Mr. Gorland --

MR. GORLAND: He can.

MR. LAWLOR: -- if that became necessary? Thank you.

BY MR. LAWLOR: (Resumed)

Q   Could you tell us a little bit about your educational background, where you grew up and what schools you attended, sir.

A   I have a high school education and that was in Wilkes-Barre, Pennsylvania.

1    MR. GORLAND: M-O-N-M-O-U-T-H.
2    THE WITNESS: This was in New Jersey.
3    BY MR. LAWLOR: (Resumed)
4    Q    Is that a larger facility?
5    A    Not really. I was a packaging specialist at
6 Fort Monmouth, which dealt with writing packaging require-
7 ments for specifications.
8    MR. GORLAND: I didn't catch the year that you
9 went to Fort Monmouth.
10    THE WITNESS: 1976.
11    BY MR. LAWLOR: (Resumed)
12    Q    Was that the area of responsibility that you took
13 on at that time when you went to Fort Monmouth?
14    A    At that time I was writing packaging requirements
15 for specifications.
16    Q    What is the specification for packaging? Is that
17 a military standard or a spec? What type of --
18    A    Military specification.
19    Q    And how long --
20    MR. GORLAND: Did you understand the question?
21 I didn't understand the question.
22    MR. LAWLOR: Let me rephrase the question.
23

|   |   |
|---|---|
| 1 | BY MR. LAWLOR:   (Resumed) |
| 2 | Q   Had you become familiar with Military Standard |
| 3 | 129 throughout your career? |
| 4 | A   I used Military Standard 129 as a guide during |
| 5 | my inspection years. This was my marking instruction guide. |
| 6 | Q   How long did you remain at Fort Monmouth, New |
| 7 | Jersey? |
| 8 | A   Approximately four years. |
| 9 | Q   So that takes you up to about 1980? |
| 10 | A   Yes. |
| 11 | Q   Where did you go then, sir? |
| 12 | A   I came back to the Packaging Center at Tobyhanna. |
| 13 | Q   Is that where you are currently? |
| 14 | A   That's where I am now. Yes, sir. |
| 15 | Q   What are your job responsibilities there now, |
| 16 | sir? |
| 17 | A   I'm a packaging specialist in the Standardization |
| 18 | Branch. |
| 19 | Q   What are your responsibilities now, sir? |
| 20 | A   One of my responsibilities is Action Officer for |
| 21 | Military Standard 129. |
| 22 | Q   Can you explain what Action Officer means? |
| 23 | A   Action Officer in the Standardization Branch for |

1   this particular document, his duties encompass explaining
2   the document to various people upon request, to make
3   changes to the document -- these changes are made by proposals
4   or current actions -- to revise the document within
5   standardization regulations.
6       Q   You mentioned make changes to the document by
7   proposals or current actions.  Can you give us an example
8   of the type of proposals?
9       A   Well, it could be any proposal from the field,
10  departmental proposals.
11      Q   Does this include manufacturers of the goods?
12      A   A manufacturer may suggest; however, within the
13  policy of standardization an essential comment is the
14  comments that we take action on.
15      Q   And what is an essential comment?
16      A   An essential comment would be a proposal made for
17  which through coordination would be accepted by all of
18  the services.  In other words, an essential comment must
19  be acted upon, where a suggested comment doesn't carry the
20  same action.
21      Q   All right.  Mr. Martin, have we missed anything
22  with regards to your career?
23      A   Not that I know of.

FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. LAWLOR:

Q   Mr. Martin, I would like to direct your attention to the same edition of Mil Standard 129, that being Mil Standard 129(b), 10 April 1957, which Mr. Watkins showed you. I would direct your attention first to paragraph 1.4 which he earlier showed you with regards to -- and let me come around so I can look over your shoulder.

With regard to 1.4, Unauthorized Markings, would you read that aloud again, please.

A   (Witness reading from document)  "No marking shall be placed on any container other than those specified in the Standard or authorized by the cognizant activity concerned or those required by regulation or statute."

Q   All right. Directly under this exact specification Mr. Watkins had provided you, there is a 1.4.1. Would you read that into the record, please.

A   (Witness reading from document)  "Advertising matter and case marking. Unless otherwise specified herein or in the contracting order, advertising matter and case markings not interfering with the clarity of a required marking on containers will be permitted, provided that no payment of royalties directly or indirectly by the government

is involved by the inclusion of such matter."

Q   All right. Mr. Martin, does this permit unauthorized markings that do not interfere with the clarity of the required markings --

A   It wouldn't prohibit.

Q   In other words, this --

A   Unauthorized markings are defined as advertising matter.

Q   All right. So, this 1.4.1 would permit unauthorized markings which did not interfere with the required markings? Is that correct?

MR. WATKINS: I think he has answered that.

THE WITNESS: By interpretation.

BY MR. LAWLOR:   (resumed)

Q   Is that correct, sir?

A   Would you read that back, please.

(Whereupon, the pending question was read back.)

BY MR. LAWLOR:   (resumed)

Q   Perhaps I can rephrase the question.

A   Yes. I'm not sure that I understand.

Q   All right. Mr. Martin, reading 1.4.1 which is directly under 1.4 in the 1957 Mil Standard 129(b), does this provision permit unauthorized markings or advertising

1   material which does not interfere with the clarity of the
2   required markings on containers?
3           MR. GORLAND: Are you asking for his interpreta-
4   tion of the application of that as opposed to what the docu-
5   ment merely states? I'd have to make the same objection.
6           MR. LAWLOR: All right.
7           BY MR. LAWLOR: (resumed)
8   Q   Could you interpret 1.4.1.
9   A   (Witness reading from document) "No marking
10  shall be placed on a container other than those specified
11  in the Standard or authorized by the cognizant activity
12  concerned or those required by regulation or statute."
13          Unauthorized markings to an inspector on the line
14  would be advertising by contractors, RCA label.
15  Q   All right, sir. What does 1.4.1 provide? The
16  following paragraph.
17  A   (Witness reading from document) "Unless other-
18  wise specified herein contract or advertising matter and
19  case markings not interfering with the clarity of
20  required marking on container will be permitted provided
21  that no payment of royalties, directly or indirectly, by
22  the government is involved by the inclusion of such matter."
23          This has been taken out of the Standard now. At

82

that time I don't know why it was in there.

Q   All right. But at this time that provision was in the standard? Is that correct, sir? In 1957.

A   In 1957, yes.

Q   And that provision would have allowed unauthorized markings which did not interfere with the authorized markings? Is that correct?

A   Yes.

MR. LAWLOR: I think that's all the questions I have.

EXAMINATION BY COUNSEL FOR PITTSBURGH CORNING

BY MR. MILLS:

Q   Mr. Martin, what is a case marking?

A   What?

Q   What is a case marking?

MR. GORLAND: Are you asking for his interpretation of Paragraph 1.4.1's use of case marking?

MR. MILLS: All right. That will do.

BY MR. MILLS:   (resumed)

Q   What is your interpretation of 1.4.1's meaning of case markings? What do you understand a case marking to be as used in 1.4.1?

A   Case marking can be -- in the instance of FMS