# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

**HON. JOAN A. MADDEN**
**J.S.C.**

PRESENT: _____     PART _11_

_Justice_

Index Number : 190196/2010                                    INDEX NO. _____
DUMMITT, RONALD
vs.                                                          MOTION DATE _____
A.W. CHESTERTON
SEQUENCE NUMBER : 020                                        MOTION SEQ. NO. _____
TRIAL DE NOVO

The following papers, numbered 1 to _____ , were read on this motion to/for _____

Notice of Motion/Order to Show Cause — Affidavits — Exhibits    _____    | No(s). _____

Answering Affidavits — Exhibits _____    | No(s). _____

Replying Affidavits _____    | No(s). _____

Upon the foregoing papers, it is ordered that this motion is _determined in accordance with The annexed decision and order._

**FILED**

AUG 21 2012

NEW YORK
COUNTY CLERK'S OFFICE

_MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE_
_FOR THE FOLLOWING REASON(S):_

Dated: _August 20, 2012_                                    _____, J.S.C.

**HON. JOAN A. MADDEN**
J.S.C.

1. CHECK ONE: ...................................... ☒ CASE DISPOSED     ☐ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: ...........................MOTION IS: ☐ GRANTED   ☐ DENIED   ☒ GRANTED IN PART   ☐ OTHER

3. CHECK IF APPROPRIATE: ................................................. ☐ SETTLE ORDER     ☐ SUBMIT ORDER

☐ DO NOT POST     ☐ FIDUCIARY APPOINTMENT     ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 11
-------------------------------------------------------------------------X
IN RE NEW YORK CITY ASBESTOS LITIGATION
RONALD DUMMITT,                                           INDEX NO. 1090196/10

       Plaintiff,

    -against-                                           **F I L E D**

A.W. CHESTERTON, et al,

       Defendants.                                      **AUG 21 2012**
-------------------------------------------------------------------------X
JOAN A. MADDEN, J.:                                       NEW YORK
                                    COUNTY CLERK'S OFFICE

      Defendant Crane Co. (Crane) moves pursuant to CPLR 4404(a) to set aside the

judgment in favor of plaintiff and for judgment in its favor as a matter of law on the grounds that

it is not liable for the mesothelioma plaintiff Ronald Dummitt alleges he developed as a result of

exposure to asbestos while serving in the Navy.  The jury found that Crane acted recklessly in

failing to warn of the dangers of asbestos, and awarded damages of $32 million; $16 million for

past and $16 million for future pain and suffering.[1]  Specifically, Crane argues it is not liable as

it did not manufacture, supply or place into the stream of commerce any of the asbestos

containing products to which Mr. Dummitt was exposed; Mr. Dummitt was exposed to asbestos

containing products manufactured by other companies; Crane is shielded from liability based on

the government contractor defense; the Navy was a knowledgeable purchaser; the Navy's

failure to warn was a supervening cause; and there was insufficient evidence of recklessness

and insufficient evidence that any breach of a duty by Crane was a proximate cause of Mr.

Dummitt's mesothelioma.  In the event judgment is not entered in its favor, Crane moves to set

aside the verdict and for a new trial on those grounds, and on the grounds that consolidation of

---

      [1]The jury found Crane 99% responsible and defendant Elliot Turbomachinery Co., Inc.,
1% responsible.

Mr. Dummitt's case with several other cases was prejudicial; the court erred in excluding the

Navy from the verdict sheet and in its instructions with respect to the burden of proof as to

CPLR Article 16 apportionment; and the jury's failure to apportion damages to any companies

other than Crane and Elliot was against the weight of the evidence. Finally, Crane moves to set

aside the verdict of $16 million each for past and future pain and suffering on the grounds that it

is excessive.

Plaintiff opposes the motion with respect to Crane's argument that it is entitled to

judgment as a matter of law arguing that Crane bases its motion on an incorrect standard of

review, that Crane's arguments address whether there was evidence to support its contentions,

not whether there was a rational basis for the jury's verdict, the correct standard of review.

Plaintiff further argues that the evidence at trial was sufficient to support the jury's verdict, the

verdict was not excessive, and the court did not err as to the law with respect to the government

contractor defense, the burden of proof under Article 16 and in excluding the Navy from the

verdict sheet.

CPLR 4404(a) provides that "the court may set aside a verdict or any judgment entered

thereon and direct that judgment be entered in favor of a party entitled to judgment as a matter

of law or it may order a new trial . . . where the verdict is contrary to the weight of the evidence

[or] in the interests of justice." The standard for setting aside the verdict and entering judgment

for the moving party as a matter of law is whether "there is simply no valid line of reasoning and

permissible inferences which could possibly lead rational men [and women] to the conclusion

reached by the jury on the basis of the evidence presented at trial. The criteria to be applied in

making this assessment are essentially those required of a Trial Judge asked to direct a

verdict." Cohen v. Hallmark Cards, Inc, 45 NY2d 493, 499 (1978). However, "in any case in

which it can be said that the evidence is such that it would not be utterly irrational for a jury to

reach the result it has determined upon, and thus, a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence." Id.

The standard used in determining a motion to a set aside a verdict as against the weight of the evidence is "whether the evidence so preponderated in favor of [the moving party], that the verdict could not have been reached on any fair interpretation of the evidence." Lolik v. Big V Supermarkets, Inc, 86 NY2d 744, 746 (1995) (quoting Moffatt v. Moffatt, 86 AD2d 864 [2nd Dept 1982], aff'd 62 NY2d 875 [1984]). This does not involve a question of law, but rather "a discretionary balancing of many factors." Cohen v. Hallmark Cards, Inc, supra at 499.

## I. DUTY TO WARN

With respect to Crane's motion for judgment notwithstanding the verdict or in the alternative to set aside the verdict on the grounds that Crane had no duty to warn, for the reasons below, I conclude the motion should be denied. Plaintiff's theory of liability was that Crane, as a manufacturer of valves had a duty to warn of the use of defective products with its valves. Specifically, plaintiff asserted asbestos containing products, including gaskets, packing and insulation at issue here, are dangerous, and therefore defective, and that Crane knew of the dangers and knew such products would be used with its valves. Thus, plaintiff argues, Crane is liable for failing to warn of the dangers of using asbestos containing products in conjunction with its valves.

The evidence showed that during plaintiff's 17 years of service on Navy ships, he was exposed to asbestos not only from products used with Crane's valves, but also from products of other manufacturers. As to Crane, plaintiff established that he was exposed to asbestos during the maintenance and replacement of gaskets, packing and insulation used with Crane's valves. It is undisputed that plaintiff did not allege that the proof would establish that Crane manufactured or supplied either the original or replacement asbestos containing products to

3

which he was exposed. Rather, plaintiff alleged and offered proof that as to some of the valves which Crane supplied to the Navy on the ships where plaintiff served, Crane supplied, although it did not manufacture, the original asbestos containing gaskets and packing. Plaintiff also offered proof that Crane rebranded asbestos sheet gaskets as Cranite and supplied some of its valves to the Navy with such Cranite gaskets, and sold asbestos containing gaskets and replacement parts for its valves. While plaintiff conceded he could not prove that he was exposed to original or replacement asbestos containing products supplied or sold by Crane, he offered this evidence to establish that Crane knew that asbestos containing products would be used with its valves.

In addition to the foregoing, plaintiff offered evidence that Navy drawings for Crane's valves used on the ships where he served specified internal gaskets and packing, and that Navy specifications required these components to be asbestos containing. Moreover, plaintiff produced evidence through Crane's corporate representative, Anthony Pantaleoni, that Crane was aware routine maintenance of the valves required replacement of packing and gaskets, and that such maintenance would release asbestos which would be hazardous. Plaintiff also introduced evidence that Crane knew asbestos insulation would be used with its valves. As to asbestos insulation, plaintiff's evidence showed that Crane published a manual in 1925 showing the use of asbestos containing covering and cement on Crane's valves to prevent the loss of heat, Crane contributed to a 1946 Navy Machinery Manual specifying asbestos insulation for high heat applications, and Crane advertised its valves as easier to insulate. Moreover, plaintiff showed that the Navy required valves to be tested by the manufacturer with lagging, and that Crane sold asbestos insulation, advertising that it could be used to cover irregular surfaces like valves. Finally, plaintiff introduced ship records for the ships on which he served, showing that insulation work was performed on valves on the ships.

4

The Court of Appeals in Liriano v. Hobart Corp, 92 NY2d 232 (1998), explains the law of products liability and negligence as follows:

> A manufacturer who places a defective product on the market that causes injury may be liable for the ensuing injuries. A product may be defective when it contains a manufacturing flaw, is defectively designed or is not accompanied by adequate warnings for the use of the product. A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known. A manufacturer also has a duty to warn of the danger of unintended uses of a product provided these uses are reasonably foreseeable.

Id at 237 (internal citations omitted).

As stated above, plaintiff's theory of liability was that Crane's valves were defective as Crane failed to warn of the dangers of exposure to asbestos from asbestos containing products used with its valves.   Crane argues it is entitled to judgment as a matter of law, as under the New York law of products liability and negligence, a manufacturer has no duty to warn with respect to products it did not manufacture or place into the stream of commerce.  Citing Amatulli v. Delhi Construction Corp, 77 NY2d 525 (1991), Crane argues a two-step analysis is used to determine whether a defendant has a duty: first, whether defendant is responsible for placing the product into the stream of commerce; and second, whether the use of the product was foreseeable.[2]

Crane also relies on the holding in Rastelli v. Goodyear Tire & Rubber Co., 79 NY2d 289 (1992), which Crane argues stands for the proposition that based on a stream of commerce analysis, a defendant manufacturer has no duty to warn where its product is used with a

---

[2]It must be noted, in Amatulli the Court of Appeals addresses this issue in connection with a negligence claim, specifically, allegations that defendant negligently failed to warn and failed to provide adequate instructions of any potentially safer handling methods with respect to exposure by plaintiff to asbestos from her husbands work clothes. Thus, the central issue in Amatulli was whether in negligence a duty existed to a class of potential plaintiffs not previously recognized, and, not, the issue here, whether a defendant has a duty to warn of the use of its product with the defective product of another manufacturer.

defective product of another manufacturer which product defendant did not place into the stream of commerce. In Rastelli, the Court of Appeals considered plaintiff's theories of liability grounded in strict products liability and negligence.[3] At issue was whether Goodyear was liable for injuries resulting from the use of a tire that exploded when mounted on a defective multi-piece rim manufactured by another company. The Goodyear tire could be used with 24 different models of multi-piece rims out of approximately 200 types of multipiece rims sold in the United States. Id at 293, fn 1. Plaintiff argued that the tire was made for installation on a multi-piece rim, and, as Goodyear was aware of the dangers of using its tires with such rims, it had a duty to warn of the dangers of such use. Id at 297. In finding that Goodyear was not liable, the Court of Appeals determined that "[u]nder the circumstances of this case, we decline to hold that one manufacturer has a duty to warn about another manufacturer's product when the first manufacturer produces a sound product which is compatible for use with a defective product of the other manufacturer." Id at 297-298. The Court reasoned that "Goodyear had no control over the production of the subject multipiece rim, had no role in placing that rim in the stream of commerce, and derived no benefit from its sale." Id at 298.

Here, as to the existence of a duty, plaintiff relies on the legal analysis in Sawyer v. AC&S, Inc, 32 Misc3d 1237(A) (Sup Ct, NY Co, June 24, 2011, Heitler, J.) and DeFazio v. Crane Co, 2011 WL 1826856 (Sup Ct, NY Co, May 2, 2011, Heitler, J). These decisions discuss Crane's argument that it has no duty to warn under Rastelli in light of the First Department's subsequent decision in Berkowitz v. AC&S, Inc, 288 AD2d 148 (1st Dept 2001). In Berkowitz the First Department held that a manufacturer may be liable for failure to warn of the dangers of asbestos with respect to asbestos containing products it neither manufactured nor installed, but

---

[3]The decision states that the complaint set forth causes of action for negligence, strict products liability and breach of warranty, and that the Appellate Division granted Goodyear summary judgment dismissing the breach of warranty claim. Rastelli v. Goodyear Tire & Rubber Co, supra at 294.

6

which were used in conjunction with its equipment.  At issue was whether defendant

Worthington, a manufacturer of pumps used on Navy ships, was liable with respect to asbestos

containing insulation it did not supply or manufacture, but which was used with its pumps.[4]

Addressing arguments of a conflict between the decisions in Rastelli and Berkowitz,

Justice Heitler in Sawyer, found that they are neither mutually exclusive nor in conflict, and in

support of this conclusion, pointed to the following analysis in Curry v. American Standard, 201

US Dist LEXIS 142496, (SDNY Dec. 6, 2010, Gwin, J).

> The Court thus finds that a manufacturer's liability for third-party component
> parts must be determined by the degree to which injury from the component
> parts is foreseeable to the manufacturer. Accordingly, the issue of Crane's
> liability for third-party component products rests in the degree to which Crane
> could or did foresee that its own products would be used with asbestos-
> containing components. Where Crane's products merely could have been used
> with asbestos-containing components, the New York Court of Appeals holding in
> Rastelli cautions against liability.  Yet where, as in Berkowitz, Crane meant its
> products to be used with asbestos-containing components or knew that its
> products would be used with such components, the company remains potentially
> liable for injuries resulting from those third-party manufactured and installed
> components.

Id at 3.  Justice Heitler distinguished the Berkowitz and Rastelli holdings, noting that while there

---

[4]In evaluating the evidence in Berkowitz, the First Department noted Worthington's
admission that it sometimes used asbestos containing gaskets and packing, Worthington's
manual for a power plant referenced an asbestos component in one of its pumps,
specifications for the sale to the government required asbestos use, the lack of evidence that
Worthington deviated from these specifications, and the testimony of certain plaintiffs that they
observed the hand making of asbestos gaskets. Although this evidence was cited with respect
to the issue of whether the pumps contained asbestos, it is also relevant to the issue of whether
Worthington had a duty to warn, based, in part, on whether Worthington knew or should have
known its pumps would be used with asbestos containing products.
    Here, Crane attempts to distinguish Berkowitz on its facts asserting that the decision
hinged on proof that plaintiffs were exposed to asbestos containing products originally supplied
by Worthington. However, the First Department clearly stated that an issue of fact existed as to
whether the pumps contained asbestos and did not specify that this issue only referred to
asbestos containing products originally supplied by Worthington. Moreover, Crane's assertion
renders superfluous the court's holding that Wothington may have had a duty to warn of the
dangers of asbestos it neither manufactured nor installed in its pumps.

was no duty to warn in <u>Rastelli</u> "because the combination of a manufacturer's own sound product with another defective product somewhere in the stream of commerce was too attenuated to impose such a duty," in <u>Berkowitz</u>, "if the same manufacturer knew or should have known that its product would be or ought to be combined with inherently defective material for its intended use, that gives rise to a duty to warn of known dangers attached to such use." <u>Sawyer v. AC&S, Inc</u>, <u>supra</u>.

I find the reasoning in <u>Curry</u> and <u>Sawyer</u> persuasive and conclude that sufficient evidence was adduced at trial that Crane meant for its valves to be used, or knew or should have known that its valves would be used in conjunction with asbestos containing gaskets, packing and insulation to warrant a determination that Crane was potentially liable under a failure to warn theory in strict products liability and negligence. As indicated above, plaintiff offered the following proof: Crane supplied asbestos containing gaskets, packing and insulation with certain valves it supplied to the Navy on the ships where plaintiff served; Crane supplied some of its valves to the Navy with Cranite gaskets; Crane sold asbestos containing gaskets and replacement parts; Crane knew that Navy drawings for Crane's valves specified asbestos containing internal gaskets and packing; and Crane knew asbestos insulation would be used with its valves. Moreover, the evidence showed that asbestos containing gaskets, packing and insulation were routinely used with valves.

Under these circumstances, the duty is not based solely on foreseeability, or the possibility that a manufacturer's sound product may be used with a defective product so as to militate against a finding of a duty to warn. Rather, these circumstances show a connection between Crane's product and the use of the defective products, and Crane's knowledge of this connection, such that, under <u>Berkowitz</u>, Crane could be potentially liable based on a duty to warn theory as a manufacturer who meant for its product to be used with a defective product of

8

another manufacturer, or knew or should have known of such use.

In reaching this conclusion, I reject Crane's argument that under present New York law the existence of a duty requires a finding that defendant was responsible for placing the alleged injury causing product into the stream of commerce.[5] In addition to Rastelli, Crane cites two Court of Appeals decisions, Amatulli v. Delhi Construction Corp., supra and Codling v. Paglia, 32 NY2d 330 (1973). While those decisions stand for the general proposition that a manufacturer who places a defective product into the stream of commerce which causes injury may be liable for such injury, they do not address the issue here, whether a defendant may be liable for injury resulting from a defective product it did not place into the stream of commerce, but which it knew or should have known would, or which was meant to be used in conjunction with its product. The additional cases Crane cites are distinguishable on their facts. See Kazlo v. Risco, 120 Misc2d 586 (Sup Ct, Orange Co 1983) (manufacturer of a pool not liable where it was not aware that an allegedly defective ladder would be used); Passeretti v. Aurora Pump Co, 201 AD2d 475 (2nd Dept 1994) (appellant not liable where there was no evidence in the record that it had any connection with the pump in question); Porter v. LSB Industries, Inc, 192 AD2d 205 (4th Dept 1993) (trademark registrant not liable in products liability or negligence for a defective product); Curry v. Davis, 241 AD2d 924 (4th Dept 1997 ) (entity involved in Section 8 housing subsidy program not liable in strict products liability with respect to lead paint in an apartment rented through the program); D'Onofrio v. Boehlert, 221 AD2d 929 (4th Dept 1995) (trademark licensee not liable for injuries caused by a defective product); and Smith v. Johnson Products Co, 95 AD2d 675 (1st Dept 1983) (entity which did not manufacture the product in issue not liable in strict products liability).

---

[5]Notably in Rastelli, the Court of Appeals acknowledged that "[t]his is not a case where the combination of one sound product with another sound product creates a dangerous condition about which the manufacturer of each product has a duty to warn (see, Ilosky v Michelin Tire Corp, 172 WVa 435, 307 SE2d 603 [1983]." Rastelli, supra at 298.

9

Plaintiff points to the following cases as instances where courts have found that a defendant may be liable for failing to warn about an injury producing component that was neither manufactured nor supplied by defendant: Penn v. Jaros Baum & Bolles, 25 AD3d 402 (1st Dept. 2006) (manufacturer of an electrical alarm pull box and master discharge cylinders may be liable where those components initiated a discharge of gas from another manufacturer's carbon dioxide suppression system which killed plaintiff); Baum v Eco-Tec, Inc., 5 AD3d 842 (3rd Dept 2004) (defendant may be liable for injuries from the use of certain "air pipes" as "probes" regardless of whether defendant manufactured or supplied the pipes); Rogers v. Sears Roebuck & Co, 268 AD2d 245 (1st Dept 2000) (manufacturer of a grill may be liable with respect to dangers from the build-up of propane gas where its grill could not be used without a propane gas tank); Village of Groton v. Tokheim Corp., 202 AD2d 728 (3rd Dept), lv app de 84 NY2d 801 (1994) (manufacturer of a regulator has a duty to warn of the use of its regulator which caused leaks when used in an above ground fuel dispensing system without a pressure relief mechanism); and Baleno v. Jacuzzi Research, Inc, 93 AD2d 982 (4th Dept 1983) (manufacturer of a portable Jacuzzi hydrotherapy unit may be liable with respect to its use with a defectively wired outlet). Furthermore, numerous trial court decisions on the asbestos docket throughout New York, which plaintiff cites, support his position and have held that a legal duty to warn exists where the injury producing component was neither manufactured nor supplied by defendant.[6]

---

[6]Plaintiff cites the following trial court decisions: Reals v. Nicholson Steam Traps (Sup Ct, Oswego Co, Aug 8, 2011); Potter v. Crane, Index No. 138620/2010 (Sup Ct, Erie Co, March 31, 2011); Cobb v. Clark Reliance (Sup Ct, Onondaga Co, March 30, 2011); Skindell v. Air & Liquid Systems, (Sup Ct, Erie Co, March 21, 2011); Gitton v. Cran, Case No. 7:07-CV-04771 (SDNY, Dec 7, 2010); Curry v. Crane, Case No. 7:08-CV-10228 (SDNY, Dec 6, 2010); Clas v. Crane, Index No. 8338/2006 (Sup Ct, Erie Co, Oct 6, 2010); Gennone v. Crane Co, Index No. 0987/2009 (Sup Ct, Schenectady Co, June 21, 2010); Coon v. Crane, Index No. 2008-9199 (Sup Ct, Erie Co, Jan 25, 2010); Brinson v. Aurora Pumps, Index No. 51789 (Sup Ct, Warren Co, Sept 11, 2009); Stadt v. Buffalo Pumps (Sup Ct, Monroe Co, 2008); Pokorney v. Foster Wheeler, Index No. 2006-3087 (Sup Ct, Onondaga Co, 2008); and Tuttle v. Gardner Denver, Index No. 2006-5602 (Sup Ct, Oswego Co, 2007).

Since submission of this motion, a number of courts in various state and federal jurisdictions have considered this issue. In post-submission letter briefs, Crane points to the following decisions: Surre v. Foster Wheeler LLC, 831 FSupp2d 797 (SDNY 2011); Conner v. Alfa Laval, Inc, 842 FSupp2d 791 (EDPa 2012); O'Neil v. Crane Co., 266 P3d 987 (Sup Ct, Cal 2012); and In re Eighth Judicial District Asbestos Litigation (Drabczyk), 92 AD3d 1259 (4th Dept), lv app den,19 NY3d 803 (2012). Drabczyk, a Fourth Department decision, and Surre, a Federal district court decision applying New York law, although not controlling, are relevant to the discussion at bar.[7]

In Drabczyk, the court found that the trial court erred in charging the jury that defendant Fisher could be liable for decedent's exposure to asbestos contained in products used in conjunction with its valves. In a letter response, plaintiff's counsel states that his firm was trial counsel for the plaintiff in Drabczyk, and asserts that in the Drabczyk appeal, defendant Fisher only challenged its liability for external insulation applied to its valves, which insulation it did not supply.[8] Counsel asserts that at trial, Fisher conceded it was liable for replacement gaskets and packets used with its valves. As to external insulation, plaintiff's counsel argues that the facts in Drabczyk are distinguishable from the instant facts, as there was no evidence in Drabczyk that Fisher knew asbestos insulation would be used with its valves, while here, there is evidence

---

[7]The O'Neil and Conner courts held respectively that neither California nor maritime law imposes a duty to warn about the dangers arising from another manufacturer's product which it did not place into the stream of commerce, even if it is foreseeable that its product will be used in conjunction with the defective product. In O'Neil, the California Supreme Court based its conclusion on policies underlying the strict liability doctrine, noting that the doctrine "derives from judicially perceived public policy considerations and should not be expanded beyond the purview of these policies." In its analysis, the court stated that "[a]lthough an important goal of strict liability is to spread the risks and costs of injury to those most able to bear them . . . it was never the intention of the drafters of the doctrine to make the manufacturer or distributor the insurer of the safety of their products. It was never their intention to impose absolute liability." O'Neil v. Crane Co, supra (citations and quotation marks omitted).

[8]Plaintiff's counsel attaches a copy of certain pages of Fisher's appellate brief in support of this statement.

11

showing that Crane had knowledge of the use of asbestos insulation with its valves.

Plaintiff's argument is also applicable to the analysis in Surre, where the federal court applied New York law. Although the court in Surre held that Crane was not liable for the failure to warn of the dangers of external asbestos insulation applied post-sale to its boilers, it also found that there was no evidence that Crane knew or had reason to know during the period of plaintiff's exposure that asbestos insulation would be applied to its boilers. The court reasoned that Crane was not liable as it did not place the insulation into the stream of commerce, the boiler did not need asbestos insulation to function, and there was no evidence that Crane was involved in the decision to use, or specified the use of asbestos insulation with its boilers. In reaching its decision, the Surre court explicitly recognized that "where circumstances strengthen the connection between the manufacturer's product and the third party's defective one, a duty to warn may arise . . . if the third party product is necessary for the manufacturer's product to function," or "the manufacturer knows that a defective product may be used with its product." Surre, supra at 801 (citing Rogers v. Sears Rosebuck & Co, supra and Berkowitz v. AC& S Inc, supra).

As to plaintiff's argument that Crane had a duty to warn since it was foreseeable that asbestos would be used with its boilers, the court in Surre stated that "a duty to warn against the dangers of a third party's product does not arise from foreseeability alone" and relied on the decision in Tortoriello v. Bally Case, Inc, 200 AD2d 475 (1st Dept 1994). In Tortoriello, the First Department held that a manufacturer of a freezer was not liable as it played no role in selecting quarry tile for the freezer floor which plaintiff alleged contributed to causing her to fall, even though the tile was one of three types of flooring the manufacturer depicted in its literature for use in its freezer. Applying this reasoning in Tortoriello, the court in Surre held that Crane was not liable as it played no role in choosing the asbestos insulation used with its boilers. The court

12

went onto say that even if the foreseeability theory is valid, there was no evidence that Crane knew or should have known that asbestos insulation would be applied to the boilers at issue. Thus, contrary to Crane's argument, Surre is a nuanced decision and does not stand for the broad proposition that for a manufacturer to be liable it must place a product into the stream of commerce.

Assuming the accuracy of the assertions by plaintiff's counsel as to Fisher's concessions at trial and the issues Fisher appealed, the decisions in Drabczyk and Surre are not necessarily inconsistent with the conclusion reached herein.  The facts are distinguishable, as unlike the facts in Surre and Drabczyk, in the instant case there is evidence that Crane meant for its valves, or had or should have had knowledge of the use of asbestos containing gaskets, packing and insulation with its valves.  Moreover, for the reasons stated above, Crane's duty is not based on foreseeability alone, but rather on circumstances which strengthen the connection between Crane's valves and the defective gaskets, packing and insulation.

Accordingly, Crane's motion for judgment notwithstanding the verdict on the ground that it did not have a legal duty to warn of the dangers of the use of its valves with asbestos containing products it did not place into the stream of commerce, is denied.  Crane's motion to set aside the verdict as against the weight of the evidence on the same ground is also denied as there was sufficient evidence as detailed above for the jury's determination that Crane failed to comply with its duty to warn with respect to such use.

## II. EXPOSURE TO ASBESTOS FROM CRANE'S VALVES

Crane argues that plaintiff failed to produce sufficient evidence to establish that exposure to asbestos from Crane's valves was a substantial factor in causing his mesothelioma such that it is entitled to judgment notwithstanding the verdict or in the alternative, the verdict should be set aside as against the weight of the evidence.  In this regard, Crane argues its motion to strike the testimony of plaintiff's medical expert, Dr. Jacqueline Moline, should have been granted, as

13

Dr. Moline failed to establish specific causation as required under the holding in Parker v. Mobil Oil Corp., 7 NY3d 434 (2006). Pointing to Dr. Moline's testimony that she could not segregate out and analyze plaintiff's individual exposure to specific products, Crane argues that her testimony failed to establish that plaintiff was exposed to sufficient levels of asbestos from products used with Crane's valves to warrant a finding that such exposure was a substantial contributing factor in causing his mesothelioma. Crane further argues that plaintiff's expert industrial hygienist, Richard Hatfield, similarly failed to show which exposures could have been substantial contributing factors, based on his response to a single hypothetical question that "there could be some exposures there that could be substantial."

An opinion on causation "should set forth a plaintiff's exposure to a toxin, that the toxin is capable of causing the particular illness (general causation) and that plaintiff was exposed to sufficient levels of the toxin to cause the illness (specific causation)." Parker v. Mobile Oil Corp, supra at 448. However, contrary to Crane's argument, "it is not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship, provided that whatever methods an expert uses to establish causation are generally accepted in the scientific community." Id. Moreover, "so long as plaintiffs' experts have provided a 'scientific expression' of plaintiff's exposure's levels, they will have laid an adequate foundation for their opinions on specific causation." Nonnon v. City of New York, 88 AD3d 384,396 (1st Dept 2011) (quoting Jackson v. Nutmeg Technologies, Inc, 43 AD3d 599, 602 [3rd Dept 2007]).

Applying theses standards, I conclude plaintiff established legally sufficient evidence of specific causation. At the outset, I note Crane relies on isolated responses by Dr. Moline and Mr. Hatfield and fails to address the entirety of their testimony within the evidentiary and contextual framework of the trial. Significantly, Dr. Moline testified that there "is no threshold that has been determined to be safe with respect to asbestos exposure and mesothelioma"; even low doses of asbestos can cause mesothelioma; plaintiff's cumulative exposures to

14

asbestos were substantial contributing factors which caused his mesothelioma; each of the occupational exposures described contributed to causing the disease; and "there's no way of separating them [the individual exposures] out." Mr. Hatfield testified to the release of asbestos fibers into the air from the removal and replacement of gaskets, packing and insulation; the percentage of asbestos in gaskets and packing of, respectively, 60 to 85, and 15 percent; the existence of quadrillions of asbestos fibers in a standard gasket; and tests he performed showing that the removal of a gasket released from 2.3 fibers per cubic centimeter (CC) to 4.4 asbestos fibers per CC, compared to the highest measured background level of .0005, and that the removal of packing released from .2 to .3 fibers per CC.

Based on the foregoing, there is "scientific expression" of the basis for the opinions. Nonnon v. City of New York, supra at 396. Moreover, when the testimony of Dr. Moline and Mr. Hatfield is considered together with evidence that the ships on which plaintiff served contained hundreds of Crane's valves, there is legally sufficient evidence that plaintiff was exposed to asbestos while supervising routine maintenance work on Crane's valves so as to establish specific causation. See In re New York Asbestos Litigation (Marshall), 28 AD3d 255 (1st Dept 2006); Lustenring v. AC&S, Inc, 13 AD3d 69 (1st Dept 2004), lv app den 4 NY3d 708 (2005). Accordingly, Crane's motion with respect to specific causation is denied on both grounds.

## III. STATE OF THE ART

Crane argues that the state of the art evidence with respect to the dangers of exposure to asbestos from gaskets, packing and lagging pads was insufficient to establish that it had a duty to warn and, thus, its valves were not defective nor was it negligent. Crane's argument is not persuasive. I find that plaintiff established sufficient state of the art evidence that Crane knew or should have known of the dangers of asbestos exposure such that its motion for judgment notwithstanding the verdict and to set aside the verdict as against the weight of the evidence is properly denied.

15

It must first be noted that Crane's argument includes gaskets, packing and lagging pads, but primarily addresses gaskets and packing. Crane frames the issue as requiring specific publications with respect to the dangers of asbestos containing gaskets and packing, and asserts that their use was considered safe through 1978. Crane further asserts it was not until the 1990's that articles were published raising health concerns about asbestos in gaskets and packing. In support of its assertion that gaskets and packing were considered safe through 1978, Crane's relies on a table in a book published by Dr. Selikoff, whose expertise and contributions in the field of occupational medicine are discussed below; the table states that there are no health hazards in gaskets and packing used in shipyard applications.

As explained by plaintiff's state of the art expert, Dr. Barry Castleman, the information in the table is not an affirmative statement by Dr. Selikoff, but rather a republished table from a British Navy publication included in his book. Dr. Castleman also testified that while articles with measurements and data on exposure from gaskets were published in the early 1990's, he pointed to prior publications, a book written in 1942 and an article in 1961 authored by Dr. Wilhelm Hueper, who later became the head of the Environmental Cancer Section of the National Cancer Institute, which list packing and gaskets as potential sources of asbestos exposure. As indicated below, various studies and reports showed the dangers of asbestos exposure to workers where there was occupational exposure with similarities to the exposure plaintiff alleged. Moreover, Anthony Panteleoni, Crane's corporate representative, testified that Crane knew of the dangers of exposure to asbestos in the early 1970's.

Plaintiff alleged exposure between 1960 through 1977. Dr. Castleman testified to the state of the art evidence and extensive publications concerning the dangers of asbestos, including the Merriweather report published in 1930. This report detailed the dangers of exposure to asbestos dust created during work in factories and recommended dust controls

16

including adequate ventilation, exhaust ventilation, isolation of dust producing processes and the use of respirators. Although Dr. Merriweater concentrated on asbestos produced in factories, he did refer to asbestos from gaskets, packing and insulation. In addition to the Merriweather report, Dr. Castleman testified to the following reports and publications which discussed the dangers of exposure to asbestos: reports in the early 1930's of workers diagnosed with asbestosis from exposure to asbestos insulation used on pipes and boilers; an article published in the American Medical Association in the 1940's by Dr. Hueper, urging industrial management to protect workers from asbestos; a 1942 report by Warren Cook, who had written about occupational exposure to toxic substances, recommending limits on exposure to asbestos; and publications beginning in the 1930's by the National Safety Council, described as "a major industry organization," warning of dangers from asbestos dust.

Dr. Castleman also testified to numerous publications or presentations in the construction industry which discussed the dangers of asbestos, including a1936 presentation by Lanza (ph); abstracts in the Industrial Hygiene Digest in 1935, 1938 and 1949; and publications in the 1930's in the Mechanical Engineering Journal published by the American Society of Mechanical Engineers, about asbestos dust hazards and management in industry. Dr. Castleman pointed to an epidemiologic study by Breslow and co-workers published in the American Journal of Public Health finding a higher incidence of lung cancer from asbestos workers, boilermakers and steamfitters than in the control group; and a 1960 report published in the British Journal of Industrial Medicine finding that of 33 cases of mesothelioma, 32 persons had a history of occupational or environmental exposure to asbestos.

Significantly, Dr. Castleman discussed a 1964 report published in the Journal of the American Medical Association by Dr. Selikoff, a recognized expert in asbestos related occupational disease based in Mount Sinai Hospital, which details a high incidence of cancer of the lungs and pleura and deaths from asbestosis among workers who insulated and removed

17

asbestos containing pipe covering and thermal insulation; and a three-day conference held in New York in 1964 organized by Dr. Selikoff with respect to the dangers of asbestos. Thus, while the republished table and 1992 articles were some evidence to be considered by the jury, the totality of the state of the art evidence and specific references to gaskets and packing were sufficient such that Crane's motion for judgment as a matter of law and to set aside the verdict on these grounds is denied.

Crane also appears to assert that it was not negligent because the state of the art evidence shows it did not violate custom and practice.[9]  Specifically, Crane argues that "no rational juror could find a valve manufacturer could reasonably be expected to warn of the alleged hazards of asbestos containing gaskets and packing or lagging pads that a sailor may work with in an engine room on Navy ships given what was known and knowable at the times relevant to this case."  Crane points to Lancaster Silo & Block Co v. Northern Propane Gas Co, 75 AD2d 55 (4th Dept 1980), for the proposition that "[i]f a given design is within the state of the art, plaintiff can argue that a deviation from that standard is negligence." Id at 66.   While Lancaster involves both design defect and failure to warn claims, plaintiff is correct that the foregoing proposition is applicable to the design defect claim.  In any event, even if this proposition is applicable to failure to warn claims, Crane's argument is unpersuasive for the same reasons I rejected its argument that its valves were not defective based on the state of the art evidence.

Nor is Crane's argument that preclusion of questioning of Dr. Castleman and introduction of evidence of an alleged conspiracy to conceal information about the harmfulness of insulation

---

[9]Crane's argument at trial as to custom and practice was that its conduct should be judged "by looking at the circumstances in the relevant community to determine its relative culpability," and pointed to plaintiff's testimony that he did not see any warnings. Crane argued that none "of the hundreds if not thousands of suppliers to the Navy provided a warning." This argument was rejected on the grounds that Crane had a nondelegable duty and the conduct of other companies was irrelevant as to whether Crane fulfilled its duty.

18

by Johns-Manville and other insulation companies, grounds to grant Crane's motion.  Crane's

line of questioning and the evidence it offered, an internal Johns-Manville memo,[10] were properly

excluded as the issue was not Johns-Manville's knowledge, but rather the information that was

generally available to the public and within the industry.[11]  While Crane asserts that such

evidence was relevant to Johns-Manville's and certain other companies' knowledge as CPLR

Article16 entities, at trial this argument was not raised during oral argument on this issue when

Dr. Castleman was testifying.   In any event, when the Article 16 argument was made, after Dr.

Castleman completed his testimony, Crane was explicitly permitted to call Dr. Castleman as its

witness regarding any Article 16 entity including Johns-Manville.

## IV. INTERVENING CAUSE AND KNOWLEDGEABLE PURCHASER

Crane argues that the Navy was fully aware of the dangers of the potential harm of

asbestos and its failure to warn was a superceding and intervening cause of plaintiff's injuries

sufficient to break the casual chain so that Crane is not liable as a matter of law.   With respect

to this issue, the Court of Appeals has determined:

> Where the acts of a third person intervene between the defendant's conduct and
> the plaintiff's injury, the causal connection is not automatically severed.  In such
> a case, liability turns upon whether the intervening act is a normal or foreseeable
> consequence of the situation created by the defendant's negligence (see Parvi v.
> City of Kingston, 41 NY2d 553, 560; Restatement, Torts 2d, §§ 443, 449;
> Prosser, Law of Torts, § 44).  If the intervening act is extraordinary under the
> circumstances, not foreseeable in the normal course of events, or independent
> of or far removed from the defendant's conduct, it may well be a superseding act
> which breaks the causal nexus (see, e.g., Martinez v. Lazaroff, 48 NY2d 819,
> 820; Ventricelli v. Kinney System Rent A Car, 45 NY2d 950, 952; Rivera v. City
> of New York, 11 NY2d 856).

Derdiarian v. Felix Contracting Corp, 51 NY2d 308, 315 (1980).  Moreover, "[a]n intervening act

may not serve as a superceding cause, and relieve an actor of responsibility, where the risk of

---

[10]Exhibit "O."

[11] Moreover, the parties stipulated that Dr. Castleman would not testify as to a
company's specific knowledge.

the intervening act occurring is the very same risk which renders the actor negligent." Id at 316.

Here, the Navy's failure to warn was not an intervening act, as the risk of the Navy's conduct, that is, its failure to warn of the dangers of asbestos, is the same risk which renders Crane negligent.  Moreover, the Navy's failure to warn was neither extraordinary nor unforeseeable so as to break the casual nexus.  Other courts have held that it was foreseeable in the absence of warnings by Crane, that the Navy as the employer would not warn plaintiff of the dangers of asbestos.  See In re New York City Asbestos Litigation (Ronsini), supra; In re Brooklyn Navy Yard Asbestos Litigation, 971 F2d 831, 838-839 (2nd Cir 1992).

Crane's argument that the Navy was aware of the dangers of asbestos, even if true, does not relieve Crane of liability.  Crane relies on McLaughlin v. Mine Safety Appliances Co., 11 NY2d 62 (1962) and Billsborrow v. Dow Chemical USA, 177 AD2d 7 (2nd Dept 1992), which are both distinguishable on their facts.   In those cases, defendants actually provided warnings, and the issue was whether the nature of the intervener's conduct was so extraordinary that it was unforeseeable.  In McLaughlin, the Court of Appeals found that an issue existed as to whether a fireman's conduct was "so gross" as to supercede defendant's negligence, where there was evidence that the fireman had actual knowledge that certain heat blocks needed insulation, the fireman activated the blocks after removing them from their containers which had warnings against their use without insulation, and the fireman handed the uninsulated blocks to a nurse for their use and stood by as she applied them to an infant's body which resulted in severe burns.  Similarly, the Billsborrow court found that an issue existed as to whether plaintiff's employer's negligence was a superceding cause where the employer knew of the dangers of using a chlorinated solvent for cleaning a vapor degreasing machine and nonetheless failed to provide his employees with respirators, and knew plaintiff was using a mask which did not provide protection against the vapors to which he was exposed.

Crane's argument that the knowledgeable user doctrine shields it from liability is also without merit. Crane argues that since the Navy knew of the dangers of asbestos, Crane is not liable for failure to warn. The cases Crane cites are distinguishable. In Steuhl v. Home Therapy Equipment, Inc, 51 AD3d 1101 (3rd Dept 2008), the assembly of the hospital bed required the insertion of a hitch pin in the clevis pin to ensure that the head of the bed remained attached to the rest of the frame, and the dealers' trained technicians assembled the bed, not the end users. The court held that since the evidence showed that trained technicians knew this was required, the failure to warn was not a proximate cause of plaintiff's injury. Similarly, in Travelers Insurance Co v. Federal Pacific Electric Co, 211 AD2d 40 (1st Dept), lv app den 86 NY2d 712 (1995), a communications company's employees who were electricians were knowledgeable users such that a circuit breaker manufacturer had no duty to warn of the danger of failing to test the operation of a wet switchboard before putting it back in use. Crane also cites Billsboro v. Dow Chemical USA, supra, which neither analyzes nor applies the knowledgeable user doctrine, but rather references it in a footnote, and articulates intervening cause as the dispositive issue.

## V. GOVERNMENT CONTRACTOR DEFENSE

Crane argues that the Navy exercised its discretion and approved certain warnings based on Navy custom, practice and policies. Crane relies on Navy specifications "which govern everything on a ship," and Navy inspections with respect to compliance with such specifications. According to Crane, the foregoing "proves conclusively that those [Crane's] valves carried any labeling or warnings required by the government." Crane further argues that this court misconstrued the first element of the defense that the government approve reasonably precise specifications with respect to product warnings. Specifically, Crane argues that the court relied on "obsolete decisions" including In re New York Asbestos Litigation

21

(Ronsini), supra, in finding that Crane had not established that the Navy exercised its discretion in providing reasonably precise specifications conflicting with state law, and that under the law as it has evolved, citing Getz v. Boeing Co, 654 F3d 852 (9th Cir 2011), cert den 132 SCt 1582 (2012) and Faddish v. General Electric Co., 2010 WL 4146108 (ED Pa 2010), Crane was entitled to the defense.  For the reasons below, I reject Crane's arguments and conclude that based on the trial record the government contractor defense was not applicable as a matter of law, nor was an issue of fact raised for the jury's determination.

In Boyle v. United Technologies, Corp, 487 US 500 (1988), the U.S. Supreme Court recognized, in the context of a design defect claim brought under state law, that where the government exercises its discretionary function with respect to a contract provision, a contractor may be shielded from liability under state tort law.  To meet its burden of demonstrating entitlement to this defense, defendant must show that: 1) the government approved reasonably precise specifications; 2) the equipment conformed to those specifications; and 3) the supplier warned the government about the dangers of that were known to the supplier but not to the government. Id at 513.  The defense is limited to circumstances where the state tort law duty poses a significant conflict with the duties imposed under a federal contract. Id at 507.

For claims based on failure to warn, a defendant must show governmental control over the nature of the warnings, compliance with governmental directions, and communications to the government of all product dangers known to the contractor but not known to the government. See Densberger v. United Technologies Corp, 297 F3d 66, note 11 (2nd Cir 2002), cert den 537 US 1147 (2003) (citing In re Joint Eastern & Southern District New York Asbestos Litigation (Grispo), 897 F2d 626 [2nd Cir 1990]).  In Grispo, the court held that "Boyle's requirement of government approval of 'reasonably precise specifications' mandates that the federal duties be imposed upon the contractor.  The contractor must show that whatever

22

warnings accompanied a product resulted from a determination of a government official . . . and thus that the Government itself 'dictated' the content of the warnings meant to accompany the product" (emphasis in original). Id at 630.

Here, the issue is whether the evidence Crane presented as to its valves demonstrated that Navy specifications contained warnings or labeling requirements limiting information such that Crane established the Navy exercised its discretion and the specifications conflicted with state law. Crane points to the testimony of retired Navy officers, Admiral Sargent and Doctor Forman[12] that the Navy required standardization of all equipment used on its ships, and that military specifications (specifications) were issued for all equipment so that the same set of specifications could be invoked in different contracts. According to Admiral Sargent, Navy specifications are "regulatory" and not "prohibitive," so that the specifications would not "proscribe," but rather require compliance with the specification; if the equipment did not comply with the specification, it would be rejected.

The evidence indicated that contracts with individual vendors would invoke certain specifications applicable to the contracted for equipment. Although testimony indicated that contracts are stored in the national archives, Crane did not introduce relevant contracts nor, with one exception, specifications applicable to Crane's valves. Crane introduced and questioned Admiral Sargent about a specification for a specific type of Crane valve described as a "stop and stop check, globe, angle and wide pattern" valve.[13] Asked about a section of the specification which detailed the labeling information required on the valve's identification plates, Admiral Sargent testified that he has seen this type of information in various specifications applying to valves; the plates on valves are called label plates; a "10 list items" of information

_____

[12]The witnesses were called respectively by Crane and defendant Elliot Turbo Machinery Co., Inc.     .

[13]Exhibit "N."

23

were required, including the manufacture's name, and size and class of the valve; Navy

inspections ensured compliance with these labeling requirements; and if the label plate did not

conform to the labeling requirements, it would be rejected.   Of significance to the extent of

information on the label plate, was Admiral Sargent's testimony that this specification

incorporated specification 15071 which required caution and warnings and labels under certain

circumstances.  Admiral Sargent was further questioned about a specification providing for

information regarding safe handling, operation and maintenance on an identification plate for

mechanical electronic equipment, and agreed there was space on the plate for such

information; he also agreed that some specifications referenced instruction manuals which

included safety precautions, and that such specifications applied to some complex hydraulic

valves, albeit not the type of valve at issue here.  When asked if he knew as to valves generally

whether the Navy provided additional space on plates for information regarding the safe

handling and maintenance of the equipment, Admiral Sargent testified that "[w]hat I know is

what I saw today and that was the one spec, the particular one Mr. King showed me for valves,

did not have anything like that in it."

       With respect to the requirement that contractual specifications conflict with state law,

the First Department has held that no basis exists for the government contractor defense "[i]n

the absence of any evidence of a conflict between State warning requirements and any Federal

prescription of label information or proscription of a warning."  In re New York Asbestos

Litigation (Ronsini), supra at 251.  Under this standard, I conclude that Crane has not

established it was entitled to this defense as it failed to establish that the Navy prescribed or

proscribed any specific warnings with respect to its valves.  The one specification introduced for

a  "stop and stop check, globe, angle and wide pattern" valve merely established information

required on the label plate as to that one type of valve and did not establish that the Navy either

dictated or proscribed the contents of any warnings as to that type of valve or to Crane's valves generally. This conclusion is supported by the evidence that under certain circumstances the Navy not only permitted, but required, cautions and warnings as to other types of equipment. Thus, Crane has failed to establish that the Navy exercised its discretion as to warnings or that there was a conflict with state warning requirements.

Nor has Crane shown entitlement under the law as articulated in Getz v. Boeing Co, supra. In Getz, while the Federal appellate court rejected plaintiffs' argument that its prior decisions limited the government contractor defense to cases where the government specifically forbids warnings or dictates the contents of the warnings, the court stated that to establish the first element of the defense, a contractor must show that "the government exercised its discretion and approved certain warnings." Id at 866  This means that the contractor  "must demonstrate that the government approved reasonably precise specifications thereby limiting the contractor's ability to comply with its duty to warn." Id at 866-867 (citations and internal quotation marks omitted). The court found that the government exercised its discretion when the Army selected "a complete set of warnings" in the Operator's Manual for the MH-47E Chinook helicopter in issue. Id at 867.[14]   Here, Crane does not assert nor does the evidence support a finding that the Navy exercised its discretion and selected a complete set of warnings as did the Army in Getz,

Crane also relies on Faddish v. General Electric Co, supra.  In Faddish, the Federal district court stated that to satisfy the first prong, a contractor "must show something more than reasonably precise specifications" and  "must produce evidence that the United States Government 'dictated the content of the warnings' by producing military specifications

_____

[14]The court cited Tate v. Boeing Helicopters, 55 F3d 1150, 1157 (6th Cir 1995) ("[W]here the government goes beyond approval and actually determines for itself the warnings to be provided, the contractor has surely satisfied the first condition because the government exercised its discretion.")

'discuss[ing] product warnings' and 'placing limit[s] upon any additional information a manufacturer may have wished to convey to those using the product.'" Id at 7, 8 (quoting In re Joint Eastern & Southern District New York Asbestos Litigation (Grispo), supra). The court specifically found that the contractor, General Electric, established that the Navy exercised its discretion regarding "the type and content of warnings" that could be placed on General Electric's turbines,[15] as the Navy "was intimately involved with both the labeling of the equipment on its ships and the manufacturer-produced information that was allowed to accompany any product." Id at 8.[16]   In contrast, here, as discussed above, Crane has not established that the Navy exercised its discretion as to warnings; at best, Crane established that the Navy was involved in labeling of the valves.

Crane also argues that this Court's evidentiary ruling precluding its Navy witness from testifying that if Crane had attempted to place warnings on its valves, such warnings would have been rejected, prevented Crane from establishing that the Navy exercised its discretion. This evidence was properly excluded as it was undisputed that Crane never attempted to warn the Navy, and the opinion of the Navy witness was based on pure speculation as Crane offered no specific Navy regulation or protocol to support this conclusion other than the witness's generalized opinions of what the Navy would have done had Crane warned the Navy about the dangers of asbestos of which it knew but the Navy did not.

---

[15]The court cited, *inter alia,* evidence that drawings for nameplates, instruction manuals and every other document relating to the construction, maintenance and operation of the vessel were approved by the Navy and this control included decisions of what warning should or should not be included; the absence of space on the label plate  for the equipment in issue for a warning; technical manuals for certain types of equipment which, if approved, could include warnings; and the apparent rejection of the willingness of a manufacturer of asbestos insulation to provide a statement of precautions to be taken.

[16]In reaching this conclusion, with respect to the issue of proscription, the court noted that the prevailing view is that "an independent contractor does not have to show an express government prohibition on all warnings but rather must establish that the government exercised its discretion regarding warnings to be placed on defendant's products." Faddish, supra at 9.

26

## VI. PROXIMATE CAUSE

Crane argues that plaintiff failed to establish proximate cause, as the Navy would not have permitted a warning on its valves. Crane also argues that there was no evidence that a warning would have made its way to plaintiff since, *inter alia*, the Navy would not have permitted the warnings, was aware of the dangers of asbestos, and in certain instances used warning signs and distributed respiratory protection to shipyard workers, but did not provide the same protections to plaintiff. This argument in is without merit and recasts many of Crane's arguments with respect to the government contractor defense.

Significantly, plaintiff explicitly and clearly testified that had he seen warnings, he would have acted differently to protect himself. The jury was able to evaluate this aspect of plaintiff's testimony together with his testimony regarding his recollection of the various equipment and manufacturers, his knowledge of maintenance routines and procedures, the manner in which he was exposed, and the manner in which he performed his duties. Plaintiff's testimony is further supported by his testimony that as to certain equipment, there were instruction manuals which he consulted; such testimony is consistent with the evidence discussed above that some specifications referenced technical manuals which contained cautions and warnings. When plaintiff's testimony is considered together with this evidence, there is a valid line of reasoning, as well as permissible inferences for the jury to have concluded that Crane's failure to warn was a proximate cause of plaintiff's developing mesothelioma.

To the extent Crane asserts that the Navy would not have permitted warnings, for the reasons stated with respect to the government contractor defense, Crane's assertion is based on speculation and is insufficient to grant judgment notwithstanding the verdict or to set aside the verdict. Finally, as to Crane's argument that even if it had provided warnings, plaintiff would have developed mesothelioma from other "intense exposures," such argument is without

27

foundation in law and is an attempt to exempt Crane from liability based on the actions of others.

## VII. RECKLESSNESS

Crane argues that plaintiff failed to properly plead recklessness as an exception to CPLR Article 16. As a threshold issue, Crane failed to raise this objection during trial or at oral argument with respect to the charge on recklessness, and first raised this issue in its written motion for a directed verdict submitted after oral argument and after the court's decision denying the motion. Thus, the objection is unpreserved. In any event, while CPLR 1603 requires a plaintiff to allege and prove the applicability of one or more of the exemptions provided in CPLR 1601 or 1602, "the primary function of a pleading is to apprise an adverse party of the pleader's claim," Cole v. Mandell Food Stores, Inc, 93 NY2d 34 (1999), and to "afford defendant sufficient 'notice of such assertion so that it could prepare its defense or adjust its trial strategy.'" Roseboro v. New York City Transit Authority, 286 AD2d 222 (1st Dept), app dism 97 NY2d 676 (2001) (quoting Cole v. Mandell Food Stores, Inc, supra).

Crane claims that it was prejudiced by an inability to prepare a defense, and cites as an example of such inability, "not asking witnesses questions on these issues." Such claim is belied by the record which indicates that Crane was aware that recklessness was alleged and during trial argued that certain evidence was relevant to this issue. Furthermore, paragraph 90 of the complaint alleges that plaintiff's disabilities are "the direct and proximate result of . . . [defendant's] demonstrated wanton and reckless disregard for his/her safety and well being." Under these circumstances, even if the objection were preserved for review, viewing the complaint in light of Crane's awareness that recklessness was asserted, and the lack of prejudice or surprise, Crane's motion to set aside the reckless finding on this ground is denied.

As to the standard to be applied where reckless conduct is alleged, the Court of Appeals has "[a]dopted a gross negligence standard, requiring that 'the actor has intentionally done an

28

act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow,' and has done so with conscious indifference to the outcome." In re New York City Asbestos Litigation (Maltese), 89 NY2d 955 (1997) (quoting Saarinen v. Kerr, 84 NY2d 494, 501 [1994]). Here, the evidence showed the following: Crane's valves were on the ships on which plaintiff served; on some of those ships, the majority of valves were manufactured by Crane; Navy specifications required asbestos containing gaskets and packing; some of Crane's valves were shipped to the Navy with such asbestos containing gaskets and packing, although plaintiff did not allege that he was exposed to asbestos from such gaskets or packing; the valves required routine maintenance and replacement of gaskets and packing which released asbestos fibers into the air; and Crane did not test its valves as to the release of such fibers.

There was also evidence of Crane's access to and knowledge of the dangers of asbestos in the 1930's through its membership in various trade associations, and in particular through the participation of Crane's employees in associations that published articles identifying exposure to asbestos as the cause of asbestosis and lung disease in workers. This evidence included the participation of Crane's medical employees in the Illinois Manufacturing Association which published the Industrial Review, a journal containing articles about legislation to compensate workers who developed asbestosis. Moreover, a Crane employee was a director of AAIPS which published an article entitled "Dusty Death," that identified asbestosis as a cause of lung disease in workers. Crane's president was also a member of ASME, which published the journal Mechanical Engineering identifying the hazards of asbestos (articles include "Dust In Industry, Silicosis & Asbestosis" and "Toxic Dusts, Their Origins and Sources in 23 Various Industries"). Finally Crane was a member of the IHT which issued digests of occupational diseases including abstracts regarding the dangers of asbestos.

29

Giving plaintiff the benefit of all favorable inferences, this evidence supports an inference that Crane had knowledge in the 1930's and 1940's of the dangers of asbestos, well before plaintiff's exposure in the 1960's. This knowledge and Crane's failure to test its valves for release of asbestos during maintenance and repairs, together with an inference of Crane's knowledge that asbestos insulated gaskets and packing would be used with its valves, establish sufficient evidence from which a jury could infer that in failing to warn, Crane acted intentionally concerning a known risk with conscious indifference as to harm that was highly probable. See In re Eighth Judicial District Asbestos Litigation (Drabczyk), supra; In re New York City Asbestos Litigation (D'Ulisse), 16 Misc3d 945 (Sup Ct, NY Co 2007); Hamilton v. Garlock, Inc, 96 FSupp2d 352 (SD NY 2000); In re Asbestos Litigation (Greff, McPadden, Ciletti), 986 FSupp 761 (SD NY 1997).

## VIII. CONSOLIDATION

Crane moves for a new trial on the ground that the consolidation of plaintiff's case with six other in extremis cases from the October 2010 In Extremis Calendar was improper and prejudicial. Principally, Crane complains of the length of jury selection; the length of the trial which it asserts resulted in a depleted number of qualified jurors in the jury pool; the reduction in the number of plaintiffs and defendants from seven to two plaintiffs and from over fifteen to three defendants; and the lack of commonality of occupations, work sites and diseases of the two remaining cases, the Dummitt and Konstantin cases.[17] Crane's arguments are without merit.

As to the length of jury selection and the trial, regardless of the number of plaintiffs and defendants, asbestos trials are by nature complex and lengthy. Furthermore, as explained in the decision granting consolidation, historically, in New York County, asbestos cases have been

---

[17]Konstantin v. A.W. Chesterton, Index No. 190134/10, Sup Ct, NY Co.

consolidated for trial. The consolidation decision details the court's consideration of the factors delineated in Malcolm v. National Gypsum Co., 995 F2d 346, 350 (2nd Cir 1993). In any event, with respect to the remaining plaintiffs, Mr. Dummitt and Mr. Konstantin, there was sufficient similarity of occupations as both alleged exposure due to work, which in the case of Mr. Dummitt involved the repair and maintenance of equipment, and in the case of Mr. Konstantin, involved the sanding of joint compound during construction work. Moreover, the nature of exposure was similar, as both involved exposure while in the vicinity of work which plaintiffs alleged released asbestos fibers into the air.

Crane's assertion of prejudice based on different diseases is also without merit. While Mr. Dummitt developed pleura mesothelioma and Mr. Konstantin developed mesothelioma of the tunica vaginalis, notwithstanding that the cause of Mr. Konstantin's mesothelioma was disputed, Crane suffered no prejudice since it was undisputed that Mr. Dummitt's mesothelioma resulted from exposure to asbestos. Crane has not made any showing of prejudice resulting from the length of the trial, which was due in part to budgetary restraints restricting court hours. The length of the trial was also due in part to the number, nature and extent of Crane's objections and legal arguments which at times resulted in the continuation of a witness' testimony on non-consecutive days. Crane's further assertion of jury confusion is unsupported by the record. Throughout the trial, the jury was given instructions with respect to evidence admitted for a limited purpose or against only one defendant. The jury was also provided with separate and detailed verdict sheets for each plaintiff. Accordingly, Crane's motion to set aside the verdict based on the consolidation of the cases for trial is denied.

## IX. THE NAVY AS A CPLR ARTICLE 16 ENTITY

Crane argues that the Navy should have been included on the verdict sheet for the purposes of CPLR Article16 apportionment, as principles of sovereign immunity under the *Feres* doctrine and the relevant provisions of the Federal Tort Claims Act (FTCA) apply to

subject matter jurisdiction, and do not prevent plaintiff from obtaining personal jurisdiction over

the Navy, and the fact that the Navy may be immune from liability does not prevent

consideration of its fault for Article 16 purposes.  Crane also argues a personal injury action

against the Navy was not barred by the grave injury provisions of CPLR 1601 or CPLR 1602(4),

as the Navy does not meet the definition of employer under the New York Workers'

Compensation Law (WCL), nor is the Navy subject to the WCL.

Plaintiff counters that the limitations of Article 16 are not applicable, as the Navy

cannot be a tortfeasor since it is not subject to suit under the FTCA; the federal *Feres* doctrine

bars suit by Mr. Dummitt, a former Navy employee, from suing the United States government

for personal injuries sustained during the course of service; the Navy cannot be liable as the

discretionary function exception applies; the Navy is shielded from suit under the WCL; CPLR

1601(1) precludes the Navy from being placed on the verdict sheet as plaintiff did not sustain a

grave injury within the meaning of the WCL; CPLR 1602(2)(ii) provides that a party's immunity

is not affected by Article 16; CPLR 1602(4) provides an exception in the absence of a grave

injury; and personal jurisdiction cannot be obtained over the Navy without the express

permission of Congress.  Plaintiff also asserts that the Navy has never been placed on the

verdict sheet in an asbestos action in New York, despite the defendant manufacturers' repeated

requests.

"CPLR article 16 modifies the common-law rule of joint and several liability by limiting a

joint tortfeasor's liability in certain circumstances.  Prior to article 16's enactment, a joint

tortfeasor could be held liable for the entire judgment, regardless of its share of culpability. . . .

Article 16, as enacted, limits a joint tortfeasor's liability for noneconomic losses to its

proportionate share, provided that it is 50% or less at fault.  While article 16 was

intended to remedy the inequities created by joint and several liabilities on low fault, 'deep

32

pocket' defendants, it is nonetheless subject to various exceptions that preserve the common-law rule." Rangolan v. County of Nassau, 96 NY2d 42, 46 (2001) (internal citations omitted). Here, the threshold issue is whether the following exclusions in CPLR 1601(1) apply:

> [T]he culpable conduct of any person not a party to the action shall not be considered in determining any equitable share herein if the claimant proves that with due diligence he or she was unable to obtain jurisdiction over such person in said action (or in a claim against the state, in a court of this state); and further provided that the culpable conduct of any person shall not be considered in determining any equitable share herein to the extent that action against such person is barred because the claimant has not sustained a "grave injury" as defined in section eleven of the workers' compensation law.

As discussed below, I conclude that the jurisdictional and grave injury exclusions quoted above are both applicable, and based on those exclusions the Navy is not subject to Article 16 apportionment.

With respect to the CPLR 1601(1) jurisdictional exclusion, it must be emphasized that the statute refers to jurisdiction generally without distinguishing between personal or subject matter jurisdiction. Crane's argument frames the issue narrowly as involving only a determination of personal jurisdiction. In support of this argument, Crane points to the analysis in cases where courts have held that the term "jurisdiction" in CPLR 1601(1) refers to in personam jurisdiction rather than subject matter jurisdiction. These cases include issues as to whether for Article 16 purposes, jurisdiction could be obtained in New York State Supreme Court over non-party bankrupt companies, the State of New York, and a non-party to whom the statutory bar of the WCL applied, respectively, In re New York City Asbestos Litigation (Tancredi), 194 Misc2d 214 (Sup Ct, NY Co 2002), aff'd 6 AD3d 352 (1st Dept 2004), Rezucha v. Garlock Mechanical Packing Co, Inc, 159 Misc2d 855, 860 (Sup Ct, Broome Co 1993), and Duffy v. County of Chautauqua, 225 AD2d 261 (4th Dept 1996).[18]

---

[18]Justice Freedman in Tancredi points out that the Fourth Department's construction of "jurisdiction" in Duffy is technically dicta, as the Court did not need to analyze CPLR 1601 to reach its ultimate holding that CPLR 1602 exempted the action from apportionment.

33

However, the facts in the case at bar are distinguishable from these cases and dictate a different analysis, as, here, the issues include the interrelationship of the applicability of Article 16 and principles of sovereign immunity, the FTCA, the *Feres* doctrine, and the impact of these principles on the jurisdiction of the federal and state courts. The doctrine of sovereign immunity shields the federal government and its agencies from suit. See Wake v. United States, 89 F3d 53, 57 (2ⁿᵈ Cir 1996). The FTCA is a limited waiver of sovereign immunity with respect to tort claims, including claims alleging negligence resulting in personal injury or death against the government. It provides that the federal district courts shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages. 28 USC §1346(b)(1). The FTCA allows such claims "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law where the act or omission occurred." 28 USC §1346(b)(1). Thus, under the FTCA, as to Mr. Dummitt's claims, this court does not have jurisdiction over the Navy since the federal district court has exclusive jurisdiction over such suits. Nor under the FTCA would a suit against the Navy be allowed in the absence of grave injury, since the Navy, if a private person, as Mr. Dummitt's employer, would not be subject to suit under New York's WCL.

Moreover, under the *Feres* doctrine the government is not liable under the FTCA "for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service," Feres v. United States, 340 US 135,146 (1950), and this immunity applies to plaintiff's direct claims and defendants's cross claims, see Wake v. United States, supra at 62. Significantly, here, the *Feres* doctrine is a complete bar to a suit against the Navy as plaintiff's injuries arose out of an activity incident to service in the Navy. Plaintiff cannot sue the Navy in either state or federal court, nor can he recover any damages from the Navy for his injuries. Thus, the context in which the jurisdictional issue is presented in this case, differs significantly from the context in Tancredi where the bankruptcy proceedings did not divest the court of

34

jurisdiction, in Duffy where the court had jurisdiction and the issues involved a statutory bar

under the WCL, and in Rezucha where the court had jurisdiction over the issues, and, although

the State of New York could not be sued in Supreme Court, it was subject to suit in the Court of

Claims.

I conclude that in the context of this case where the Navy is not subject to suit in federal

or state court, and where there is an absolute bar to suit against Navy, the issue of personal

jurisdiction is not dispositive, and that for Article 16 purposes, plaintiff is unable to obtain

jurisdiction over the Navy and the Navy's culpable conduct is not considered. CPLR 1601(1);

see In re 5th Judicial District Asbestos Litigation (Pokorney), Index No. 2006-3087 (Sup Ct,

Onondaga Co, July 2, 2008, McCarthy, J.). Article 16 is the "product of a painstaking balancing

of interests." Morales v. County of Nassau, 94 NY2d 218, 224 (1999). The conclusion reached

herein is consistent with the purpose of the jurisdictional exclusion of Article 16 to ensure that

plaintiff sues all tortfeasors and to exclude such non-parties over whom plaintiff is unable to

obtain jurisdiction.

Turning to the grave injury exclusion, under the FTCA, claims against the United States

for personal injury are allowable if a private person would be liable under the laws of the state

where the accident occurred. 28 USC §1346(b); see Makarova v. United States, 201 F3d 110,

113 (2nd Cir 2000). Thus, if a private person would be shielded under state law, then the United

States is also shielded. See id at 115; Cox v. United States, 881 F2d 893, 895 (10th Cir 1989).

Here, plaintiff alleges, and Crane does not dispute, that plaintiff did not suffer a grave injury

within the meaning of the WCL. Therefore, under New York law, an action against the Navy as

a private person, that is, as plaintiff's employer, would be barred under the WCL and for that

reason, the Navy's culpable conduct is not properly "considered in determining any equitable

share." CPLR 1601(1). In reaching this conclusion, I reject Crane's argument that the grave

injury exclusion does not apply because the Navy is not subject to the WCL, as such

interpretation would render meaningless the FTCA provision permitting suit against the United States where a private person would be liable under the applicable state law.

I also reject Crane's argument that the grave injury exclusion is inapplicable because the Navy is not an employer within the meaning of the WCL. As quoted above, the second exclusion in CPLR 1601(1) refers broadly to "any person" and does not limit its applicability to the definition of employer in the WCL. However, even if the WCL definition were applicable, section 2 of the WCL defines "employer" broadly as "a person, partnership association, corporation, and the legal representatives of a deceased employer . . . having one or more persons in employment, including the state, a municipal corporation, fire district or other political subdivision of the state and every authority or commission heretofore or hereafter created by the public authorities law." While this definition lists various governmental entities, it is not intended to be an exhaustive list excluding all others not specifically mentioned. Having reached the above conclusions, the additional arguments raised by plaintiff in connection with CPLR 1601(1) need not be addressed.

## X.  ARTICLE 16 BURDEN OF PROOF AND APPORTIONMENT

Crane further fails to establish grounds to set aside the verdict based on the court's instructions with respect to Crane's burden under Article 16. A defendant seeking to apportion liability to non-party companies pursuant to Article 16, has the burden of showing that the negligence of those companies was a "significant cause of plaintiff's injuries" and the "proper amount of equitable shares attributable to the other companies." In re New York Asbestos Litigation (Marshall), supra at 256 (citing Matter of New York City Asbestos Litigation (Ronsini), supra; Zalinka v. Owens-Corning Fiberglass Corp, 221 AD2d 830 [3rd Dept 1995]; Bigelow v. Acands, Inc, 196 AD2d 436 [1st Dept1993]).

Crane's reliance on the concurring opinion in Marsala v. Weinraub, 208 AD2d 689 (2nd Dept 1994) is misplaced. In Marsala, the concurrence found that a defendant seeking CPLR

36

Article 16 protection need not affirmatively offer evidence establishing a co-defendant's negligence, but once there has been a determination that more than one jointly liable tortfeasor has culpability, a defendant may rely on evidence offered by plaintiff, codefendants or other parties, in meeting its burden to prove its proportionate share. Id at 697. Thus, contrary to Crane's argument, the decision does not stand for the proposition that defendant need not affirmatively prove negligence and causation of non parties for Article 16 purposes.

Moreover, the jury's decision not to apportion liability to any of the 30 non-party tortfeasors listed on the verdict sheet, is not grounds to set aside the verdict, as a fair interpretation of the evidence supports the jury's conclusion. As to the liability of the non-party tortfeasors, the jury was asked to answer a three-part question just as it was asked to answer a three-part question with respect to Crane's liability. Specifically, the jury was asked was Mr. Dummitt exposed to asbestos containing products made, sold, distributed or applied by any of the non party companies; did any of those companies fail to exercise reasonable care by not providing an adequate warning about the potential hazards of exposure to asbestos; and were those companies' failure to warn a substantial factor in causing Mr. Dummitt's mesothelioma. The apportionment question listed a total of 32 companies, including Crane and Elliot. While the jury found that Mr. Dummit was exposed to asbestos from products made, sold, distributed or applied by 18 of the 30 listed companies, the jury found only Crane and Elliot negligent in failing to warn about the dangers of exposure to asbestos, and that their negligence was a substantial factor in causing Mr. Dummitt's injury. For the reasons stated below, a review of the relevant evidence supports a conclusion that contrary to Crane's argument, a rational view of the evidence supports the jury's findings.

The jury was instructed that a manufacturer's duty to warn extends to known dangers of asbestos or such dangers about which the manufacturer should have known concerning the use of the manufacturer's product with an asbestos containing product of another manufacturer. As

detailed above, plaintiff introduced substantial evidence of Crane's specific knowledge of the dangers of asbestos through its membership in various trade associations, the participation of Crane's officers or employees in various organizations or associations whose publications and activities addressed issues related to the dangers of asbestos in the workplace and diseases caused by asbestos exposure. This evidence included the membership of various employees and officers of Crane in the Illinois Manufacturing Association, AAIPS, ASME, and IHT, and identified numerous publications by these associations discussing occupational diseases caused by exposure to asbestos. Crane, on the other hand, failed to produce similar evidence of knowledge with respect to any of the Article 16 entitles, but instead chose to rely solely on the general state of the art evidence introduced through plaintiff's expert, Barry Castelman. The absence of evidence of knowledge specific to the Article 16 companies is a sufficient basis for the jury to have concluded that Crane did not meet its burden of showing that those companies were negligent. See In re Asbestos Litigation (Marshall), supra; Matter of New York City Asbestos Litigation (Ronsini), supra.

## XI. REMITTITUR AND SETOFF

In the instant case, the jury awarded Mr. Dummitt $16 million for past pain and suffering for 27 months, and $16 million for future pain and suffering for an estimated six months, for a total award of $32 million. Plaintiff's expert, Dr. Jacqueline Moline, described mesothelioma as a disease in which a tumor grows along the surface of the pleura of the lungs, and then grows inward and outward eventually "squeezing the lungs." According to Dr. Moline, typically, the tumor grows into the chest wall where there are numerous nerve endings; such growth causes a gnawing, burning, aching pain which can be excruciating and for which narcotic pain medication is generally given. The disease also causes increasingly severe shortness of breath, fatigue and weight loss. Dr. Moline testified that while there is no cure for mesothelioma, patients can

38

undergo extensive surgery to remove a lung and other areas impacted by the tumor, followed by radiation and or chemotherapy, and that other procedures include thoracentesis to remove fluid from the lungs.

The evidence showed that Mr. Dummitt was diagnosed with mesothelioma in March 2010 when he was 67 years old; his first symptoms appeared in May 2009; the tumor developed in his left side and at the time of trial, fluid was accumulating in his right side indicating the tumor had spread to that side; and he underwent four thoracentesises, thoracic surgery, and three courses of chemotherapy, including conventional and experimental treatments. As the disease progressed, Mr. Dummitt suffered from increasing shortness of breath, chronic "breakthrough" pain, and loss of appetite resulting in severe weight loss. Dr. Moline described "breakthrough" pain as pain which breaks through the pain medication the patient has been given. In addition, as a result of one type of pain medication he was taking, Mr. Dummitt developed severe itching throughout his body which required a change in medication. For three months after the thoracic surgery, Mr. Dummitt testified to "stabbing pain" and an inability to sleep. From the chemotherapy, Mr. Dummitt was "knocked out" for a week after each treatment, and suffered from flushing, hives, fatigue, loss of appetite and constipation. As Mr. Dummitt became increasingly debilitated, he was unable to concentrate so that it was difficult for him to read and he could no longer engage in the activities he participated in prior to being sick, including walking, gardening and driving. The evidence showed that as to the future, Mr. Dummitt's condition would continue to deteriorate as the mesothelioma spread. His pain would increase, and he would need assistance with basic functions such as getting up, getting dressed, bathing, walking and eating, and eventually he would be bed bound until death.

The amount of damages to be awarded for personal injuries is primarily a question for the jury, however, an award may be set aside "as excessive or inadequate if it deviates

39

materially from what would be reasonable compensation." CPLR 5501(c); see Ortiz v. 975 LLC,
74 AD3d 485 (1st Dept 2010).   Although CPLR 5501(c) dictates to the Appellate Division to
overturn a verdict when it materially deviates from what is considered reasonable compensation,
this standard has been held to apply to a trial court.  See Shurgan v. Tedesco, 179 AD2d 805,
806 (2nd Dept 1992).  In determining whether an award deviates from what is reasonable
compensation, courts look to comparable cases "bearing in mind that personal injury awards,
especially those for pain and suffering, are subjective opinions which are formulated without the
availability, or guidance, of precise mathematical quantification." Reed v. City of New York, 304
AD2d 1 (1st Dept), lv app den 100 NY2d 503 (2003).  However, the amount of damages awarded
or sustained in prior cases involving similar injuries is not binding on courts.  See Senko v.
Fonda, 53 AD2d 638, 639 (2nd Dept 1976).  "Modification of damages, which is a speculative
endeavor, cannot be based upon case precedent alone, because comparison of injuries in
different cases is virtually impossible."  So v. Wing Tat Realty, Inc, 259 AD2d 373, 374 (1st Dept
1999).  Moreover, courts have recognized that the amount of damages to be awarded is a
question of fact for the jury and a jury's verdict should be given considerable deference.  See
Ortiz v. 975 LLC, supra.

       Recent decisions which address the issue of the amount of damages where plaintiffs
suffered from mesothelioma have sustained awards of $3.5 million, Penn v. Amchem Products,
85 AD3d 475 (1st Dept 2011); $3 million and $4.5 million respectively for plaintiffs Noah Pride
and Bernard Mayer, In re New York Asbestos Litigation (Marshall), 28 AD3d 255 (1st Dept 2006);
and $20 million, In re New York City Asbestos Litigation (D'Ulisse),16 Misc3d 945 (Sup Ct, NY
Co 2007).  In two decisions issued in December 2011, where plaintiffs developed lung cancer
from, inter alia, exposure to asbestos, the trial court sustained awards of $8 million In re New
York City Asbestos Litigation (McCarthy), Index Number 100490/99 (Sup Ct, NY Co 2011), and

40

$6 million In re New York City Asbestos Litigation (Koczur), Index Number 122340/99 (Sup Ct, NY Co 2011).

While awards in comparable cases are a factor to be considered in an analysis of what constitutes reasonable compensation, such awards are not binding, as a precise comparison of injuries is virtually impossible. Here, Mr. Dummitt suffered for 27 months prior to trial, and the jury awarded damages for future pain and suffering for a six-month period. As discussed above, Mr. Dummitt had continuous medical treatment including four thoracentesises and thoracic surgery. He suffered severe side effects from three course of chemotherapy and had increasing shortness of breath, chronic "breakthrough" pain, and loss of appetite resulting in severe weight loss. As his condition deteriorated, Mr. Dummitt was unable to concentrate and was no longer able to engage in the activities he participated in prior to his illness.

This evidence differs as to information regarding the treatment, duration and extent of pain and suffering available from the record with respect to the plaintiffs in the above-cited cases. According to plaintiff's submission,[19] Mr. Penn, unlike Mr. Dummitt, had no treatment for a year prior to trial, only one thoracentises and tolerated chemotherapy well. As to Mr. Pride and Mr. Mayer, the jury's awards were based on past and future pain and suffering for a total of 11 months and 25 months respectively, a significant difference from the award for Mr. Dummitt which is based on a total of 33 months. Likewise, the awards in the two lung cancers cases were based on pain and suffering for periods of time less than Mr. Dummitt's 33 months; two years duration in McCarthy, and from four to six months in Koczur. The highest verdict, awarded in D'Ulisse, was based on medical treatment which, while similar to Mr. Dummitt's treatment, was

---

[19]Plaintiff's submission is based on selected testimony of Dr. Moline as to Mr. Penn's treatment and condition. Defendant's submission states that Mr. Penn's award is based on extreme suffering for three years and five months, and relies on an affirmation of an associate in plaintiff's law firm submitted with respect to a request for court approval of the adequacy of a certain settlement.

more extensive.  Mr. D'Ulisse had surgery to remove his left lung, a rib and part of his

diaphragm, followed by chemotherapy which resulted in loss of feelings in his legs, numbness of

his thighs and toes, vomiting and insomnia.  He had trouble breathing and was given oxygen and

had intense pain in his stomach.  From the radiation he couldn't swallow and he choked when he

tried to eat.  Mr. D'Ulisse also suffered from severe constipation, rectal bleeding and depression.

Taking into consideration the amount of the foregoing awards, recognizing that awards

for pain and suffering are not subject to precise mathematical quantification, and giving the jury's

verdict great deference, I conclude that based on the nature, extent and duration of Mr.

Dummitt's injuries, the awards of $16 million for past pain and suffering, and $16 million for

future pain and suffering deviate materially from what would be reasonable compensation.

Pursuant to CPLR 5501(c), the awards for past and future pain and suffering are vacated and a

new trial ordered on the issue of damages unless plaintiff within 30 days of service of a copy of

this decision and order with notice of entry stipulates to reduce the awards to $5.5 million for

past pain and suffering, and $2.5 million for future pain and suffering.

Turning to the issue of set-offs pursuant to General Obligations Law §15-108, plaintiff

and defendant agree that the verdict must be reduced by the amount plaintiff has received in

settlement.  Plaintiff also agrees the verdict must be reduced by a "stipulated amount" or the

actual receipt of compensation from bankruptcy trusts.  However, plaintiff disagrees that the

amount of set-off should include potential claims against bankruptcy trusts.  The record does not

reveal whether there are such potential claims and thus, whether this issue is properly before the

court.  Under these circumstances, the parties shall appear for a conference with the court

regarding this issue.

Accordingly, it is

ORDERED that the motion of defendant Crane Co. for judgment notwithstanding the

verdict is denied; and it is further

42

ORDERED that the motion of defendant Crane Co. to set aside the verdict is granted only to the extent of vacating the awards of $16 million for past pain and suffering and $16 million for future pain and suffering, and ordering a new trial on the issue of damages unless plaintiff within 30 days of service of a copy of this decision and order with notice of entry stipulates to reduce the awards to $5.5 million for past pain and suffering and $2.5 million for future pain and suffering; and it is further

ORDERED that the balance of the motion of defendant Crane Co. to set aside the verdict is denied; and it is further

ORDERED that the parties shall appear for a conference in Part 11 on September 7, 2012 at 10:00 a.m., with respect to the issue of set-off.

DATED: August 20, 2012

ENTER:

_____
J.S.C.

**FILED**

AUG 21 2012

NEW YORK
COUNTY CLERK'S OFFICE

43